UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 2 2 2012

IN RE PFIZER INC. SECURITIES
LITIGATION

No. 04 Civ. 9866 (LTS)(HBP)
No. 05 MD 1688 (LTS)

------------------------------------------------------------x

## Memorandum Opinion and Order

Lead Plaintiff Teachers' Retirement System of Louisiana ("TRSL") brings this action on behalf of a putative class of investors ("Plaintiffs") who purchased or acquired Pfizer, Inc. ("Pfizer") stock between October 31, 2000 and October 19, 2005 (the "Class Period"), against Pfizer and corporate officers Henry McKinnell, John LaMattina, Karen Katen, Joseph Feczko, and Gail Cawkwell (together, the "Individual Defendants," and, with Pfizer, "Defendants"). Plaintiffs allege that Defendants violated the federal securities laws by concealing the results of medical studies concerning two Pfizer drugs, Celebrex and Bextra, and by making misstatements and omissions in their public filings and statements concerning the company. In July 2008, the Court granted in part and denied in part Defendants' motion to dismiss the Consolidated Class Action Complaint ("CCAC"). Relying on statements in the CCAC allegedly made by four former Pharmacia employees (the "Quoted Former Employees"), the Court found that Plaintiffs had adequately pleaded scienter, and sustained Plaintiffs' claims under Section 10(b), Section 20(a) and Section 20A of the Exchange Act. Defendants now move for reconsideration of the Court's July 1, 2008, Opinion and Order (the "July Opinion"), contending that the statements attributed to the Quoted Former Employees were taken out of

context and misrepresented, and that the CCAC should be dismissed. For the following reasons, the motion is denied.

## BACKGROUND

The following statements, quoted verbatim, are taken from Paragraphs 76 - 79 and 253 of the CCAC:

- Dr. John Talley, one of the developers of Celebrex and Bextra, informed Plaintiffs' counsel that senior managers were "right on top of" the clinical studies related to Celebrex in [sic] Bextra.

- Paul Dodson, the former Senior Director of Strategic Planning and Regional operations for Pharmacia, acknowledged to Plaintiffs' counsel that decisions on what drugs to bring to market and when to launch such drugs ultimately "[came] from the top." [Mr. Dodson] further stated that information on clinical trial findings would be reported to top management and would be reported with some specificity where there was "some negative effect or a problem" with the drug. He specifically noted that the cardiovascular safety profile of Celebrex was a big issue with top management and that Dr. Needleman (the director of research at Searle and Pharmacia) was the person responsible for updating top management on significant developments relating to Celebrex and Bextra.

- Krista Fox, a former Global Marketing Communications Manager at Pharmacia, explained that information regarding the clinical trials of a drug was disseminated to key decision-makers. She stated that Pharmacia, like all other companies, had a medical information group within the company that "knows the science of a drug inside and out as well as adverse events, issues and concerns relating to the drug. Anything that you are going to get out to the public as it relates to sales and marketing efforts has to go through a review committee which usually consists of legal, medical and regulatory and they are experts on the drug and they have to approve everything."

- Andrew Watson, a Senior Product Manager on the Celebrex brand, explained how the key information was known to the "brand team" decision makers. He explained that the brand team gets involved in the R&D process through the new drug application stage because "you want to think about how you're going to be able to commercialize a product when it finally comes to market, so as much involvement as you can [sic] the better." Watson acknowledged that brand teams would have been

        aware of the science behind a drug, inclusive of the R&D as well as the risks and efficacy of a brand. He further acknowledged that between the filing of a new drug application with the FDA and final FDA approval of a drug, the brand team is working with many other groups including the marketing people and the finance people in order to get the drug to market.

- At Pfizer, all the top management had knowledge of the lack of disclosure of material adverse information concerning the cardiovascular and thrombotic risks associated with Celebrex and Bextra. Plaintiffs' counsel spoke with Dr. John J. Talley, who invented Celebrex in 1993 and Bextra in 1994. Dr. Talley worked under the direction of Dr. Philip Needleman, the chief scientist and head of Pfizer's (then Searle's) research and development on selective COX-2 inhibitors. According to Dr. Talley, members of senior management were well aware of the clinical studies that were conducted on Celebrex and Bextra. Statements by former employees of Pharmacia (now Pfizer) who worked on Celebrex, Krista S. Fox, Paul V. Dodson and Andrew Watson, confirm that any negative effect or problem with a drug was reported to top management.

In its July Opinion, the Court expressly relied on these allegations, specifically quoting the statements that the CCAC attributed to Dr. John Talley, Paul Dodson, and Krista Fox to support its finding that Plaintiffs had adequately pled scienter. (See July Opinion at 23 - 24.) On July 16, 2008, Defendants filed a motion for reconsideration, arguing that the Court had erred in finding that Plaintiffs had adequately pleaded scienter. The Court denied this first motion for reconsideration on September 4, 2008, holding that Defendants' motion was an attempt to relitigate issues already considered and decided, and thus failed to satisfy the strict reconsideration standard.

