UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x



IN RE PFIZER INC. SECURITIES
LITIGATION

This document relates to: All Actions
-------------------------------------------------------x

No.  04 Civ. 9866 (LTS)(HBP)
No.  05 MD 1688 (LTS)

<u>**OPINION**</u>

APPEARANCES:

GRANT & EISENHOFER P.A.
By: Jay W. Eisenhofer, Esq.
    Keith M. Fleischman, Esq.
    Richard S. Schiffrin, Esq.
    Stephen G. Grygiel, Esq.
    Mary S. Thomas, Esq.
    Brenda F. Szydlo, Esq.
    Michele S. Carino, Esq.
    Ned C. Weinberger, Esq.
485 Lexington Avenue, 29th Floor
New York, NY 10017

*Lead Counsel for Plaintiffs*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
By: David Kessler, Esq.
    Andrew L. Zivitz, Esq.
    Benjamin J. Sweet, Esq.
    Karen E. Reilly, Esq.
    Michelle M. Newcomer, Esq.
280 King of Prussia Road
Radnor, PA 19087

SIMPSON THACHER & BARTLETT LLP
By: Michael J. Chepiga, Esq.
    Lynn K. Neuner, Esq.
    George S. Wang, Esq.
    Lisa H. Rubin, Esq.
425 Lexington Avenue
New York, NY 10017

DLA PIPER LLP
By: John R. Wellschlager (*pro hac vice*)
6225 Smith Avenue
Baltimore, MD 21209
        - and-
    Michael D. Hynes, Esq.
    Rachel V. Stevens, Esq.
1251 Avenue of the Americas
New York, NY 10020

*Counsel for Defendants*

SEEGER WEISS LLP
By: Christopher A. Seeger, Esq.
    David R. Buchanan, Esq.
    Jeffrey S. Grand, Esq.
One William Street
New York, NY 10004

*Additional Counsel for Plaintiffs*

LAURA TAYLOR SWAIN, United States District Judge

In these putative class actions that have been consolidated in this Court by order of the Judicial Panel of Multidistrict Litigation, Lead Plaintiff Teachers' Retirement System of Louisiana ("TRSL") brings this action on behalf of investors ("Plaintiffs") who purchased or acquired Pfizer, Inc. ("Pfizer") stock between October 31, 2000, and October 19, 2005 (the "Class Period"), against Pfizer and corporate officers Henry McKinnell, John LaMattina, Karen Katen, Joseph Feczko, and Gail Cawkwell (together, the "Individual Defendants" and, with Pfizer, "Defendants"). Plaintiffs allege that Defendants violated the federal securities laws by concealing the results of studies concerning two Pfizer drugs, Celebrex and Bextra, and making misstatements and omissions in their public filings and statements concerning the company. Now before the Court is Plaintiffs' motion for: 1) certification as a class action, with a proposed main class consisting of all persons who purchased or otherwise acquired Pfizer stock between October 31, 2000 and October 19, 2005 (the "Class," and the "Class Period"); 2) certification of a sub-class consisting of all persons who purchased stock contemporaneously with sales of Pfizer stock by Individual Defendants on certain dates (the "20A Subclass"); 3) appointment of TRSL and named plaintiffs Christine Feckles ("Feckles"), Julie Perusse ("Perusse") and Alden Chace ("Chace") (together, the "Individual Plaintiffs" and, with TRSL, the "Proposed Class Representatives") as class representatives; and 4) appointment of  Grant & Eisenhofer as Class Counsel. The Court has reviewed thoroughly all of the parties' submissions and, for the following reasons, Plaintiffs' motion is granted in its entirety.

BACKGROUND

Between December 15, 2004, and June 21, 2005, several securities fraud actions were filed against Pfizer, alleging that Pfizer and its officers and directors had violated Sections

10(b), 20(a), and 20A of the Securities Exchange Act of 1934 by making material misstatements and omissions concerning the safety of two drugs, Celebrex and Bextra.  On June 16, 2005, the Judicial Panel on Multidistrict Litigation consolidated a total of 29 of these related actions for pretrial proceedings in the Southern District of New York, as In re: Pfizer Inc. Securities, Derivative & ERISA Litigation, 05 MD 01688.  On October 21, 2005, Judge Richard Owen appointed TRSL as Lead Plaintiff, and Grant & Eisenhofer as Lead Counsel in the securities actions.  Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), formerly known as Schiffrin & Barroway, serves as additional counsel.

On February 16, 2006, TRSL filed a Consolidated Class Action Complaint ("CCAC").  Defendants moved to dismiss the CCAC and, on July 1, 2008, the Court granted in part and denied in part the motion to dismiss (the "July Opinion").  In particular, the Court relied on statements in the CCAC allegedly made by four named former Pharmacia employees (the "Quoted Former Employees"), to find that Plaintiffs had adequately pleaded scienter.  On July 16, 2008, Defendants filed a motion for reconsideration, arguing that the Court erred in finding that Plaintiffs had adequately pleaded scienter.  The Court denied this first motion for reconsideration on September 4, 2008.

The Court subsequently directed the parties to conduct discovery, in order to determine whether reliable scientific evidence existed during the relevant period that showed that Celebrex or Bextra was associated with increased cardiovascular risk.  After the parties had exchanged substantial amounts of expert discovery, Defendants moved under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), to preclude Lead Plaintiffs from offering the testimony or opinions of their experts.  Lead Plaintiff similarly

moved to preclude one of Defendants' experts from offering testimony. In October 2009, the Court held a five-day <u>Daubert</u> hearing. Following the hearing, the Court denied the parties' respective motions. Discovery continued, with both parties obtaining large numbers of documents and conducting multiple depositions.