Three years later, in August and September of 2011, Defendants' counsel contacted the four Quoted Former Employees in connection with Plaintiffs' pending motion for class certification. At this time, the Quoted Former Employees told Defendants' counsel that they did not recall speaking with Plaintiffs' counsel; did not recall speaking with anyone who

had identified him or herself as acting on behalf of Plaintiffs in this litigation; would not have spoken with anyone who had identified him or herself as acting on behalf of Plaintiffs in the litigation; and that, prior to speaking with Defendants' counsel, they had no knowledge of the CCAC or the use of their statements in the CCAC. (Wang Decl., Ex. 1 ¶¶ 3-4, 10-11; Ex. 2 ¶¶ 3-4; Ex. 3 ¶¶ 3-4.) In light of these revelations, Defendants moved to compel the production of documents reflecting Plaintiffs' counsel's communications with the Quoted Former Employees. Defendants thereafter discovered that the Quoted Former Employees had never spoken to Plaintiffs' counsel, but rather had spoken only to a private investigation firm retained by Plaintiffs' counsel. Defendants ultimately obtained memoranda from the private investigation firm, reflecting its interviews with the Quoted Former Employees.

Although the statements attributed to the Quoted Former Employees in the CCAC are taken verbatim from Plaintiffs' investigators' interview memos, Defendants argue that Plaintiffs' counsel ignored the portions of the interview memos that contradicted their theory of the case, and instead selectively quoted statements, out of context, to suggest inferences that contradict what the Quoted Former Employees actually said. For example, the CCAC alleges that Paul Dodson "stated that information on clinical trial findings would be reported to top management and would be reported with some specificity where there was 'some negative effect or a problem' with the drug." (CCAC ¶ 76.) The CCAC further alleges that Dodson "specifically noted that the cardiovascular safety profile of Celebrex was a big issue with top management." (Id.) According to Plaintiffs' investigator's memorandum, however, what Dodson actually said is that, "[w]hile he supposed that top managers at Pharmacia were keeping in eye on' on [sic] clinical trials that might give insight into the safety of Celebrex, it was his impression that senior officers were never really concerned that Celebrex would be shown to

have CV safety problems because no clinical trials up to that point had demonstrated CV safety issues with the drug." (Wang Decl., Ex. 9, at PFE PLTF 003111.) Defendants argue that Plaintiffs' counsel similarly misrepresented the statements attributed to the other Quoted Former Employees.

The Quoted Former Employees have reviewed their interview memos and have executed sworn declarations (the "November 2011 Declarations") concerning the statements attributed to them in the CCAC. These declarations represent that the Quoted Former Employees:

- Were surprised to learn of the existence of the litigation

- Had no knowledge of the filing of any complaint, or that the CCAC relied on statements attributed to them in alleging claims of wrongdoing against Defendants

- Were employees of Pharmacia, not Pfizer, and were never in a position to know what Pfizer or its employees knew.

- Never believed or had any evidence that there was any wrongdoing by anyone associated with Pharmacia or Pfizer, and never told anyone otherwise

- Never believed or had any evidence that any of the defendants knew of, disregarded or failed to publicize evidence that Celebrex and Bextra were unsafe, and never told anyone otherwise; and

- Believe their statements were presented to the Court in a misleading fashion.

(See Wang Decl., Exs. 41-44.)

Defendants now move again for reconsideration of the Court's July Opinion denying their motion to dismiss, arguing that the evidence produced during discovery suggests that the statements attributed to the Quoted Former Employees in the CCAC were, at best, misrepresentations, and, at worst, fraudulent. Plaintiffs' counsel's conduct, Defendants assert,

warrants reconsideration of the July Opinion, and the granting with prejudice of the Rule 12(b)(6) dismissal motion that was the subject of that decision. According to Defendants, the CCAC could not have been upheld as sufficient with respect to scienter had its allegations tracked accurately the statements of the Quoted Former Employees and, because the complaint should have been dismissed at the pre-discovery stage, Plaintiffs should not be permitted to replead with corrected statements and supplemental information garnered through discovery. Defendants also appear to invoke the inherent sanctioning power of the Court, arguing that Plaintiffs' counsel's alleged ethical violations and misrepresentations warrant dismissal of the putative class action on the merits.

DISCUSSION

Rule 54(b) provides that "any order . . . that adjudicates fewer than all of the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all of the claims." Fed. R. Civ. P. 54(b). The Court has "inherent power to correct an interlocutory ruling at any time prior to the entry of final judgment." Catskill Dev., L.L.C. v. Park Place Entertainment Corp., 217 F. Supp. 2d 423, 428 (S.D.N.Y. 2002). A court "will reconsider a prior decision in the same case if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error or to prevent manifest injustice." Id. at 429.