Lead Plaintiff filed this motion for class certification on March 16, 2011. While this motion was pending, Defendants filed a second motion for reconsideration of the Court's July Opinion and dismissal of the CCAC, based on new evidence that Defendants contended showed that the statements attributed to the Quoted Former Employees in the CCAC were not accurately presented and were insufficient to plead scienter. On March 22, 2012, the Court denied that motion for reconsideration. Plaintiffs also moved for leave to amend the complaint, seeking to conform their pleadings to the evidence produced in discovery. The Court granted Plaintiffs' motion on March 22, 2012.

Familiarity with the facts and arguments raised in Defendants' Motion for Reconsideration and Plaintiffs' Motion for Leave to Amend, both of which involved issues that are also raised in the instant motion practice, is presumed.


<u>DISCUSSION</u>

I.    <u>Standard of Review</u>

To certify a class, the Court must find, by a preponderance of the evidence, that the proposed class action "meets both the preconditions of Rule 23(a) and falls into one of the categories found in Rule 23(b)." <u>Koss v. Wackenhut Corp.</u>, No. 03 Civ. 7679, 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009); <u>see also</u> <u>In re Initial Pub. Offerings Sec. Litig.</u>, 471 F.3d 24, 41-42

(2d. Cir. 2006).  Rule 23 is not a "mere pleading standard"; rather, "a party seeking class certification must affirmatively demonstrate his compliance with the Rule."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).  Although district courts are "afforded substantial leeway in deciding issues of class certification," Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 238 F.R.D. 82, 92 (S.D.N.Y. 2006), a court "may not certify a class without making a ruling that each Rule 23 requirement is met . . . [and] all . . . evidence must be assessed as with any other threshold issue." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 221 (2d Cir. 2008).

II.     Rule 23(a) requirements

A class may be certified only if it satisfies the following prerequisites: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  While the Court must rigorously analyze whether each of the prerequisites of Rule 23(a) have been satisfied, it is relevant to note that Defendants do not challenge that (1) the proposed Class is sufficiently numerous; or (2) Plaintiffs' claims present common questions of law or fact.  Defendants challenge the propriety of class treatment under Rule 23(a) only with respect to only (3) – "typicality" –  and (4) – "adequacy."  For the following reasons, the Court finds that Plaintiffs have satisfied the requirements of Rule 23(a).

A.    The class is so numerous that joinder of all members is impracticable

"In securities fraud class actions . . . the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." Teachers Ret. Sys. of La. v. ACLN Ltd., No. 01 Civ. 11814, 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (internal quotations omitted).  Additionally, "numerosity is presumed when the class consists of at least 40 members."  In re Parmalat Sec. Litig, 04 MD 1653, 2008 WL 3895539, at *4 (S.D.N.Y. Aug. 21, 2008).  The record demonstrates clearly that the numerosity requirement is met.  As of March 9, 2001, there were 6,313,729,006 shares of Pfizer common stock outstanding and, as of January 31, 2001, there were approximately 202,365 record holders of Pfizer common stock.  (See Thomas Decl., Ex. 28.)  Throughout the Class Period, Pfizer's common stock was traded on the New York Stock Exchange ("NYSE") with an average weekly trading volume of millions of shares.  (See Fischel Decl. ¶ 13.)  Given the large number of outstanding Pfizer shares, the large number of record holders, and Pfizer stock's large trading volume during the Class Period, the Class satisfies Rule 23(a)'s numerosity requirement. See, e.g., Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 175 (S.D.N.Y. 2008) (numerosity requirement satisfied when defendant "had approximately 440 million shares of common stock outstanding, which traded on the New York Stock Exchange at an average daily trading volume of 1.2 million to 2.9 million shares"); In re Omnicom Group, Inc. Sec Litig., 02 Civ. 4483, 2007 WL 1280640, at *3 (S.D.N.Y. Apr. 30, 2007) (numerosity requirement satisfied where class numbered in "thousands, if not tens of thousands" and held "some 200 million shares of [defendant company's] stock").  Rule 23(a)(1) is therefore satisfied.

B.   There are questions of law and fact common to the class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While commonality "does not mean that all issues must be identical as to each [class] member, . . . it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." Cutler v. Perales, 128 F.R.D. 39, 44 (S.D.N.Y. 1989) (internal quotations omitted). In securities fraud cases, "where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." Fogarazzao v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005); see also In re Interpublic Sec. Litig., No. 02 Civ. 6527, 2003 WL 22509414, at *3 (S.D.N.Y. Nov. 6, 2003) (commonality requirement satisfied when there were issues as to whether defendants' "public filings and statements contained material misstatements, whether the defendants [acted with scienter] in misrepresenting material facts in [these] public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements"). Here, Plaintiffs have demonstrated by a preponderance of the evidence that there are common questions of law and fact going to the existence and concealment of material information relating to cardiovascular risks of Celebrex and Bextra, as well as such questions going to the impact of Defendants' alleged misrepresentations and omissions on the price of Pfizer stock at relevant times. Rule 23(a)(2) is therefore satisfied.

C.   The Proposed Class Representatives' Claims are Typical of Members of the Class

The claims asserted by the proposed class representatives must be typical of the claims of each class member. Fed. R. Civ. P. 23(a)(3). This requirement is satisfied when "each class member's claim arises from the same course of events, and each class member makes

similar legal arguments to prove the defendant's liability." <u>Parmalat</u>, 2008 WL 3895539, at *5.

However, "[t]ypicality does not . . . require that the representatives' claims be identical to those

of the class members," <u>Trief v. Dun & Bradstreet Corp.</u>, 144 F.R.D. 193, 200 (S.D.N.Y. 1992),

and so is "not defeated by minor variations in the fact patterns of individual class member's

claims." <u>Abdul-Malik v. Coombe</u>, No. 96 Civ. 1021, 1996 WL 706914, at *3 (S.D.N.Y. Dec. 6,

1996). "So long as the disputed issue of law or fact occupies essentially the same degree of

centrality to the named plainitff's claim as to that of other members in the proposed class," the

typicality requirement is satisfied. <u>Omnicom</u>, 2007 WL 1280640, at *4.