A court may use its inherent power to impose sanctions only if it finds that a party has acted in bad faith, and "there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." See Wolters Kluwer Financial Services, Inc. v. Scivantage, 564 F.3d 110, 114 (2d Cir. 2009). Such findings "must be supported by a high

degree of specificity in the [facts]." Id.

In support of their dismissal request, Defendants rely primarily on a decision from the Northern District of Illinois, City of Livonia Employees' Retirement System v. The Boeing Company, No. 09 C 7143, 2011 WL 824604 (N.D. Ill. Mar. 7, 2011). In Boeing, plaintiffs based their scienter pleadings in the complaint on statements allegedly made by an unnamed confidential source, who had been employed by Boeing. Relying on these statements, the court found that plaintiffs had adequately pleaded scienter, and denied defendants' motion to dismiss. In response to a motion to dismiss the complaint for fraud on the Court, plaintiffs' counsel reiterated the allegations regarding the confidential source's position at Boeing and involvement in the relevant project. The Court summarily denied the dismissal motion in reliance on counsel's representations.

During discovery, defendants' counsel learned the identity of the source, and discovered that the source had not worked at Boeing during the relevant time period; had not held the position the supposed confidential witness had occupied; denied that he was the source of the information proffered in the complaint; had no personal knowledge of the data that the defendants allegedly knew about and withheld from the public; and, prior to his meeting with defendants' counsel, had never seen the complaint. Plaintiffs proffered no evidence to support their earlier allegations regarding the confidential source's access to the relevant internal test files or knowledge of the distribution of these test results to the defendants. The court reviewed the new evidence, including the confidential source's declaration disavowing the statements attributed to him in the complaint, found that it had committed factual errors based on "plaintiffs' fundamental misrepresentations," granted defendants' motion for reconsideration of their prior motions to dismiss the complaint for failure to state a claim and for fraud on the court,

and dismissed the complaint. Opposing defendants' motion, plaintiffs argued that the court could not reconsider its prior order denying dismissal because defendants based "their present motion on facts beyond the allegations of the [complaint], in derogation of Rule 12(b)(6)." Boeing, 2011 WL 824604, at *3. The Boeing Court rejected this argument, finding that, because the underlying motion to dismiss was governed by the higher pleading standard of the PSLRA, the court could consider facts beyond the allegations of the complaint in order to determine whether the court committed errors of fact in its prior denial of defendants' motion to dismiss. Id.

To the extent the Boeing Court's decision was based on a Rule 12(b)(6) standard other than that which obliges courts to test the sufficiency of a complaint by taking the factual representations therein as true, and excluding matters outside the complaint,[1] this Court declines to apply its reasoning. As the Court explained in its July Opinion, the allegations set forth in the CCAC are sufficient to address scienter. To the extent the Boeing Court found the new evidence proffered in that case sufficient to warrant reconsideration of its denial of the earlier application for dismissal for fraud on the court, its dismissal decision is inapposite because there was no such earlier application here. Moreover, the record on the instant motion is not so stark as that apparently before the Boeing Court. Here, the CCAC represented that Plaintiffs' counsel had been involved in communications to which they were not directly party, and took -- at a minimum -- an aggressive approach to inferences, in combination with selective quotations from identified individuals. These individuals -- some five years after the fact -- disagree vehemently

---

[1] See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (to defeat a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'").

with the inferences drawn by Plaintiffs and are equivocal as to whether they made the statements attributed to them in the CCAC. Plaintiffs, in turn, proffer that there is evidence that the witnesses were not as removed from the events and reporting lines in question as they now claim, particularly in light of the witnesses involvement in co-promotion activities between Pharmacia and Pfizer with respect to the drugs in question. The situation, thus, is quite different from that in Boeing, where the court was persuaded that counsel had made fundamental factual misrepresentations, and where there was no evidence connecting the corroborating details proffered in the complaint to the individual to whom the confidential statements were attributed.

The record now before the Court is insufficient to warrant reconsideration of the decision denying the motion to dismiss the CCAC. Nor does it demonstrate clearly the level of bad faith conduct that might warrant the imposition of a terminal sanction dismissing the Plaintiffs' claims. Accordingly, Defendants' motion for reconsideration and their request for dismissal of the CCAC are denied, without prejudice to future summary judgment or other sanctions-related motion practice.

## CONCLUSION

For the foregoing reasons, Defendants' motion is denied. This Memorandum Opinion and Order resolves docket entry no. 304.

Dated: New York, New York
       March 22, 2012

_____
LAURA TAYLOR SWAIN
United States District Judge