      In this case, Plaintiffs' fraud claims are premised on the fraud-on-the-market

theory outlined in <u>Basic Inc. v. Levinson</u>, which presumes that, "in an open and developed

securities market, the price of a company's stock is determined by the available material

information regarding the company and its business." 485 U.S. 224, 241 (1988). Therefore,

"misleading statements will . . . defraud purchasers of stock even if the purchasers do not

directly rely on the misstatements," <u>id.</u> at 241-42, and persons buying and selling in the efficient

market can be presumed to have relied on any such misstatements and omissions for purposes of

a fraud claim. Defendants, citing TRSL's use of outside investment managers and statements by

certain of those managers regarding factors considered in purchasing Pfizer stock, as well as

TRSL's purchase of a large proportion of its Pfizer stock after an initial corrective disclosure by

Pfizer, argue that TRSL fails to satisfy the typicality requirement because it is subject to unique

defenses. <u>See</u> <u>Rocco v. Nam Tai Electronics, Inc.</u>, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("a

named plaintiff who is subject to an arguable defense of non-reliance on the market has been

held subject to a unique defense, and therefore, atypical of the class") (internal quotations

omitted).

A court will deny class certification where a class representative may be subject to a unique defense that would "pose an unacceptable risk of drawing attention away from the central issues in [the] litigation." Omnicom, 2007 WL 1280640, at *5. However, "the unique defense rule . . . is not rigidly applied in this Circuit. Indeed, it is intended to protect plaintiff class -- not to shield defendants from potentially meritorious suit and has generally been applied only where a full defense is available against an individual plaintiff's action." Parmalat, 2008 WL 3895539, at *5 (internal quotations omitted). Defendants' issues regarding TRSL's Pfizer stock purchases present no such preclusively comprehensive defense here.

> 1.    The strategies of TRSL's outside investment advisors do not render TRSL atypical

Defendants first assert that TRSL did not directly rely on any information in the marketplace regarding Pfizer, as all of TRSL's class period investments were made through accounts maintained by fourteen outside investment advisors who "had full discretion and received no input or consultation with TRSL itself."[1] (Defendants' Opposition Brief at 40.) However, it is well established that "reliance on the advice of third parties does not, in and of itself, constitute non-reliance, so long as the third party, in turn, relied on the integrity of the market." In re Harcourt Brace Jovanovich, Inc. Sec. Litig., 838 F. Supp. 109, 114 n.4 (S.D.N.Y. 1993).

Defendants next argue that two of TRSL's investment advisors – Goldman Sachs Asset Management ("GSAM") and Atlanta Capital Management Corp ("Atlanta Capital") – did

---

[1]     As Plaintiffs correctly note, this argument contradicts Defendants' later argument that TRSL and Lead Counsel committed discovery abuses by withholding documents indicating that TRSL "itself executed trades in Pfizer common stock." (See Defendants' Opposition Brief at 27-29.)

not rely on market price when deciding to invest in Pfizer stock.[2] Defendants cite a report issued by GSAM, which acknowledged that Pfizer stock was "under pressure due to concerns over new data suggesting an increased cardiac risk linked to . . . Celebrex and Bextra." (Wang Decl., Ex. 68 at GSAM000070.) Nonetheless, GSAM decided to "maintain [its] position" in Pfizer because, while it appeared that the market was "pricing in the worst case scenario, drug withdrawal from the market," GSAM believed that Pfizer's "favorable long-term prospects, strong competitive position, robust free cash flow generation and attractive valuation" made it a sound investment. (Id.) Similarly, Defendants point to testimony from Richard England, an Atlanta Capital employee, who stated that he did not believe in the efficient market hypothesis because, if he believed in it, he "would have no purpose in [his] job." (Wang Decl., Ex. 82, England Tr. at 142:8-12.) England also testified that Atlanta Capital acquired Pfizer stock for TRSL because Atlanta Capital "believed that the sell-off [of Pfizer stock] was overdone and the attractiveness of Pfizer as an investment had not been diminished and therefore at a lower price it was perhaps even more attractive than it had been before." (Id. at 110:1-6.)

        The evidence cited by Defendants is insufficient to defeat Plaintiffs' showing that TRSL meets the typicality requirement. At most, the GSAM report and Atlanta Capital testimony show that GSAM and Atlanta Capital took market price *and* other considerations into account when deciding whether to invest in Pfizer stock.[3] See, e.g., Black v. Finantra Capital, Inc., 418 F.3d 203, 210 (2d. Cir. 2005) (fact that plaintiff "also took other considerations, such as [company's] future prospects [and] its business plan . . . into account in making his investment

---

[2]     Defendants do not suggest that any of TRSL's twelve other investment advisors did not rely on market price when deciding whether to transact in Pfizer stock.

[3]     Whether Richard England does or does not personally believe in the efficient market hypothesis is irrelevant to the Court's analysis.

decision does not foreclose a finding of material reliance upon market price"); <u>Saddle Rock Partners v. Hiatt</u>, No. 96 Civ. 9474, 2000 WL 1182793, at *4 (S.D.N.Y. Aug. 21, 2000) (possible defense that plaintiff "did not rely on the integrity of the market" when purchasing company's stock did not warrant denial of class certification motion on ground of atypicality, even though plaintiff was "gambling" and "traded on perceived market inefficiencies")[4].

A decision that is particularly instructive on this point is <u>In re WorldCom, Inc. Sec. Litig.</u>, 219 F.R.D. 267 (S.D.N.Y. 2003), where the court rejected similar arguments that plaintiffs were atypical and subject to unique defenses "because they did not rely, and cannot be presumed to have relied, on the market price for WorldCom securities," and instead "relied on the advice of highly sophisticated investment managers, relied on the assessment that the market price was not accurate but in fact understated WorldCom's value, [or] relied on computer models that replicate the portfolio of the S&P 500 Index." <u>Id.</u> at 281. The court found that each of these methods reflected "an evaluation of the publicly available information about WorldCom, whether by the named plaintiff, the advisor, or a computer model." <u>Id.</u> at 282. There was "no suggestion that any of the named plaintiffs had access to non-public information and learned that there was a fraud afoot and decided nonetheless to invest in WorldCom." <u>Id.</u> The court concluded that "none of the different strategies that these institutional plaintiffs, each of whom is a fiduciary, used to make investment decisions on behalf of their beneficiaries suggests that these plaintiffs will be vulnerable at trial to a unique defense that will defeat the presumption that they

---

[4]      The <u>Saddle Rock</u> Court also explained that class certification was warranted because Defendant raised no claim that plaintiff "was privy to any insider information concerning [the company's] prospects" or that he did not purchase "the stock at prices set by the operation of the market." 2000 WL 1182793, at *5. The court further noted that "even a successful defense rebutting reliance would still leave intact the basic issues of defendants' liability for the alleged fraud. Since these are common to all class members and central to plaintiff's claim, certification is warranted." <u>Id.</u>

relied on the public statements about WorldCom that are at issue here, or that will threaten to become the focus of the litigation." Id.  As in WorldCom, Defendants here have presented no evidence that TRSL or its advisers had access to any non-public information about the drugs at issue here; the evidence that Defendants *have* presented with respect to reliance is insufficient to render TRSL atypical and defeat its motion for class certification.

> 2.      TRSL's post-disclosure investments in Pfizer do not render it atypical

Defendants also argue that TRSL is atypical because it purchased a large percentage of its Pfizer shares between October 7, 2004, the date of the first corrective disclosure, and October 20, 2005, the end of the Proposed Class Period.[5] "[N]umerous courts have held [that] the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market . . . before the information at issue was corrected or changed." In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008); see also In re AIG Sec. Litig., 265 F.R.D. 157, 169 (S.D.N.Y. 2010) (rejecting argument that proposed class representative was atypical based on post-disclosure purchases of defendant's stock); In re Arakis Energy Corp. Securities Litig., No. 95-CV-3431, 1999 WL 1021819, at *6 (E.D.N.Y. 1999) (typicality requirement satisfied when plaintiff's "cause of action [arose] from the same factual background as the other class members and there [was] no reason to believe that a defense predicated on his purchase of options late in the class period [would] divert the trial from the main issues").

---

[5]      TRSL purchased 1,641,600 shares during this period, representing approximately 44% of TRSL's entire Pfizer purchases during the Proposed Class Period.

Rocco v. Nam Tai Electronics, Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007), the decision on which Defendants' principally rely in arguing that TRSL's post-disclosure purchases render it atypical, is inapposite.  There, the primary typicality issue presented by the plaintiffs' post-disclosure purchases was that the putative class representative also sought to pursue on behalf of the class a claim regarding a second fraud that had never publicly been disclosed and about which that putative class representative had non-public information at the time of his purchases. Id. at 136.  No such circumstances are present here.  Rather, TRSL alleges here that the market price remained affected by undisclosed further information following the corrective disclosures that were made during the Class Period.  Thus, Defendants' arguments do not establish that TRSL is subject to a unique defense, and do not alter the fundamental fact that TRSL's claims "are typical of those of absent class members [because] they allege injury resulting from the same course of conduct that injured the absent class members and are based on the same theories of recovery." In re Crazy Eddie Sec. Litig., 135 F.R.D. 39, 40 (E.D.N.Y. 1991).  The requirements of Rule 23(a)(3) are therefore satisfied.

D.    The Proposed Class Representatives will fairly and adequately protect interests of the Class

"The final prerequisite for class certification under Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the class." Harris v. Initial Sec., Inc., No. 05 Civ. 3872, 2007 WL 703868, at *5 (S.D.N.Y. Mar. 7, 2007).  Adequacy of representation is determined by applying a two-part test: (1) the proposed class representatives' interests should not be antagonistic to those of other class members; and (2) proposed class counsel should be qualified, experienced and able to conduct the litigation. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). Defendants

challenge the adequacy of both proposed class counsel and the proposed class representatives.

### 1.    Class counsel

To find counsel adequate, the Court must be comfortable that counsel has the ability and experience to effectively pursue litigation on behalf of the class. It is undisputed that Lead Counsel Grant & Eisenhofer is an experienced class action law firm and has served as lead counsel in dozens of securities fraud class actions. (See Caliendo Decl., Ex. S, Firm Biography of Grant & Eisenhofer P.A.) The record of the instant litigation demonstrates amply that Grant & Eisenhofer has devoted considerable resources to this case since it was first filed, and has effectively protected the interests of Plaintiffs and the putative class.[6] Lead Counsel investigated and filed the CCAC, successfully opposed Defendants' motion to dismiss and two motions for reconsideration, prevailed on a motion for leave to amend the complaint, appeared before the Court in a five-day Daubert hearing, and conducted extensive discovery. "The record in this case reflects the commitment and zeal of Plaintiffs' counsel to safeguard the interests of their clients." See McNamara v. Bre-X Minerals, Ltd., 97-CV-159, 2003 U.S. Dist. LEXIS 25641, at *51 (E.D. Tex. Mar. 31, 2003); see also In re Sadie S.A., Sec. Litig., 269 F.R.D. 298, 310 (S.D.N.Y. 2010) (adequacy prong satisfied when lead counsel had "been intimately involved in prosecuting [the] action from its beginning stages, including investigating the claims, filing an amended complaint, successfully defending a motion to dismiss [and] pursuing the current class action certification").

---

[6]     Lead Counsel also has a strong record of success in other cases. (See, e.g., Caliendo Decl., Ex. T at 11 (Judge Kaplan noted that Grant & Eisenhofer "did a wonderful job here for the class and were in all respects totally professional and totally prepared. I wish I had counsel this good in front of me in every case").)

Defendants' contention that Grant & Eisenhofer are inadequate rests almost exclusively on the arguments relating to use of information obtained from the Quoted Former Employees that Defendants advanced in their unsuccessful renewed motion for reconsideration and opposition to Plaintiff's motion to amend. For substantially the reasons explained in the Court's March 22, 2012, Memorandum Opinions and Orders addressing those motions, Defendants' contentions based on counsel's alleged ethical violations and misrepresentations fail here as well.

When assessing the adequacy of counsel, courts are generally skeptical of defendants' ethical attacks on class counsel. See, e.g., McNamara, 2003 U.S. Dist. LEXIS 25641, at *52-54:

> [P]ermitting defendants to police the adequacy of class representatives and their counsel is like "permitting a fox . . . to take charge of the chicken house." Eggleston v. Chicago Journeymen Plumbers' Local Union, 657 F.2d 890, 895 (7th Cir. 1981). It is in a defendant's best interests to object to class counsel who are, in fact, best suited to protect the class and represent its interests, so that the defendant can seek new class counsel who will more readily compromise the claims of the class . . . It is this presumption of strategic behavior by class action defendants that has convinced courts to preclude, or severely limit, their ability to raise alleged ethical violations in the context of class certification.

See also Hemming v. Alfin Fragrances, Inc., No. 86 Civ. 2563, 1990 WL 106997, at *3-4 (S.D.N.Y. July 25, 1990).

The contradictory assertions as to counsel's compliance with ethical standards in this regard are insufficient to demonstrate that Lead Counsel is inadequate to act in such capacity for the class. Defendants' contentions regarding ethical lapses can be better advanced in a proper disciplinary forum. See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897, 2011 WL 2581755, at *6 n. 8 (S.D.N.Y. Apr. 29, 2011) ("Defendants sometimes challenge class counsel's

adequacy on the ground of violation of professional ethics in connection with the class litigation . . . [Most courts] have directed the defendants to bring any ethical complaints they have in the proper legal disciplinary forums and have not barred class certifications grounded on any determination of the merits of such ethical complaints") (citing 1 Newberg on Class Actions Section 3:42 (4th ed.).)

Moreover, while a comparison of the CCAC and the interview memos shows that Plaintiffs quoted selectively from the Quoted Former Employees' statements and drew inferences contrary to the former employees' own assertions as to the import of the underlying information, the CCAC does not misrepresent those statements in a manner that prompts any serious questions as to counsel's competency.

Plaintiffs have met their burden of demonstrating the adequacy of their proposed Class Counsel.

### 2. Lead Plaintiff TRSL is an adequate class representative

Defendants argue that TRSL is not an adequate class representative because i) it, along with Lead Counsel, engaged in discovery abuses; and ii) it has an inappropriately close relationship with Lead Counsel. TRSL has been appointed lead plaintiff and has served as a class representative in several securities cases. In the instant action, the Court previously determined that TRSL "has extensive litigation experience, has served as lead plaintiff in multiple securities actions, and has overseen sizeable recoveries in several of these," making it "precisely the type of plaintiff envisioned under the PSLRA." In re Pfizer Sec. Litig., 233 F.R.D. 334, 338 (S.D.N.Y. 2005).

a.   The alleged discovery abuses do not render TRSL inadequate

Defendants argue that, because of its "flagrant disregard" of discovery obligations, TRSL is not an adequate class representative. (Defendants Opposition Brief at 25.) See Koss v. Wackenhut Corp., No. 03 Civ. 7679, 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009) ("Courts have . . . found class representatives inadequate when they have exhibited a disregard or inability to comply with discovery requests").

Specifically, Defendants complain that TRSL did not establish a "litigation hold" on electronic communications at the commencement of the litigation, and that it was not forthcoming about its failure to preserve electronic documents until after Defendants had moved to compel the production of emails. TRSL acknowledges that it did not implement such a hold policy under its former general counsel, and asserts that it did not do so because any documents relevant to litigation "were already being preserved either under a contract that created them or [were] covered by [State] law." (Caliendo Decl., Ex. H, Reeves Tr. at 29:16 - 30:04.) The documents that Defendants believe TRSL has withheld are any class-period emails indicating the relationship between TRSL and its money managers – specifically, to what extent TRSL had discretion as to whether to invest in Pfizer stock. TRSL's chief investment officer has testified that, because TRSL delegates any decision-making on specific investments to outside money managers, no company-specific email correspondence would be relevant to the subject of TRSL's Pfizer investments. (See Caliendo Decl., Ex. F, Griffith Tr. at 122:2 - 22, 150:20-151:2 ("in the decision process of buying Pfizer stock . . . [there was] no conversation going back between money managers and staff in any e-mail describing what and how much to purchase.") Defendants cite to a variety of documents produced in discovery to refute TRSL's argument, noting that:

TRSL's class-period contracts with several of its money managers state that the money managers had no authority to place trading orders but would solely make "recommendations" to TRSL.  (See, e.g., Wang Decl., Exs. 50-55.)

At least four of TRSL's money managers produced email communications with TRSL, illustrating that TRSL itself executed trades in Pfizer common stock during 2005.  (See Wang Decl., Exs. 56-67.)

One of TRSL's money managers produced notes reflecting a phone conversation with a TRSL investment staffer and a related 2005 e-mail exchange during which the TRSL employee asked for information about the performance of a particular stock.  (See Wang Decl., Ex. 18 at PFE SECURITIES UBS 0000579-580.)

One of TRSL's money managers - Goldman Sachs Asset Management - produced commentaries on the performance of individual stocks, including its observations, in the fourth quarter of 2004, about Pfizer.  (Wang Decl., Ex. 68 at GSAM000070.)

TRSL proffers that it used the "recommendation" language with certain of its investment advisors because TRSL, for a time, had a trading desk that performed the mechanics of certain trades (Caliendo Decl., Ex. F, 9/2/11 Griffith Tr. at 129:23-134:20; 167:4018); Ex. G, 11/3/11 Griffith Tr. at 115:4-117:22), and maintains that it did not make or participate in decisions to purchase Pfizer stock.  Thus, it asserts, no emails relevant to such decisions existed. After extensive discovery, Defendants have made no significant showing to the contrary. TRSL's technical lapse, in the context of litigation concerning stock purchased mainly in adviser-managed accounts and pursued on a fraud-on-the-market theory, and where there is no allegation that TRSL was privy to material non-public information concerning the drug testing at issue, is an insufficient basis for rejecting TRSL on the grounds of adequacy.

        b.      Defendants have not shown any disqualifying impropriety in the relationship between TRSL and Lead Counsel

Defendants argue that the longstanding relationship between TRSL and Lead Counsel prevents TRSL from exercising independent judgment on behalf of putative class.

Defendants assert that, since 2000, Lead Counsel has represented TRSL in at least fourteen class

or derivative actions, including eleven actions in which TRSL ultimately served as a lead or

representative plaintiff; that TRSL is uninformed about the instant litigation; and that Lead

Counsel has contributed to the campaign of TRSL trustee and Louisiana State Treasurer John

Neely Kennedy.  Defendants also cite allegations that, in a previous case – the Tyco securities

class action – TRSL allowed Lead Counsel to profit at the expense of absent class members.

Courts have found close business or personal relationships between class

representatives and attorneys to be grounds for disqualification, fearing that such close

relationships could lead class representatives to subordinate the interests of absent class

members to those of class counsel.  See In re IMAX Sec. Litig., 272 F.R.D. 138, 156 (S.D.N.Y.

2010) (noting concerns "that a class representative who is *closely associated* with the class

attorney would allow settlement on terms less favorable to the interests of absent class

members") (internal quotations omitted); Spagnola v. Chubb Corp., 264 F.R.D. 76, 96-97

(S.D.N.Y. 2010) (finding proposed representative inadequate when he and counsel had "known

each other for almost 40 years, having first met as officemates at a law firm their first year after

law school; they socialize often; they talk 'all the time' and visit each other's vacation homes").

Here, the fact that TRSL, a large fund, has been lead plaintiff in a number of cases prosecuted by

Lead Counsel, a prominent plaintiffs' securities firm, is not in and of itself indicative of any

improper relationship.  See, e.g., In re Am. Italian Pasta Co. Sec. Litig., No. 05-0725-CV, 2007

WL 927745, at *5 & n.4 (W.D. Mo. Mar. 26, 2007) ("[t]he existence of a prior relationship

between Lead Plaintiff and Class Counsel is not a problem" and "[i]n fact, the existence of a

prior successful relationship suggests a reasonable basis for Lead Plaintiff's selection of Class

Counsel"). Nor are the Tyco allegations, which were rejected by a trial court[7], sufficient to indicate any impropriety rendering TRSL inadequate.

Defendants' argument that TRSL is uninformed about the instant case is unsupported by the record. In his deposition, TRSL's general counsel, Roy A. Mongrue, Jr., testified that he understood the key claims being raised; had attended the Daubert hearing, reviewed the motion for class certification prior to its filing; receives written updates from Lead Counsel about the case on at least a quarterly basis; receives copies of most documents that Lead Counsel files in the case; and has discussed any questions or concerns about the case with Lead Counsel. (See generally Caliendo Decl., Ex. L.) Defendants' examples of TRSL's alleged lack of knowledge and supervision – that TRSL's chief investment officer could not link the timing of TRSL's stock purchases to Pfizer's corrective disclosures and that general counsel Mongrue was unaware of the substance of Pfizer's recent motion for reconsideration – are trivial and insufficient to establish that TRSL is an inadequate class representative. See Baffa v. Donaldson, 222 F.3d 52, 61 (2d Cir. 2000).

The contribution by Grant & Eisenhofer to TRSL Trustee Kennedy's campaign fund is likewise insufficient to undermine Plaintiffs' showing of adequacy. Plaintiffs proffer that Mr. Kennedy, who is only one member of TRSL's fifteen-member board of trustees, has had no involvement in TRSL's selection of Lead Counsel for securities litigation. (See Caliendo Decl., Ex. L, Mongrue Tr., 44-47, 289, 298-99 (testimony that Lead Counsel in this case was selected

---

[7]     The judge in Tyco denied a class member's motion to vacate counsel's fee award, and the class member has appealed the decision to the First Circuit. Another class member is prosecuting a putative class action in Delaware federal court, alleging that Lead Counsel disregarded its fiduciary duties by concealing a revised fee agreement from the class. (See Caliendo Decl., Ex. N; Wang Decl., Exs. 28 & 30.)

by TRSL's executive director based on the recommendation of TRSL's general counsel, and that the Board of Trustees played no role).)

> 3.   Individual Plaintiffs Fleckles, Perusse, and Chace are adequate class representatives

Defendants challenge the adequacy of the individual named plaintiffs as representatives, arguing that they are insufficiently familiar with the litigation.  As explained above, adequacy under Rule 23(a) requires only that (1) the proposed class representatives' interests not be antagonistic to those of other class members; and (2) their attorneys be qualified, experienced and able to conduct the litigation.  See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp, 222 F.3d 52, 60 (2d Cir. 2000).  The Court has determined that class counsel is adequate.

Nothing in the CCAC or the record before the Court indicates that the interests of the three Individual Plaintiffs are not aligned with those of absent class members.  Each of the Individual Plaintiffs alleges that he or she relied on Defendants' misrepresentations and purchased inflated shares of Pfizer common stock during the Class Period, and was consequently damaged.  See, e.g., Pennsylvania Ave. Funds v. Inyx Inc., No. 08 Civ. 6857, 2011 WL 2732544, at *5 (S.D.N.Y. July 5, 2011) (lead plaintiff's interests aligned closely with interests of the class members when "all of them purchased Inyx securities during the class Period and require[d] nearly identical factual and legal proofs to prevail on the claims asserted").

Rather than directly contesting the Individual Plaintiffs' qualifications under the two-pronged Baffa test, Defendants raise "peripheral arguments regarding the named plaintiffs' adequacy," In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 282-83 (S.D.N.Y. 2003), arguing that the Individual Plaintiffs have failed to adequately inform themselves about Lead Counsel, and that their participation in the litigation was secured through questionable means.  Courts

rarely deny class certification on the basis of the inadequacy of class representatives, doing so "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." Koss v. Wackenhut Corp., 2009 WL 928087, at *7.

 The record before the Court demonstrates that the Individual Plaintiffs have extensive knowledge of the litigation. They have testified, inter alia, as to the claims at issue, the identities of the defendants, the identities of Lead Plaintiff and Lead Counsel, procedural milestones in the case, and their fiduciary duties as class representatives. (See generally Caliendo Decl., E's. O, P, Q.) The Individual Plaintiffs have also diligently supervised the case and the conduct of counsel, and have received regular communications about case developments. (Caliendo Decl., Ex. O, Fleckles Tr. at 179:11-180:19, 202:6-203:7, 287:8-288:9; Ex. P, Perusse Tr. at 282:4-283:1, 284:20-285:22; Ex. Q, Chace Tr. at 73:2-18, 74:6-12, 105:7-106:9, 106:16-18, 124:8-24, 176:3-19, 177:21-178:17.) Such knowledge and supervision are clearly sufficient to establish the Individual Plaintiffs' adequacy. See, e.g., Baffa, 222 F.3d at 61 ("The Supreme Court [has] expressly disapproved attacks on the adequacy of a class representative based on the representative's ignorance"); Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 181 (S.D.N.Y. 2005) ("it is well established that in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected").

 Defendants' argument that the Individual Plaintiffs are inadequate because they have communicated only with Kessler Topaz, rather than with Lead Counsel, is unavailing, as the Individual Plaintiffs are well aware that Lead Counsel and Kessler Topaz are working

together to litigate this case. (See, e.g., Caliendo Decl. Ex. O, Fleckles Tr. at 270:22 - 272:19;

Ex. P, Perusse Tr. at 115:16 - 117:4; Ex. Q, Chace Tr. at 69:9 - 72:14.); see also WorldCom, 219

F.R.D. at 286-87 ( "while the defendants fault [the] named plaintiffs for deferring to lead

plaintiff and for relying on their own counsel to interact with [lead plaintiff's] counsel, these

named plaintiffs are in fact cooperating in the efficient management of the litigation").

Defendants' argument that the Individual Plaintiffs have not adequately informed themselves

about allegations of Lead Counsel's misconduct in Tyco also fails, as the Individual Plaintiffs

had no obligation to investigate court-appointed Lead Counsel, and all three Individual Plaintiffs

testified that the Tyco accusations did not change their willingness to participate in the case,

given Lead Counsel's performance to date. (See, e.g., Caliendo Decl., Ex. Q, Chace Tr. at

183:20-194:5, 186:4-12, 188:19-190:3.)

      Defendants' final argument is that Kessler Topaz improperly solicited the

Individual Plaintiffs' participation in this litigation, by mailing notice to putative class members,

including Ms. Fleckles and Ms. Perusse. (See Wang Decl., Ex. 78.) The Court's duty, in

determining the adequacy of proposed class representatives, is to "ensure that the litigation is

brought by [those] who understand[] and control[] the major decisions of the case." Sanchez v.

WalMart Stores, Inc., No. 2:06-CV-02573, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009).

As previously discussed, the extensive evidentiary record establishes that the Individual

Plaintiffs more than satisfy these criteria, and Defendants' contention -- that arguable

improprieties in the manner in which Individual Plaintiffs learned of this litigation should

disqualify them from serving as class representatives -- is baseless.

      All of the requirements of Rule 23(a) are thus satisfied.

III.     Rule 23(b) requirements

        Having established that the Rule 23(a) prerequisites to a class action are satisfied, Plaintiffs must next demonstrate that this action may be "maintained" as a class action under Rule 23(b).  Here, Lead Plaintiff seeks certification pursuant to Rule 23(b)(3), which provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Except to the extent that their arguments that Lead Plaintiff TRSL is not "typical" of the class are also relevant to the question of "predominance," (see discussion, supra at Section II(c)), Defendants do not dispute that Plaintiffs have met Rule 23(b)(3)'s requirements of predominance and superiority.

     A.     Questions of law or fact common to class members predominate over any
         questions affecting only individual members

        "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  "In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues."  In re Arakis Energy Corp. Sec. Litig., No. 95 Civ. 3431, 1999 WL 1021819, at *10 (E.D.N.Y. Apr. 27, 1999)

        Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act.  To prevail on their Section 10(b) claim, Plaintiffs must establish: (1) a material misrepresentation or

omission by defendants; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance or transaction causation; (5) economic loss; and (6) loss causation.[8]  See In re Parmalat Securities Litig., 04 MD 1653, 2008 WL 3895539, at *7.  All of these elements, other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation such as this.  See id., at *8 ("It is common ground, save for the issue of [reliance] that . . . plaintiffs' claims are predicated upon a common nucleus of facts and a common course of conduct such that each element necessary to prove defendants' allegedly fraudulent conduct is common to all class members")

Reliance is "the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).  To establish reliance, a plaintiff must show that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Fogarazzao, 263 F.R.D. at 99.  As explained above, Plaintiffs here rely on fraud-on-the-market.  Thus, their proof of reliance is class-wide as well.  In a case premised on fraud on the market, a proposed class is entitled to a presumption of reliance if the security at issue traded in an efficient market – that is, a market that "reflects all publicly available information, and, hence, any material misrepresentations." In re SCOR Holding (Switz.) AG Litig., 537 F. Supp. 2d 556, 574 (S.D.N.Y.); see also In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 481 (2d Cir. 2008) (where a defendant has "(1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-

---

[8]     Plaintiffs also allege that Defendants violated Section 20A of the Exchange Act.  To prevail on this claim, Plaintiffs must establish a predicate violation of the Exchange Act (here, the 10(b) violation), and must also show that the proposed 20A Subclass purchased Pfizer stock contemporaneously with sales by Pfizer insiders while those insiders possessed material, non-public information.

developed (i.e., efficient) market, investors' reliance on those misrepresentations may be presumed"). Plaintiffs have proffered sufficient evidence to establish that Pfizer's public statements about the safety profiles of Celebrex and Bextra were material, and that Pfizer stock traded on an efficient market.[9] Therefore, the fraud-on-the-market presumption applies[10] and Plaintiffs need not establish individualized reliance. Questions of law and fact that are common to class members thus clearly predominate over any questions affecting only individual members.

B.     A class action is superior to other methods for fairly and efficiently adjudicating the controversy

The second prong of Rule 23(b)(3) requires the Court to determine whether plaintiffs have shown that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Parmalat, 2008 WL 3895539, at *10. Defendants do not challenge superiority, and the Court independently concludes that a class action is superior in this case to other methods. In reaching its conclusion, the Court has considered a non-exhaustive list of factors including: 1) the interests of members of the class in individually controlling the

---

[9]     While the Supreme Court has not conclusively defined what constitutes an "efficient" market, several courts rely on the factors set forth in Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), when evaluating whether an efficient market exists. See, e.g., In re Xcelera.com Sec. Litig., 430 F.3d 503, 511 (1st Cir. 2005); Parmalat, 2008 WL 3895539, at *9. The Cammer factors, which are not intended to be exclusive, are as follows: 1) a large weekly trading volume; 2) the existence of significant number of analyst reports; 3) the existence of market makers and arbitrageurs in the security; 4) the eligibility of company to file an S-3 registration statement; and 5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. 711 F. Supp. at 1286-87. Plaintiffs have established that each of these factors weighs in favor of an efficient market.

[10]    Defendants have proffered no evidence to rebut the presumption.

prosecution or defense of separate actions; 2) the extent and nature of any litigation concerning the controversy already begun by or against class members; 3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and 4) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b); Parmalat, 2008 WL 3895539, at *10.

There is no indication that individual class members have any interest in prosecuting their claims separately, or that any such litigation has already commenced. Over the past seven years, this Court has become familiar with both the parties to and the subject matter of this action, and so believes that concentrating the litigation in this forum would promote judicial economy.  Finally, the Court does not foresee any difficulties in managing this case as a class action.  Therefore, the Court finds that a class action is the superior method by which to adjudicate this case.

IV.     The appropriate class period is from October 31, 2000 to October 19, 2005

Defendants argue that any class period should end no later than October 15, 2004, the date on which Pfizer disclosed the results of two clinical trials showing that Bextra had a high cardiovascular risk.  In a securities class action, the class period should end when the market is "cured" -- that is, "when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security."  In re SCOR Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556, 583 & n. 45 (S.D.N.Y. 2008) (internal quotations omitted).

It cannot be said that the market was "cured" by the October 15, 2004, announcement.  While this disclosure certainly resulted in a decline in the price of Pfizer's stock,

Plaintiffs have proffered evidence sufficient to support their class-wide claim that additional disclosures in 2005 also affected Pfizer's stock price. (See, e.g., Fischel Decl. ¶ 40; Caliendo Decl., E's. Y & Z; CCAC ¶¶ 217, 229, 231.) Accordingly, Plaintiffs have established the existence of plausible claims for the period through October 19, 2005, that present class-wide questions of law and fact, and as to which the Proposed Class Representatives are typical and adequate.

V.      Certification of the Section 20A Subclass is Warranted

For substantially the reasons discussed above with respect to the main Class, the Court finds that the proposed 20A Subclass satisfies the requirements of Rule 23(a) and (b). However, to certify a subclass under Rule 23(c)(5), plaintiff must, in addition to meeting the requirements of Rule 23(a) and (b), show that the subclass is appropriate either to "expedite resolution of the case by segregating a distinct legal issue that is common to some members of the existing class," or to protect class members against intra-class conflicts, such as where "class members assert divergent claims based on non-overlapping factual circumstances, harms and systemic failures." Casale v. Kelly, 257 F.R.D. 396, 408-09 (S.D.N.Y. 2009).

Defendants argue that the Court should not certify the proposed 20A Subclass, because Plaintiffs' Section 20A claims are inextricably entwined with their Section 10(b) claims. However, the Proposed 20A Subclass must prove additional, distinct legal elements, beyond those which the Section 10(b) plaintiffs must prove. Specifically, in order to recover, members of the proposed 20A Subclass must, in addition to proving a predicate violation of the Exchange Act under 10(b), establish that they purchased Pfizer stock contemporaneously with a sale by an Individual Defendant, and that the Individual Defendant was in possession of material nonpublic

information at the time of the sale. <u>See</u> 15 U.S.C. § 78t-1. Therefore, a distinct legal issue is presented and subclass certification is appropriate to expedite resolution of the case.

C<small>ONCLUSION</small>

For the foregoing reasons, Plaintiffs' motion for class certification is granted. A separate order will be entered.

Dated: New York, New York
      March 29, 2012

                                    LAURA TAYLOR SWAIN
                                    United States District Judge