UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
                                   :
IN RE PFIZER INC. SECURITIES       :     04 Civ. 9866 (LTS)(HBP)
LITIGATION                         :
                                   :     OPINION
                                   :     AND ORDER
                                   :
----------------------------------X

            PITMAN, United States Magistrate Judge:

I.   Introduction

            By notice of motion dated August 28, 2012 (Docket[1] Item

425), lead plaintiff Teachers' Retirement System of Louisiana

("TRSL") and plaintiffs Christine Fleckles, Julie Perusse and

Alden Chase (collectively, with TRSL, "Plaintiffs") move for

sanctions, including an adverse-inference jury instruction,

against defendant Pfizer, Inc. ("Pfizer") based on Pfizer's

alleged spoliation of evidence and delayed production of

documents.  By a motion also dated August 28, 2012 (Docket Item

422), Pfizer and the individual defendants Henry McKinnell, Karen

Katen, John LaMattina, Joseph Feczko and Gail Cawkwell move for

sanctions and for an adverse-inference jury instruction against

--------------------------
            [1]Unless otherwise stated, all references to the "Docket" are
to In re Pfizer Securities Litigation, 04 Civ. 9866 (LTS)(HBP)
(S.D.N.Y.).

TRSL based on its alleged spoliation of evidence and against Plaintiffs for their failure to preserve certain expert discovery materials and for their allegedly improper and misleading use of statements of former Pharmacia employees in the Consolidated Class Action Complaint.

For the following reasons, both Plaintiffs' and Pfizer's motions are denied in their entirety.

II.   <u>Facts</u>

This action was commenced on December 15, 2004 (Docket Item 1).  Plaintiffs claim that Pfizer violated the federal securities laws when it allegedly made fraudulent, material misrepresentations and fraudulently omitted to state facts concerning the cardiovascular safety of two of its COX-2 family of pain-relieving drugs, Celebrex and Bextra, and that, as a result, Plaintiffs suffered losses in connection with their purchase of Pfizer stock (Docket Item 361 ¶ 1) between October 31, 2000 through October 19, 2005 (the "Class Period").

A.   Pertinent Facts Related to
     <u>Plaintiffs' Motion for Sanctions</u>

Prior to the commencement of this action, Pfizer and

Pharmacia[2] were parties to other lawsuits related to Celebrex and
Bextra.  In 2001, Pfizer was a party in a patent dispute with
Brigham Young University over the identification of the COX-2
enzyme that led to the development of Celebrex and Bextra (Docket
Item 427, Declaration of Mary S. Thomas, Esq. in Support of
Plaintiffs' Motion for Spoliation and Other Sanctions Against
Defendant Pfizer Inc. ("Thomas Decl.") ¶ 5, Ex. 1).  In 2003,
Pharmacia, which Pfizer acquired in 2003, was sued in New Jersey
federal court for securities fraud arising out of allegedly false
and misleading statements concerning the gastrointestinal safety
of Celebrex (see Alaska Electrical Pension Fund v. Pharmacia
Corp., No. 03 Civ. 1519 (D.N.J.); Thomas Decl. ¶ 7).  As early as
2004, Pfizer was involved in several qui tam actions under the
False Claims Acts and a federal criminal investigation regarding
the off-label promotion and sale of Bextra (Thomas Decl. ¶ 8).
By 2005, Pfizer had also been sued in numerous products liability
actions relating to Celebrex and Bextra (Thomas Decl. ¶ 6).  As a
result of these lawsuits, Pharmacia had litigation holds related
to Celebrex in place as early as May 2001 (Thomas Decl. Exs.
5-6).  Pfizer had litigation holds in place related to its COX-2
drugs, including Celebrex and Bextra, dating back to 2001 (Thomas

---

[2]Pharmacia was Pfizer's marketing and sales partner with
respect to Celebrex and Bextra.

Decl. Ex. 3 at 50:18-23).

      The first complaint in this action was filed on December 15, 2004 and a second complaint was filed two days later (Docket Item 431, Declaration of John R. Wellschlager, Esq. in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Spoliation and Other Sanctions Against Defendant Pfizer, Inc. ("Wellschlager Decl.") Exs. 1-2).  On December 17, 2004, Pfizer issued a litigation hold notice to its employees directing them to preserve all documents related to Celebrex and Bextra (Wellschlager Decl. Ex. 3).  Pursuant to this hold, Pfizer followed "a preserve in place policy where the colleague who receives the hold is obligated to assure [his or her documents'] preservation" (Thomas Decl. Ex. 3 at 43:16-19). As an example, for custodial files, the relevant custodians would create a subfolder on either their computer hard drives or on Pfizer's server and then "whatever documents they believe[d] [were] relevant would be put into a subfolder" (Thomas Decl. Ex. 3 at 44:2-15).  With respect to documents that were not associated with a particular custodian, Pfizer's policy was to hold these documents separately in a "structured database" (Thomas Decl. Ex. 3 at 45:6-23).

      1.   eRooms

Discovery began in this action in late 2008.
Plaintiffs served Pfizer with document requests that sought,
inter alia, documents associated with the clinical trials of
Celebrex and Bextra (Thomas Decl. Ex. 10).  The requests
delineated specific categories for each study (Thomas Decl. Ex.
10).  For example, Plaintiffs requested:

> 2. For the Alzheimer's 1999 study (001), all:
>
> > a) Data Safety Monitoring Committee ("DSMC")
> > minutes;
> >
> > b) presentations by Pfizer, G.D. Searle & Co.,
> > and/or Pharmacia, or any agent or representative
> > of the same (collectively, the "Company") to the
> > DSMC;
> >
> > c) reports on any data prepared by the Company for
> > the DSMC;
> >
> > d) correspondence between the Company and the
> > DSMC;
> >
> > e) custodial files of any Company employees that
> > corresponded or interacted with the DSMC;
> >
> > f) custodial files of any clinical monitors
> > involved in the study;
> >
> > g) custodial files of any medical monitors
> > involved in the study;
> >
> > h) custodial files of any statisticians involved
> > with statistical work for the DSMC or the trial
> > itself; and
> >
> > i) minutes of any study committee meeting,
> > including, but not limited to, the steering
> > committee and executive committee.

(Thomas Decl. Ex. 10 at 2).  Pfizer informed Plaintiffs that it "has never maintained documents organized according to many of the categories you have listed" and advised that "such documents would be found, to the extent they exist, in the custodial files of the Pfizer employees involved" in the particular study requested (Thomas Decl. Ex. 7 at 1; Ex. 8 at 1).

Accordingly, the parties proceeded with the production of documents from the files of the relevant custodians (Thomas Decl. ¶ 14).  Pfizer produced relevant emails, letters, study reports, press releases, organizational documents and other documents from the electronic files of 94 custodians (Wellschlager Decl. ¶ 73(a)).  Pfizer also produced the legacy files from Pharmacia, Monsanto and Searle, documents from its regulatory files, documents from the Trial Master Files, clinical study materials, expert discovery from other COX-2 related litigations and documents that had been provided to various regulators (Wellschlager Decl. ¶ 73(b)-(g)).  This production amounted to approximately 40 million pages of documents.  In addition, Pfizer responded to Plaintiffs' other discovery requests, including interrogatories, requests for admissions, expert discovery and fact witness depositions (Wellschlager Decl. ¶¶ 74-75).

In 2010, after reviewing the deposition transcript of a former Pfizer employee taken in a different case related to Celebrex and Bextra, Plaintiffs discovered a reference to an "eRoom" that had been maintained by Pfizer (Thomas Decl. ¶ 14). An eRoom, as described in one Pfizer-produced document, was a "collaborative application" for Pfizer employees to "share documents, share calendars, archive email, conduct discussions/instant messaging, and to conduct informal polls" (Thomas Decl. Ex. 25 at Cardon-V 10000333648). Accordingly, on December 21, 2010, Plaintiffs served a document request on Pfizer that specifically sought "all documents concerning Bextra or Celebrex, sent to or maintained in the 'e-room' for safety materials, as described by Winifred M. Begley, in her September 6-8, 2006 deposition" (Thomas Decl. Ex. 24 at 10, Request 24). Pfizer objected to this request on various grounds, including that it was "premised upon faulty or incorrect factual predicates" (Thomas Decl. Ex. 28 at 26).

After a March 31, 2011 meet and confer, Pfizer's counsel agreed to look into the existence of eRooms, as well as any other centralized databases that Pfizer maintained (Thomas Decl. ¶ 21). Plaintiffs provided Pfizer with a list of references to eRooms that they had discovered in their review of Pfizer's document production (Thomas Decl. Ex. 29). Pfizer

7

responded that it had de-commissioned the use of eRooms, but that it was working toward locating the specific material Plaintiffs had requested and any potentially archived data (Thomas Decl. Ex. 32 at 1).

In order to further explore the nature and extent of Pfizer's use of eRooms, Plaintiffs noticed a deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and, at Pfizer's request, submitted some of the Rule 30(b)(6) topics as interrogatories (Thomas Decl. ¶ 27). Jack Wish, who was responsible for the management of Pfizer's eRooms from 2003 to 2005, certified that the interrogatory responses "were based upon Pfizer's knowledge, information and belief" and that "they were true to the best of my knowledge, information and belief" (Thomas Decl. Ex. 40 at 20). In addition, Pfizer produced four witnesses who testified regarding discovery-related issues, including the eRooms (Wellschlager Decl. ¶ 75).

In its interrogatory responses, Pfizer represented that it had archived its eRooms in 2011 (Thomas Decl. Ex. 40 at 5). During the archiving process, Pfizer first locked the eRooms to prevent the addition or deletion of any information, and then saved the contents of the locked eRooms to a zip file that was maintained by Pfizer IT personnel (Thomas Decl. Ex. 40 at 6). Thus, when the archived eRooms were restored for production in

8

this action, they contained only those documents and metadata
that existed in them at the time of their archiving (Thomas Decl.
Ex. 40 at 15; see also Wellschlager Decl. Ex. 24 at 26:3-4 (Mr.
Wellschlager: "[T]he e-rooms exist in the form that they were
ultimately archived . . . .").

      Pfizer explained in its interrogatory responses that
documents shared in an eRoom were usually created outside of the
eRoom in a native computer application -- like Microsoft Word --
and then posted in the eRoom by the user (Thomas Decl. Ex. 40 at
16).  Mr. Wish testified that even when a document was created
using a feature of the eRoom software that allowed a user to
create a document directly in the eRoom, that file would be saved
both on the user's local computer and in the eRoom (Wellschlager
Decl. Ex. 6 at 173:13-175:5).  Accordingly, regardless of whether
the document was created using the eRoom software or another
computer application, any documents posted in an eRoom would be
saved on both the individual user's computer and in the eRoom
(see Thomas Decl. Ex. 40 at 16 ("[T]he contents of an eRoom are
usually duplicative of information that can be found
elsewhere.")).

      Documents contained in the eRooms contained various
types of metadata (Thomas Decl. Ex. 40 at 8).  This included
application metadata, which was generated by the particular

computer application, i.e., Microsoft Word, that created the
document and recorded "when a document was created or modified,
the individual who last modified the document, and/or the total
number of times the document was revised" (Thomas Decl. Ex. 40 at
9).  The eRoom software also created its own application
metadata, which recorded information such as the item's name,
type, URL location, ID number, path, creation date within the
eRoom, modification date within the eRoom (to the extent this was
available), access information, creator name and role (e.g.,
coordinator or participant[3]) and size (Thomas Decl. Ex. 40 at 9-
10).  The eRooms that were restored in this action retained
whatever application metadata they had when the particular eRoom
was archived (Thomas Decl. Ex. 40 at 9).

      The eRoom software could also generate system metadata
for documents (Thomas Decl. Ex. 40 at 10).  System metadata, as
explained in Pfizer's interrogatory responses, included
"information about eRoom groups, members roles, and member
identities/attributes" (Thomas Decl. Ex. 40 at 10).  It could

---

[3]An eRoom coordinator generally had the broadest access
rights, including the ability to edit the name of an eRoom or its
folders or to add or delete files within the eRoom.  A
coordinator was also "most often responsible for tailoring the
eRoom to the needs of a particular team and adjusting them as
necessary" (Thomas Decl. Ex. 40 at 18).  In contrast, a
participant could only add or delete material that he or she
"owned" (Thomas Decl. Ex. 40 at 18).

also "track when a file was created within the eRoom and by whom"
(Thomas Decl. Ex. 40 at 12).  The system metadata, however, did
not automatically track every time a user made an edit unless
this option was affirmatively selected by a user (Thomas Decl.
Ex. 40 at 12-13).

The eRoom software also had a function that enabled the
system metadata to record eRoom usage information (Thomas Decl.
Ex. 40 at 10).  This usage information was stored in a facility
eRoom and recorded information such as "total member count, last
member login time, size of the eRoom, and total count of items"
(Thomas Decl. Ex. 40 at 14; Ex. 41 at 236:13-15 (Mr. Wish
testifying that "the facility reports in one section would
provide when a person last logged into a room")).  The usage
information was "used by administrative personnel to help manage
Pfizer's IT licensing agreements and the operation of Pfizer's
servers" (Thomas Decl. Ex. 40 at 10; Ex. 14 at 236:5-8 (MR. WISH:
"[e]-Room usage reports were reports that were inside of a
facility E-Room and they would show us volumetrics about E-Room
to help us maintain the infrastructure")).  The eRoom software
"permit[ed] the inspection of certain metadata in a usage report
which remain[ed] in the eRoom for up to one year" (Thomas Decl.
Ex. 40 at 10).

The usage reports stored in the facility eRoom,

11

however, did "not show what documents or folders or other
substantive information the users may have created, deleted,
edited or posted" (Thomas Decl. Ex. 40 at 14).  In addition, they
"could not report whether a document was merely viewed or by whom
it was viewed" (Thomas Decl. Ex. 40 at 18).

        Pfizer's eRooms also created security logs.  Nicholas
Brewer, who was responsible for Pfizer's eRooms from 2006-2010,
testified that he believed the eRoom software could track end-
users' access to eRoom documents (Thomas Decl. Ex. 89 at 28:13-
16).  When asked how this was done, he testified "I would assume
through security logs or versioning history.  If I recall, I
think it was either metadata or something, metadata or metafile
or something like that, that either tracked user access or
version history . . . ." (Thomas Decl. Ex. 89 at 28:18-22).  He
described security logs as "some sort of log that says this user
ID logged in at this time, this user ID logged off at that time"
and that these logs would have been kept as a text file on a
server (Thomas Decl. Ex. 89 at 29:3-11).  At a conference before
me, Pfizer's counsel explained that "it appears that while we may
have access to information about who could have availed
themselves of an e-room, a server log would show if they in fact
did and how often they did even if it doesn't show what was
looked at" (Thomas Decl. Ex. 47 at 44:20-24; <u>see also</u> Ex. 47 at

28:2-9).  Given Mr. Brewer's description and Pfizer's counsel
description, it appears that security and server logs are
identical.

The eRoom software could also create membership lists
that would reflect the current members of an eRoom, but would not
identify former members (see Thomas Decl. Ex. 40 at 18).

Pursuant to a protective order, Pfizer agreed to allow
Plaintiffs to inspect and copy documents from the eRooms that
Pfizer had restored for production without Pfizer first
conducting a privilege or responsiveness review (Wellschlager
Decl. Ex. 34).  Of the 164 eRooms Plaintiffs identified (Thomas
Decl. Ex. 108), Pfizer restored 46 eRooms and made available the
source data for another 14 eRooms that had been transferred to a
different software platform (Wellschlager Decl. ¶ 73(h)).  This
production totaled approximately 10 gigabytes of data
(Wellschlager Decl. ¶ 73(h)).  With respect to the remainder of
the eRooms identified, Pfizer has stated that these eRooms were
either duplicative, were subfolders contained in already-restored
eRooms, did not contain any substantive data or on their face did
not contain any relevant documents (Thomas Decl. Ex. 54;
Wellschlager Decl. App. B).  For those eRooms that contained only
a link to another eRoom, Pfizer restored that linked eRoom
(Wellschlager Decl. App. B).

The restored eRooms "contain[d] the same site setting, user information, and access rights as the original eRooms" (Thomas Decl. Ex. 40 at 11).  The eRooms, however, reflected that information only as it existed when the particular eRoom was archived (Thomas Decl. Ex. 40 at 15).  The restored eRooms also contained membership lists that could be generated by the eRoom software and were accessible from within the eRoom itself (Docket Item 432, Supplemental Declaration of Mary S. Thomas, Esq. ("Thomas Supp. Decl.") ¶ 2).  These lists reflected the members at the time the eRoom was archived, but did not include former members (Thomas Decl. Ex. 40 at 15).

### 2.   Centralized Databases

During the course of the parties' eRoom discussion, it was also discovered that Pfizer had not searched certain electronic databases for responsive documents.  The first, the GDMS database, contained relevant historical documents and was organized by chemical compound number, which meant that Celebrex documents would be segregated from Bextra documents (see Wellschlager Decl. Ex. 70 ¶ 20 ("[The GDMS] is an electronic document management system used by Pfizer's Research & Development and Medical units to house regulatory practices, guidelines, documents, and submission components.")).  The

14

second, the DLTS database, contained legacy Pharmacia documents
and documents provided to Pfizer's in-house legal department in
response to litigation holds (Thomas Decl. ¶ 33, Ex. 49 at 4;
Wellschlager Decl. Ex. 70 ¶ 24 ("[The DLTS] database is an
electronic management system that houses documents which no
longer support current business activities, yet have been
retained for regulatory, legal or other purposes.")).  The final
database -- Infoshare/Insight -- contained meeting minutes,
protocols, study reports, timelines, archives and governance and
regulatory information (Thomas Decl. Ex. 84).  Pfizer initially
stated that it had not searched these databases because it
believed they contained duplicative documents, but later agreed
to search for and produce documents from these databases (Thomas
Decl. Ex. 3a at 19-20).  I ordered the parties to meet and confer
on appropriate search terms and for Pfizer to "de-duplicate" any
subsequent productions (Thomas Decl. Ex. 3a at 30-33).

        During an April 18, 2012 discovery conference, I
ordered Pfizer to (1) produce the metadata search results from
the GDMS and DLTS databases by April 25, 2012 and (2) complete
production from the databases on a rolling basis within 50 days
(Thomas Decl. Ex. 52).  Pursuant to a protective order, Pfizer
agreed to produce documents without first conducting a privilege
or responsiveness review.  Pfizer completed its production from

the databases on June 12, 2012, which was after the close of discovery.  This production totaled over 21 million pages (Wellschlager Decl. Ex. 70 ¶ 27).  Plaintiffs contend that this production contains relevant and non-duplicative emails that should have been produced earlier on in discovery (Thomas Decl. ¶ 36).

   B.  Pertinent Facts Underlying
       Pfizer's Motion for Sanctions

       Pfizer's motion for sanctions is based on three separate issues.  The pertinent facts are set forth below.

   1.  TRSL's Document Preservation

       Between June 30, 2000, and June 30, 2004, TRSL increased its investment in Pfizer from approximately $15.1 million to $77.6 million (Docket Item 436, Declaration of George S. Wang, Esq. in Support of Defendants' Memorandum of Law in Support of Defendants' Motion for Sanctions ("Wang Decl.") Ex. 18 at TRSL 0000540; Ex. 19 at TRSL 0000976).  TRSL was appointed as lead plaintiff in this action on October 21, 2005 (Docket No. 43).

       Pfizer noticed a Rule 30(b)(6) deposition to explore the scope of TRSL's document preservation efforts.  TRSL, like

other pension funds, relies on outside money managers and
investment advisors to make its investment decisions.  For
example, William Reeves, TRSL's now-retired general counsel,
testified at a Rule 30(b)(6) deposition that "TRSL made no
investment decisions at all" (Wang Decl. Ex. 20 at 64:4-5).
Similarly, TRSL's Chief Investment Officer Phillip Griffith
testified at a Rule 30(b)(6) deposition that TRSL "hire[s]
managers to run the assets or to invest the assets for us" and
that TRSL does not "actually make the investment decisions or
influence the investment managers that we hire on what to buy or
sell.  It's completely their decision and it's contractually
documented" (Docket Item 435, Declaration of Mary S. Thomas,
Esq., dated September 25, 2012 ("Thomas Opp. Decl.") Ex. G at
82:4-5, 11-15).

          Pursuant to a Louisiana state statute,[4] TRSL is required
to retain permanently records relating to its investment
transactions, but only is required to retain general
correspondence for one year (Wang Decl. Ex. 54).  Mr. Griffith
testified that TRSL permanently retains the trading history of
its investments on CD-ROMs and checks and cash flow on tapes or
discs in its office (Wang Decl. Ex. 33 at 100:4-7).  This

---

[4]The parties have not identified this statute.

17

material is also permanently retained with a custodian and on a disaster recovery server (Wang Decl. Ex. 33 at 100:10-20).  With respect to emails, Mr. Griffith testified that, after discussing the matter with TRSL's information technology staff, TRSL determined that emails fell under the category of general correspondence and were, therefore, retained for one calendar year and then destroyed (Wang Decl. Ex. 34 at 100:20-102:5; Ex. 54).

When asked whether TRSL had issued a litigation hold, Mr. Griffith testified that he could not point to "a specific action" that TRSL put in place to preserve documents related to Pfizer and that he was not familiar with any TRSL preservation notice related to the Pfizer litigation (Wang Decl. Ex. 33 at 49:7-22).  Mr. Griffith, however, also testified that "there was a general understanding to retain any documents associated with any litigation" (Wang Decl. Ex. 33 at 49:13-15).  Mr. Reeves testified that he did not implement a litigation hold or circulate a document preservation notice (Wang Decl. Ex. 20 at 52:3-12) and that he did not discuss with outside counsel whether TRSL needed to preserve documents related to this action (Wang Decl. Ex. 20 at 52:13-53:4).

With respect to TRSL's retention policy for emails, Bobby Aymond, TRSL's information technology head, testified at a

18

Rule 30(b)(6) deposition that TRSL maintains backup tapes of its emails for one year (Wang Decl. Ex. 37 at 26:7-15). When asked whether TRSL ever communicated with its outside advisors about transactions involving Pfizer through email, Mr. Reeves could not definitively state that there were no such communications (e.g., Wang Decl. Ex. 20 at 124:14-19). However, he also testified that he was not aware of the existence of any emails among TRSL staff concerning investments (Wang Decl. Ex. 20 at 39:6-13). He further testified that a litigation hold was not necessary to ensure that TRSL's staff preserved documents related to this action because, to his knowledge, "there were no other documents than whatever I reiterated before because TRSL made no investment decisions at all" (Wang. Decl. Ex. 20 at 64:2-5). Plaintiffs' counsel also informed me at a discovery conference held on July 28, 2011 that "TRSL began archiving documents back in 2007, but the fact is that other than trading records, there are no responsive documents that ever existed" because TRSL "essentially delegate[s] to outside investment advisors the authority to buy and sell stock" (Thomas Decl. Ex. 33 at 7:24-8:5).

Pfizer has cited testimony and several documents that it contends establish that TRSL did discuss its specific investments both internally and with third parties:

1.  In a deposition taken in the Tyco securities
litigation, a TRSL representative testified that TRSL's
investment committee would sometimes discuss a specific
investment (Wang Decl. Ex. 34 at 41:12-13, 17-20 ("Q:
Could [the discussion of a specific investment] come up
with respect to publicly traded entities?  A:
Occasionally a comment would be asked of the manager
who's in for the detailed review about a security in
their portfolio.").

2.  UBS Warburg, one of TRSL's outside investment
advisors, emailed TRSL a research analysis of a
security (Wang Decl. Ex. 35).  Mr. Griffith testified
that this information was likely requested after TRSL
had already received the investment (Thomas Opp. Decl.
Ex. G at 154:5-156:8).

3.  When asked about specific emails that had been sent
by TRSL's investment managers to TRSL concerning the
execution of certain trades, Mr. Griffith explained
that due to a former Louisiana statute, La. Rev. Stat.
Ann. § 266.1, TRSL was required to use Louisiana
brokers to execute a certain percentage of its trades
(Thomas Opp. Decl. Ex. G at 127:3-9).  To comply with
this statute, TRSL would communicate its outside
advisors' trading decisions to Louisiana brokers who
would then execute the trades (Thomas Opp. Decl. Ex. G
at 127:10-129:22).  Mr. Griffith further testified that
"the decisions to purchase the stocks and the dollar
amounts and the time frames were all specified by the
money manager" (Thomas Opp. Decl. Ex. G at 127:21-23).

4.  Pfizer points to a Goldman Sachs document that
contained an analysis of the strength of Pfizer's stock
and that noted that "Pfizer, Inc.'s stock was under
pressure due to concerns over new data suggesting an
increased cardiac risk linked to its COX-2 inhibitors,
Celebrex and Bextra" but that "[b]ased on Pfizer's
favorable long-term prospects, strong competitive
position, robust free cash flow generation and
attractive valuation, we have decided to maintain our
position" (Wang Decl. Ex. 36 at GSAM000070).  However,
Goldman Sachs has indicated that this document "'may or
may not have been sent to [TRSL]'" (Thomas Opp. Decl.
Ex. T at 29 n.9 (alterations in original)).

2.  <u>Expert Discovery Material</u>

As one of their experts, Plaintiffs hired Dr. David Madigan, a statistician, to conduct a meta-analysis of adverse events, <u>i</u>.<u>e</u>., deaths, that had occurred during Pfizer's clinical trials of Celebrex, and to determine whether there was a statistically significant increased cardiovascular risk associated with Celebrex (Wang Decl. Ex. 1 at 1).

In 2008, Dr. Madigan had previously performed a meta-analysis of this clinical trial data in connection with a personal injury suit related to Celebrex (Wang Decl. Ex. 3).  Dr. Madigan received the raw data from Pfizer.  Dr. Madigan defined three statistical categories under which to classify the adverse events (Wang Decl. Ex. 1 at 4-5; Ex. 2 at 53:5-23).  These categories represented different types of cardiovascular events (Wang Decl. Ex. 1 at 4).  The clinical trial data described the cause of the adverse events using standardized medical terms.  In connection with the personal injury action, Dr. Madigan asked Dr. Baruch, a cardiologist, to classify each death under one of the three defined categories (Wang Decl. Ex. 2 at 55:9-15; Ex. 3 at 39:23-41:5; Thomas Opp. Decl. Ex. M at 78:12-79:12).  To record his classifications, Dr. Madigan provided Dr. Baruch with a

spreadsheet that listed the study number, patient identification number and the description of the cause of death (Wang Decl. Ex. 3 at 40:15-25; Ex. 5 at 87:16-89:2). In order to classify some of the deaths, Dr. Baruch asked Dr. Madigan for the underlying adverse event files (Wang Decl. Ex. 5 at 135:17-137:20). Dr. Baruch reported his findings by returning the spreadsheet with his classifications to Dr. Madigan (Wang Decl. Ex. 5 at 88:11-89:2; 135:21-25). Dr. Baruch did not keep any of the files that he created in classifying the deaths and did not recall for which deaths he had requested the underlying adverse event files (Wang Decl. Ex. 5 at 14:11-15:14; 135:17-136:22; 145:3-14; 148:5-149:8). Pfizer, however, has a copy of Dr. Baruch's 2008 classification spreadsheet (Wang Decl. Ex. 7 at 391:10-392:14; see also Thomas Opp. Decl. ¶ 2).

In this action, at Plaintiffs' counsel request, Dr. Curt Furberg, another medical doctor, subsequently reviewed Dr. Baruch's spreadsheet (Wang Decl. Ex. 7 at 365:4-366:3). Dr. Furberg made handwritten revisions to the chart indicating any disagreements (Wang Decl. Ex. 7 at 384:10-21). There is a dispute about how these revisions were communicated to Plaintiffs' counsel and incorporated into the final spreadsheet that was provided to Dr. Madigan to use in conducting his meta-analysis. At his deposition, Dr. Furberg testified that his

22

handwritten notes were "probably faxed" to Plaintiffs' counsel (Wang Decl. Ex. 7 at 384:22-25; 385:7-15).  However, Mr. Jarvis, one of Plaintiffs' attorneys, submitted an affidavit in connection with this motion that states that Dr. Furberg verbally relayed the results to him, and that Mr. Jarvis then inputted the changes into the electronic version of the spreadsheet (Docket Item 434, Declaration of Geoffrey C. Jarvis, Esq. in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Sanctions ("Jarvis Decl.") ¶ 6).  Mr. Jarvis attested that he never received a copy of the spreadsheet with Dr. Furberg's handwritten revisions (Jarvis Decl. ¶ 8).  Regardless of the mode of transmission, the spreadsheet with Dr. Furberg's handwritten revisions was not produced in discovery.  However, the final version of the spreadsheet, which incorporated Dr. Furberg's changes to Dr. Baruch's 2008 classifications, was produced to Pfizer at Dr. Madigan's June 11, 2009 deposition (Jarvis Decl. ¶ 7).  From this final spreadsheet, it was not possible to discern which classifications Dr. Furberg changed (see Jarvis Decl. ¶ 7; Wang Decl. Ex. 5 at 150:21-152:23 (Dr. Baruch testifying that his knowledge of Dr. Furberg's changes came from Plaintiffs' counsel).

In completing his statistical analysis, Dr. Madigan testified that he relied on the classifications that were

23

contained in the final version of the spreadsheet (Wang Decl. Ex. 2 at 96:4-97:24; Docket Item 437, Reply Declaration of Patrick T. Shilling, Esq. to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Sanctions ("Shilling Decl.") Ex. 58 at 148:9-150:24).  Dr. Madigan's March 12, 2009 expert report concluded that Celebrex was associated with a statistically significant increase of cardiovascular events (Wang Decl. Ex. 1 at 14).

In October 2009, Dr. Madigan updated his expert report to incorporate Pfizer's 2005 classifications of the adverse events in its clinical trial data and to include four additional deaths (Thomas Opp. Decl. Ex. L ¶ 8).  With respect to the Hard CHD[5] category, one of the categories Dr. Madigan had previously defined, Dr. Madigan updated his analysis to include the four additional deaths; he also relied on classification work per-formed by Dr. Furberg and Dr. Baruch with respect to these deaths (Thomas Opp. Decl. Ex. L at ¶ 12; Ex. M at 79:13-80:10).  Dr. Madigan confirmed the foregoing at his deposition  (Thomas Opp. Decl. Ex. M at 79:13-25; 237:19-239:12; 240:4-14).

---

[5]The "Hard CHD" category included myocardial infarction and sudden cardiac death events that were reported in the clinical trial data (Wang Decl. Ex. 1 at 4).

At his deposition, Dr. Madigan testified that he agreed
that the classifications of the deaths were an important part of
his analysis and affected the outcome of his analysis (Wang Decl.
Ex. 2 at 59:21-61:8).  Dr. Madigan testified at the Daubert
hearing held in 2009 that it was "reasonable" that to the extent
that Dr. Baruch's classification process was flawed, his own
process and analysis would be flawed (Wang Decl. Ex. 11 at
554:14-23).  Dr. Madigan's testimony, however, primarily focused
on how the final classifications impacted his analysis, and not
on the process underlying them.

### 3.  Statements from Former Pharmacia Employees in the Consolidated Class Action Complaint

In preparing the Consolidated Class Action Complaint
("CCAC"),[6] in or about January 2006, Plaintiffs hired an investi-
gative firm, Granite Intelligence, to research Pfizer and related
matters.  Granite Intelligence's investigators contacted four
former Pharmacia employees, Dr. John Talley, Paul Dodson, Krista
Fox and Andrew Watson (collectively, the "Quoted Former Employ-
ees"), and informed each that they were "conducting research into
Pfizer, Inc., on behalf of Grant & Eisenhofer, P.A., who in turn

---

[6]The CCAC is no longer the operative pleading in this
action.  Plaintiffs filed an Amended Consolidated Class Action
Complaint on March 27, 2012 (Docket Item 361).

is working on behalf of institutional shareholders of Pfizer,
Inc." (Wang Decl. Ex. 45 at PFE PLTF 0003108; Ex. 46 at PFE PLTF
0003116; Ex. 47 at PFE PLTF 0003113; Ex. 48 at PFE PLTF 0003122).
Granite Intelligence's investigators asked the Quoted Former
Employees about their general understanding of the drug develop-
ment and marketing process at Pharmacia, including the role of
senior management (Wang Decl. Exs. 45-48).  These interviews were
reduced to contemporaneous memoranda (Wang Decl. Exs. 45-48).

The following statements were attributed to the Quoted
Former Employees in the CCAC:

> Dr. Talley:  "Dr. John Talley, one of the developers of
> Celebrex and Bextra, informed Plaintiffs' counsel that
> senior managers were 'right on top of' the clinical
> studies related to Celebrex in [sic] Bextra" (Docket
> Item 51 ¶ 76).

> Mr. Dodson:  "Similarly, Paul Dodson, the former Senior
> Director of Strategic Planning and Regional operations
> for Pharmacia, acknowledged to Plaintiffs' counsel that
> decisions on what drugs to bring to market and when to
> launch such drugs ultimately 'comes from the top.'  He
> further stated that information on clinical trial find-
> ings would be reported to top management and would be
> reported with some specificity where there was 'some
> negative effect or a problem' with the drug.  He spe-
> cifically noted that the cardiovascular safety profile
> of Celebrex was a big issue with top management and
> that Dr. Needleman (the director of research at Searle
> and Pharmacia) was the person responsible for updating
> top management on significant developments relating to
> Celebrex and Bextra" (Docket Item 51 ¶ 76).

> Ms. Fox:  "Krista Fox, a former Global Marketing Commu-
> nications Manager at Pharmacia, explained that informa-
> tion regarding the clinical trials of a drug was dis-

seminated to key decision-makers.  She stated that
Pharmacia, like all other companies, had a medical
information group within the company that 'knows the
science of a drug inside and out as well as adverse
events, issues and concerns relating to the drug.
Anything that you are going to get out to the public as
it relates to sales and marketing efforts has to go
through a review committee which usually consists of
legal, medical and regulatory and they are experts on
the drug and they have to approve everything'" (Docket
Item 51 ¶ 77).

Mr. Watson: "Andrew Watson, a Senior Product Manager
on the Celebrex brand, explained how the key informa-
tion was known to the 'brand team' decision makers.  He
explained that the brand team gets involved in the R&D
process through the new drug application stage because
'you want to think about how you're going to be able to
commercialize a product when it finally comes to mar-
ket, so as much involvement as you can the better.'
Watson acknowledged that brand teams would have been
aware of the science behind a drug, inclusive of the
R&D as well as the risks and efficacy of a brand.  He
further acknowledged that between the filing of a new
drug application with the FDA and final FDA approval of
a drug, the brand team is working with many other
groups including the marketing people and the finance
people in order to get the drug to market" (Docket Item
51 ¶ 79).

In addition, the CCAC alleged that:  "According to Dr.

Talley, members of senior management were well aware of the

clinical studies that were conducted on Celebrex and Bextra.

Statements by former employees of Pharmacia (now Pfizer) who

worked on Celebrex, Krista S. Fox, Paul V. Dodson and Andrew

Watson, confirm that any negative effect or problem with a drug

was reported to top management" (Docket Item 51 ¶ 253; see also ¶

5).  In the CCAC, Plaintiffs relied on the statements of the

27

Quoted Former Employees to support their allegations of scienter -- namely that the individual defendants knew or were in a position to have known about material information concerning the adverse safety risks associated with Celebrex and Bextra (Docket Item 51 ¶ 82).

When the CCAC was filed, none of the Quoted Former Employees was aware that his or her statements had been used (Wang Decl. Ex. 49 ¶ 3; Ex. 50 ¶ 5; Ex. 51 ¶ 5; Ex. 52 ¶ 3). Counsel for Pfizer contacted the Quoted Former Employees in the latter half of 2011. Each reviewed the CCAC and his or her interview memoranda (Wang Decl. Ex. 49 ¶¶ 5, 8; Ex. 50 ¶¶ 6, 15; Ex. 51 ¶¶ 6, 15; Ex. 52 ¶¶ 4, 8). The Quoted Former Employees disagreed with the manner in which the CCAC had characterized their statements. They stated that they believed that the CCAC was inaccurate and misleading because their statements had been used to support the allegation that Pfizer's senior management knew about the cardiovascular safety risks associated with Celebrex and Bextra, notwithstanding that none of the Quoted Former Employees had explicitly said that (Wang Decl. Ex. 49 ¶¶ 11-12; Ex. 50 ¶ 10; Ex. 51 ¶ 9; Ex. 52 ¶¶ 4, 11). Each maintained that he or she did not believe that anyone at Pfizer or Pharmacia had engaged in any wrongdoing in connection with Celebrex and Bextra, and none was aware of any evidence of wrong-

doing (Wang Decl. Ex. 49 ¶¶ 11-12; Ex. 50 ¶ 10; Ex. 51 ¶ 9; Ex. 52 ¶¶ 4, 11).  They also all stated that they would not have spoken to Plaintiffs' investigator had they known that it was acting on behalf of a party suing Pfizer (Wang Decl. Ex. 49 ¶ 6; Ex. 50 ¶ 15; Ex. 51 ¶ 15; Ex. 52 ¶ 10).  The Quoted Former Employees, however, did not disavow the substance or the accuracy of the statements attributed to them in the CCAC, but rather only the inferences that Plaintiffs drew from those statements.

III.  <u>Analysis</u>

    A.  Applicable Law:
        <u>Spoliation Sanctions</u>

        "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  <u>West v. Goodyear Tire & Rubber, Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).  A court may impose sanctions based on Federal Rule of Civil Procedure 37(b) if a party fails to comply with a discovery order.  Fed.R.Civ.P.37(b); <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002); <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (Francis, M.J.).  A court may also impose sanctions on a spoliating party based on its "inherent power to control the

judicial process and litigation, but [that] power is limited to that necessary to redress conduct which abuses the judicial process." Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010) (Leisure, D.J.) (internal quotation marks omitted), quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (Scheindlin, D.J.), abrogated on other grounds by Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135 (2d Cir. 2012). "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.'" Zubulake v. UBS Warburg, LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (Scheindlin, D.J.), quoting Fujitsu v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001); see also Harkabi v. SanDisk Corp., 275 F.R.D. 414, 418 (S.D.N.Y. 2010) (Pauley, D.J.).

A party who seeks sanctions based on the spoliation of evidence must show:  "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Zubulake v. UBS Warburg, LLC, supra, 229 F.R.D. at 430; see also

<u>Chin v. Port Auth. of N.Y. & N.J.</u>, <u>supra</u>, 685 F.3d at 162.  If
the moving party satisfies these elements, the "court may, in its
discretion, grant an adverse inference jury instruction or other
sanctions insofar as such a sanction would 'serve the threefold
purpose of (1) deterring parties from destroying evidence; (2)
placing the risk of an erroneous evaluation of the content of the
destroyed evidence on the party responsible for its destruction;
and (3) restoring the party harmed by the loss of evidence help-
ful to its case to where the party would have been in the absence
of spoliation.'" <u>Chin v. Port Auth. of N.Y. & N.J.</u>, <u>supra</u>, 685
F.3d at 162 (internal alterations omitted), <u>quoting</u> <u>Byrnie v.
Town of Cromwell</u>, 243 F.3d 93, 107 (2d Cir. 2001).

### 1.   Duty To Preserve

"A litigant has the 'duty to preserve what it knows, or
reasonably should know, is relevant in the action, is reasonably
calculated to lead to the discovery of admissible evidence, is
reasonably likely to be requested during discovery and/or is the
subject of a pending discovery request.'" <u>Passlogix, Inc. v. 2FA
Tech., LLC</u>, <u>supra</u>, 708 F. Supp. 2d at 409, <u>quoting</u> <u>Turner v.
Hudson Transit Lines, Inc.</u>, <u>supra</u>, 142 F.R.D. at 72.  The "'obli-
gation to preserve evidence arises when the party has notice that
the evidence is relevant to litigation . . . for example when a

31

party should have known that the evidence may be relevant to future litigation.'" Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd., 769 F. Supp. 2d 269, 289 (S.D.N.Y. 2011) (Francis, M.J.) (alteration in original), quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998), overruled on other grounds, Rotella v. Wood, 528 U.S. 549 (2000).  Put another way, "the preservation requirement arises when a party 'reasonably anticipates litigation.'" Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (Francis, M.J.) (internal citations omitted).

      "Evidence that must be preserved includes documents, electronically stored information, and physical evidence that the party knows or reasonably should know is relevant to claims or defenses in the action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery." R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 23-24 (S.D.N.Y. 2010) (Dolinger, M.J.) (internal citations omitted).  "[T]he duty to preserve extends to those employees likely to have relevant information -- the 'key players' in the case." Zubulake v. UBS Warburg LLC, supra, 220 F.R.D. at 218. Though a party is required to retain all relevant documents in existence at the time the duty to preserve attaches and any relevant documents created thereafter, it is not required to

preserve "multiple identical copies." <u>Zubulake v. UBS Warburg</u>
<u>LLC</u>, <u>supra</u>, 220 F.R.D. at 218.  "In recognition of the fact that
there are many ways to manage electronic data, litigants are free
to choose how this task is accomplished." <u>Zubulake v. UBS War-</u>
<u>burg LLC</u>, <u>supra</u>, 220 F.R.D. at 218.

There appears to be some uncertainty in this district
about the role of counsel with respect to a party's duty to
preserve.  The Honorable Shira A. Scheindlin, United States
District Judge, has held that "[c]ounsel must oversee compliance
with the litigation hold, monitoring the party's efforts to
retain and produce the relevant documents" and that this requires
counsel to "become fully familiar with her client's document
retention policies, as well as the client's data retention archi-
tecture." <u>Zubulake v. UBS Warburg LLC</u>, <u>supra</u>, 229 F.R.D. at 432.
Other courts have followed this analysis in determining whether
to impose sanctions.  <u>See</u>, <u>e.g.</u>, <u>Phoenix Four, Inc. v. Strategic</u>
<u>Resources Corp.</u>, 05 Civ. 4837 (HB), 2006 WL 1409413 at *6
(S.D.N.Y. May 23, 2006) (Baer, D.J.) (counsel acted with gross
negligence when it did not undertake the "more methodical survey"
of its client's sources of information as outlined in <u>Zubulake</u>);
<u>Richard Green (Fine Paintings) v. McClendon</u>, 262 F.R.D. 284, 290
(S.D.N.Y. 2004) (Francis, M.J.) (following <u>Zubulake</u>); <u>see</u> <u>also</u>
<u>Telecom Int'l America, Ltd. v. A T & T Corp.</u>, 189 F.R.D. 76, 81

(S.D.N.Y. 1999) (Hellerstein, D.J.) ("Once on notice, the obliga-
tion to preserve runs first to counsel, who then has a duty to
advise and explain to the client its obligations to retain perti-
nent documents that may be relevant to the litigation.").  In
contrast, the Honorable Gabriel W. Gorenstein, United States
Magistrate Judge, has noted that "[t]he Second Circuit, however,
places the obligation to preserve evidence on the party." Centr-
ifugal Force, Inc. v. Softnet Commc'n, Inc., 783 F. Supp. 2d 736,
742 (S.D.N.Y. 2011) (Gorenstein, M.J.), citing Fujitsu Ltd. v.
Fed. Ex. Corp., 247 F.3d 423, 436 (2d Cir. 2001) and Kronisch v.
United States, supra, 150 F.3d at 126; see also Kyoei Fire &
Marine Ins. Co. v. M/V Maritime Antalya, 248 F.R.D. 126, 146-48
(S.D.N.Y. 2007) (Preska, D.J.) (analyzing obligation to preserve
in context of party's, not counsel's, efforts).  My research has
not disclosed any Second Circuit precedent that places the duty
to preserve on a party's counsel, and accordingly, I shall only
evaluate the duty to preserve in context of the parties' actions
here.[7]

--------

[7]This is particularly appropriate here.  In their opening
brief, Plaintiffs specifically note that they are only seeking
sanctions against Pfizer as an entity and not against Pfizer's
counsel (Docket Item 426, Plaintiffs' Memorandum of Law in
Support of Motion for Spoliation and Other Sanctions Against
Defendant Pfizer Inc. "Pls.' Mem." at 2 n.1).

2.  Culpable State Of Mind

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind."  In re WRT Energy Sec. Litig., 246 F.R.D. 185, 195 (S.D.N.Y. 2007) (Francis, M.J.).  A court may impose sanctions if it finds that the party acted at least negligently in destroying or losing the spoliated material.  Harkabi v. SanDisk Corp., supra, 275 F.R.D. at 418; see Orbit One Commc'ns, Inc. v. Numerex Corp., supra, 271 F.R.D. at 438 ("In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence."); see also In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 198 (S.D.N.Y. 2007) (Peck, M.J.).  "In the discovery context, negligence is a 'failure to conform to the standard' of 'what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding.'  'A failure to conform to this standard is negligence even if it results from a pure heart and an empty head.'"  Harkabi v. SanDisk Corp., supra, 275 F.R.D. at 418-19 (internal alteration omitted), quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, supra, 685 F. Supp. 2d at 464.

35

Gross negligence also satisfies the culpability re-
quirement.  Harkabi v. SanDisk Corp., supra, 275 F.R.D. at 419.
As Judge Scheindlin has articulated:

> [T]he following failures support a finding of gross
> negligence, when the duty to preserve has attached:
> . . . to identify all of the key players and to ensure
> that their electronic and paper records are preserved;
> to cease the deletion of email or to preserve the re-
> cords of former employees that are in a party's posses-
> sion, custody, or control; and to preserve backup tapes
> when they are the sole source of relevant information
> or when they relate to key players, if the relevant
> information maintained by those parties is not obtain-
> able from readily accessible sources.

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am.
Sec., LLC, supra, 685 F. Supp. 2d at 471.

The failure of a party to institute a litigation hold
does not constitute gross negligence per se.  Chin v. Port Auth.
of N.Y. & N.J., supra, 685 F.3d 162.  Rather, the Court of
Appeals for the Second Circuit has recently held that "'the
better approach is to consider [the failure to adopt good preser-
vation practices] as one factor' in the determination of whether
discovery sanctions should issue."  Chin v. Port Auth. of N.Y. &
N.J., supra, 685 F.3d at 162 (alteration in original), quoting
Orbit Commc'ns Inc. v. Numerex Corp., supra, 271 F.R.D. at 441.

However, "[a] finding of gross negligence merely per-
mits, rather than requires, a district court to give an adverse
inference instruction" or to award other sanctions.  Chin v. Port

36

Auth. of N.Y. & N.J., supra, 685 F.3d at 162.  The Court of
Appeals has instructed that a "'case-by-case approach for the
failure to produce relevant evidence,' at the discretion of the
district court, is appropriate."  Chin v. Port Authority of N.Y.
& N.J., supra, 685 F.3d at 162, quoting Residential Funding Corp.
v. DeGeorge Fin. Corp., supra, 306 F.3d at 108.

     3.  Relevance

     If the spoliating party has acted only negligently, the
moving party can satisfy the final requirement of the spoliation
analysis if it can show that the lost materials were relevant.
Harkabi v. SanDisk Corp., supra, 275 F.R.D. at 419-20.  "[T]he
Court of Appeals has held that for the destroyed evidence to be
'relevant' it must be 'more than sufficiently probative to sat-
isfy Rule 401 of the Federal Rules of Evidence.'"  Kyoei Fire &
Marine Ins. Co. v. M/V Maritime Antalya, supra, 248 F.R.D. at
144, quoting Residential Funding Corp. v. DeGeorge Fin. Corp.,
supra, 306 F.3d at 108-09.  A party may establish relevance by
"'adduc[ing] sufficient evidence from which a reasonable trier of
fact could infer that 'the destroyed [or unavailable] evidence
would have been of the nature alleged by the party affected by
its destruction.'"  Harkabi v. SanDisk Corp., supra, 275 F.R.D.
at 420 (alterations in original), quoting Residential Funding

Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 109; see also
Richard Green (Fine Paintings) v. McClendon, supra, 262 F.R.D. at
291 (moving party "must present extrinsic evidence tending to
show that the destroyed [documents] would have been favorable to
their case." (alteration in original and internal citations
omitted)); Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048
(GEL)(JCF), 2005 WL 1925579 at *8 (S.D.N.Y. Aug. 11, 2005) (Fran-
cis, M.J.) (to establish relevance, "the moving party may submit
extrinsic evidence tending to demonstrate that the missing evi-
dence would have been favorable to it"); Zubulake v. UBS Warburg
LLC, supra, 229 F.R.D. at 431 (internal footnotes omitted)
("[T]he concept of 'relevance' encompasses not only the ordinary
meaning of the term, but also that the destroyed evidence would
have been favorable to the movant.").  However, a court must not
"hold the prejudiced party to too strict a standard of proof
regarding the likely contents of the destroyed or unavailable
evidence because doing so would subvert the purpose of the ad-
verse inference, and allow parties who have destroyed evidence to
profit from that destruction."  In re NTL, Inc. Sec. Litig.,
supra, 244 F.R.D. at 199 (internal citations and alterations
omitted); see also In re WRT Energy Sec. Litig., supra, 246
F.R.D. at 197 ("[T]he burden placed on the moving party to show
that the lost evidence would have been favorable to it ought not

38

be too onerous, lest the spoliator be permitted to profit from its destruction.").

However, "'[w]here a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party.'"  In re WRT Energy Sec. Litig., supra, 246 F.R.D. at 198, quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 109; see also Passlogix, Inc. v. 2FA Tech., LLC, supra, 708 F. Supp. 2d at 411 ("To have a sufficiently culpable state of mind warranting a relevance inference, the spoliator must have acted in bad faith -- that is, intentionally or willfully."); Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 141 (S.D.N.Y. 2009) (Baer, D.J.) ("[W]hen evidence is destroyed in bad faith or with gross negligence, that alone has been found to be sufficient to support an inference that the missing evidence would have been favorable to the prejudiced party, and thus relevant.").

"Nonetheless, a court should never impose spoliation sanctions of any sort unless there has been a showing -- inferential or otherwise -- that the movant has suffered prejudice." GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 353 (S.D.N.Y. 2012) (Maas, M.J.); see also Passlogix, Inc. v. 2FA Tech., LLC, supra, 708 F. Supp. 2d at 412 ("Moreover, 'when the

39

spoliating party [is] merely negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction.'" (alteration in original), quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, supra, 685 F. Supp. 2d at 467-68).

> The noncompliant party bears the burden to demonstrate that the other parties did not suffer any prejudice from the spoliation.  Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they never asked for the evidence later shown to have been spoliated.

R.F.M.A.S., Inc. v. So, supra, 271 F.R.D. at 24-25 (internal citations omitted).

    B.  Application of Law:
       Plaintiffs' Motion for Sanctions

Plaintiffs contend that Pfizer should be sanctioned because (1) metadata from the eRooms have been destroyed; (2) entire eRooms have allegedly been destroyed or lost; and (3) certain relevant documents from Pfizer's productions are missing. I conclude that Plaintiffs are not entitled to sanctions on any of these grounds.

      1.  Pfizer's
        Duty to Preserve

40

The parties do not dispute that Pfizer implemented a litigation hold in this matter and, accordingly, Pfizer did not breach its duty in that respect.  The parties, however, disagree about when Pfizer's duty to impose this hold commenced.  Plaintiffs argue that Pfizer's duty to preserve arose in 2001 when it was first became involved in a patent dispute related to Celebrex and Bextra.  Pfizer contends that its duty to preserve attached in this action when the first complaint was filed on December 15, 2004 and that the earlier patent litigation did not trigger its duty.  Further, Pfizer claims that there are no documents, and Plaintiffs have failed to identify any, under Pfizer's custody and control that have been destroyed or lost after December 15, 2004.

I conclude that Pfizer's duty to preserve in this case arose in 2004, not in 2001.  The 2001 lawsuit was a patent action related to the identification of the enzyme that led to the development of Celebrex and Bextra.  As such, it raised different factual issues from the instant action and would not have given Pfizer reasonable notice of the foreseeability of this securities fraud litigation.  Cf. Byrnie v. Town of Cromwell, supra, 243 F.3d at 108 (party had notice of duty to preserve before complaint was filed where it had previously received FOIA requests

41

and others had expressed concerns about the subject matter of the
suit); <u>Kraus v. Gen. Motors Corp.</u>, 03 Civ. 4467 (CM), 2007 WL
3146911 at *2 (S.D.N.Y. Oct. 24, 2007) (McMahon, D.J.) (defendant
under no duty to preserve car as evidence in products liability
suit before complaint was filed because it had not been previ-
ously notified of any injury that might reasonably lead to liti-
gation and no litigation had been threatened); <u>M & T Mortg. Corp.
v. Miller</u>, 02 Civ. 5410 (NG)(MDG), 2007 WL 2403565 at *5
(E.D.N.Y. Aug. 17, 2007) (duty to preserve attached as of date of
an earlier action when the allegations in the earlier action were
"strikingly similar" to the current action); <u>see also</u> <u>Brigham
Young Univ. v. Pfizer, Inc.</u>, 282 F.R.D. 566, 572 (D. Utah 2012)
(rejecting argument that Pfizer's duty to preserve extended back
to earlier, unrelated litigations).  In addition, the duty to
preserve only extends to documents relevant to the claim of which
the party has notice.  For example, documents bearing on concep-
tion and reduction to practice may be critical in a patent case
in which the priority of inventions of a drug is in issue.  It is
difficult to understand, however, how such claims would trigger
an obligation to preserve documents concerning the side effects
experienced by some patients taking the drug.  Thus, because
Pfizer's obligation to preserve did not accrue before 2004 and

Pfizer did timely issue a hold on December 17, 2004, it did not breach its duty to preserve in this respect.

With respect to the scope of Pfizer's duty to preserve, Plaintiffs claim that Pfizer should have maintained the eRooms in the state in which they existed in 2004 and that the 2011 archiving project resulted in the destruction of relevant evidence. According to Plaintiffs, had the eRooms been subject to the litigation hold in 2004, they would have been able to establish what information was shared between Pfizer and Pharmacia about the cardiovascular risks associated with Celebrex and Bextra and who at Pfizer had access to this information. Pfizer responds that to the extent that any documents were lost or destroyed, the documents contained in the eRooms would have been duplicative of the custodial productions and that some eRooms were either consolidated into other eRooms or only contained non-substantive information. Additionally, Pfizer argues that neither the eRooms nor their metadata reflect who accessed particular documents contained in them.

A party is not required to preserve all exact duplicate copies of documents, but it is required to preserve all sources of potentially relevant evidence. Although the eRooms contain documents that may be largely duplicative of the custodial productions, they have a value in of themselves as compilations.

43

The manner in which Pfizer and its employees internally organized documents is relevant because it allows Plaintiffs to draw connections and understand the narrative of events in a way not necessarily afforded by a custodial production. Accordingly, Pfizer's duty to preserve extended to the eRooms and the failure to maintain them as of December 17, 2004 is a breach of Pfizer's obligation to preserve relevant documents. Thus, Plaintiffs have satisfied the first requirement of the spoliation analysis.

2. <u>Pfizer's Culpability</u>

Plaintiffs argue that Pfizer acted with at least gross negligence, if not willfulness, because Pfizer (1) repeatedly misrepresented the non-existence of the eRooms and the centralized databases in this action and other actions; (2) did not place a litigation hold on these sources; and (3) did not appropriately monitor its existing litigation hold. Pfizer responds that, to the extent there is any missing evidence, it did not act wilfully or intentionally in light of its good faith efforts to locate and restore all the eRooms Plaintiffs have identified and its otherwise full cooperation with Plaintiffs' discovery requests.

I conclude that Pfizer's conduct is, at most, negligent. Pfizer's conduct with respect to the eRooms and the cen-

44

tralized databases must be viewed in the context of the entire
discovery process in this case.  This history reflects that, to a
large extent, Pfizer did comply with its discovery obligations.
First, Pfizer instituted a litigation hold at the outset of this
case and identified the "key players" to Plaintiffs by naming
relevant custodians, as well as producing regulatory and
clinical-trial files and other legacy company files.  This re-
sulted in the production of 40 million pages of documents from 94
custodians.  Though Pfizer's hold did not ultimately reach the
eRooms and the centralized databases at issue here, there is no
indication that this failure was willful rather than only negli-
gent.  See De Espana v. American Bureau of Shipping, 03 Civ. 3573
(LTS)(RLE), 2007 WL 1686327 at *6 (S.D.N.Y. June 6, 2007) (Ellis,
M.J.) (finding that party acted only negligently notwithstanding
that its "preservation efforts regarding electronic records
within those agencies were inadequate and untimely"); see also
GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., supra, 282
F.R.D. at 357 (party only negligent when it failed to take any
steps beyond general backup procedures to preserve evidence after
litigation was anticipated).

        Pfizer did not conceal the existence of either the
eRooms or the centralized databases.  Though Plaintiffs may have
preferred to receive documents grouped by study, rather than by

custodian, Pfizer's response that it did not maintain documents according to the specific categories that Plaintiffs had listed in their document requests does not rise to the level of a purposeful misrepresentation, despite its narrow wording. Plaintiffs' argument that Pfizer's failure to take server snapshots of the eRooms and the centralized databases warrants a finding of a culpability greater than negligence is without merit. Although these snapshots could have proven what documents existed in these sources when the litigation hold was first placed, Pfizer's failure to do so amounts to no more than negligence, given that Pfizer preserved both electronic and hard copy documents of relevant custodians, as well as other pertinent clinical trial and regulatory files. Accordingly, the failure to take server snapshots did not result in the complete lack of preservation of relevant evidence and does not demonstrate more than negligence.

Although Plaintiffs are correct that Pfizer was previously sanctioned for discovery abuses in two other actions, the rulings in those actions do not prove willful or bad faith misconduct here. In <u>Brigham Young University v. Pfizer, Inc.</u>, 262 F.R.D. 637 (D. Utah 2009), Pfizer was sanctioned for failing to produce documents. In that decision, the Honorable Brooke Wells, United States Magistrate Judge, found that Pfizer was guilty of

46

negligence, but was not guilty of willfulness or bad faith;[8] the sanction was limited to the payment of plaintiff's attorneys' fees and further discovery concerning the completeness of Pfizer's search for documents.  Pfizer's prior acts of negligence are not admissible to prove that it was negligent here. Fed.R.Evid. 404(b); Jones v. Southern Pac. R.R. Co., 962 F.2d 447, 449 (5th Cir. 1992).  A fortiori, they cannot prove a more culpable mental state.

In In re Neurontin Antitrust Litig., MDL No. 1479, 2011 WL 2357793 (D.N.J. June 9, 2011), Pfizer was sanctioned for failing to produce a properly prepared 30(b)(6) witness and for its counsel's conduct at a 30(b)(6) deposition.  This misconduct is so factually distinct from the completeness of Pfizer's search for documents that it has minimal relevance here, and does not support an inference that Pfizer's conduct here was willful or in bad faith.

Finally, and most importantly, once it became clear that the eRooms and centralized databases existed and contained relevant documents, Pfizer worked with Plaintiffs to ensure the

---

[8]Although Magistrate Judge Wells did find that "Pfizer's [document] production has been negligent to the point that it closely approaches a finding of bad faith," she expressly declined to find that Pfizer acted willfully or in bad faith. 262 F.R.D. at 645.

production of documents from these sources, including foregoing

an initial privilege and relevancy review.  Pfizer has also

documented its efforts to identify, locate and restore all the

eRooms Plaintiffs had requested (Wellschlager Decl. App. B).  It

is also important to bear in mind that the eRooms contained

documents which likely would have been located elsewhere, i.e.,

in the custodial file of the person who created the document.

Although its efforts may not have been perfect, Pfizer did en-

deavor to meet all its obligations once additional document

repositories were identified and did produce an additional 20

million pages of documents.  Given its initial document produc-

tion and Plaintiffs' inability to identify any critical or "smok-

ing gun" documents first disclosed as part of the eRoom produc-

tion, Pfizer's actions in discovery do not suggest willful delay

or purposeful sluggishness.  Despite Pfizer's partially inade-

quate preservation efforts, these failures did not amount to a

total disregard of its discovery obligations.  See Pension Comm.

of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,

supra, 685 F. Supp. 2d at 465 ("[T]he failure to take all appro-

priate measures to preserve ESI likely falls in the negligence

category"), citing Treppel v. Biovail Corp., 249 F.R.D. 111, 121

(S.D.N.Y. 2008) (Francis, M.J.); cf. Residential Funding Corp. v.

DeGeorge Fin. Corp., supra, 306 F.3d at 112; Adorno v. Port Auth.

48

of N.Y. & N.J., 258 F.R.D. 217, 228 (S.D.N.Y. 2009) (Chin, then
D.J., now Cir. J.) (finding defendant acted only with negligence
where the plaintiffs had not shown "a wholesale failure by the
Port Authority to put in place a 'litigation hold' or otherwise
communicate document or destruction policies to its employees,
such that a finding of gross negligence by defendant would be
appropriate"); Convolve, Inc. v. Compaq Computer Corp., supra,
223 F.R.D. at 169-70 (sanctions not warranted notwithstanding
party's initial failure to produce certain documents and "its
erroneous representations that such documents did not exist").
Accordingly, I find that Pfizer has acted only with negligence.

        3.  Relevance

        Because Pfizer's spoliation was only negligent, Plain-
tiffs "must demonstrate that a reasonable trier of fact could
find the missing [evidence] would support [their] claims."
Treppel v. Biovail Corp., supra, 249 F.R.D. at 122, quoting
Zubulake v. UBS Warburg LLC, supra, 220 F.R.D. at 221 (first
alteration in original).  Plaintiffs have identified several
different categories of spoliated evidence that they contend
would have been favorable to them and, thus, are relevant.

                a.  eRoom Metadata
                    and Membership Lists

                        49

First, Plaintiffs claim that metadata from the eRooms, including "membership records, lists, usage and facility reports, security logs for all relevant eRooms as they existed during the Class Period and at the start of this case" have been lost (Docket Item 429, Plaintiffs' Reply Brief in Further Support of Motion for Spoliation and Other Sanctions Against Defendant Pfizer Inc. ("Pls.' Reply") at 2).[9]  According to Plaintiffs, this information is directly relevant to the individual defendants' scienter.  Pfizer contends that the restored eRooms contain all the metadata that existed at the time the eRoom was archived.

Plaintiffs have not established the relevance of the lost metadata from the Class Period.  As an initial matter, there is no real dispute that restored eRooms do not contain the metadata as it existed during the Class Period, but rather only contain the metadata as it existed when the particular eRoom was

_____

[9]In their reply brief, Plaintiffs also claim that the contents of the eRoom recycling bins have been lost (Pls.' Reply at 2).  While eRooms did have recycling bins that were capable of permanently deleting material (see Thomas Decl. Ex. 99), Plaintiffs have not offered any evidence that indicates or otherwise suggests that relevant evidence was placed in the eRooms' recycling bins.  Even if relevant evidence had been deleted from an eRoom, Pfizer has represented that it would have likely also existed in custodial file of the person who created it (Wellschlager Decl. Ex. 6 at 173:13-175:5, Thomas Decl. Ex. 40 at 16).  In this absence of proof of relevance or prejudice, Plaintiffs are not entitled to sanctions from any spoliation that may have resulted from Pfizer's use of the eRoom recycling bins.

archived.  For example, usage reports were only kept for one

year, and not on a cumulative basis.  In addition, membership

lists reflect only members as of the time the eRoom was archived.

Because many of the eRooms were archived in 2011, this means that

these lists would not reflect an eRoom's members throughout the

Class Period.  Thus, some metadata has been lost.  Despite this

lost evidence, there is no basis to impose sanctions.

While the metadata contained in the usage reports in

the facility eRooms would have reflected who created documents

and when these documents were created during the Class Period, it

would not reflect what individual users viewed or accessed such

documents.  Similarly, although the server logs or security logs

tracked when a user logged in or out of an eRoom, they did not

record what, if anything, that user might have accessed.  As

such, the evidentiary value of this information with respect to

the individual defendants' scienter would be minimal because it

could not be used to establish whether an individual defendant

accessed a particular document concerning the risks of Celebrex

and Bextra, assuming the eRooms contained such documents.  More-

over, many of the eRoom reports, including the usage reports,

reflected largely administrative information -- such as server

capacity -- that has no bearing on the securities fraud issues

raised in this action.  Most importantly, Plaintiffs have not

demonstrated prejudice.  Plaintiffs do not contend that this
metadata is the only source of scienter evidence, but rather only
that it "would clearly be helpful to Plaintiffs in proving their
case" (Pls.' Mem. at 20).  Plaintiffs do not explain how the
metadata would "clearly be helpful" to them and such utility is
not clear to me.  Thus, I conclude that there is no basis to
award sanctions arising from the lost eRoom metadata because
Plaintiffs have failed to establish its relevance.

        With respect to the eRoom membership lists, Plaintiffs
claim that Pfizer created such lists for all of its eRooms in
addition to the membership lists that can be automatically gener-
ated by the eRoom software and accessed from within the eRoom
itself (Pls.' Reply at 2 n.1).  In support of their claim that
such separate membership lists exist, Plaintiffs point to:  (1)
several of their own demonstrative exhibits; (2) several Pfizer
emails sent to certain members of some eRooms; and (3) several
screen shots taken of eRoom membership lists from within the
restored eRooms (Thomas Decl. Exs. 58-62b).  These documents,
however, do not demonstrate that Pfizer maintained membership
lists for its eRooms apart from the lists generated by and acces-
sible within the eRoom itself.  With respect to the demonstrative
exhibits which compare membership lists for particular eRooms
over time, they show only that the membership of an eRoom was not

static, but not that Pfizer maintained historical membership
lists for its eRooms in the regular course of business.  The
emails demonstrate, at most, that Pfizer used email to communi-
cate with eRoom members, but not that these emails served as a
comprehensive or historical record of a particular eRoom's mem-
bers.  Furthermore, Plaintiffs do not claim that Pfizer has not
produced all other similar emails that might have been sent to
eRoom members.  The screenshots of the eRoom membership lists
merely show that the eRoom software is capable of generating such
lists, but not that Pfizer maintained a history of these lists as
members were either added or deleted.  Thus, because Plaintiffs
have failed to show that Pfizer routinely maintained membership
lists for its eRooms outside of the eRoom themselves, there is no
spoliation and no basis for sanctions.

b.  COX-2 Alliance eRooms

Second, Plaintiffs claim that multiple eRooms from the
COX-2 Alliance[10] have been deleted and that these eRooms are
relevant because they "were the direct line of e-communication
between Pfizer and its co-promoter Pharmacia" (Thomas Decl. ¶
49).  Pfizer maintains that no eRooms with substantive informa-

---

[10]The COX-2 Alliance refers to a joint marketing effort by
Pfizer and Pharmacia to promote Celebrex and Bextra.

tion were deleted and that some of the eRooms Plaintiffs have

identified as deleted were consolidated into other existing

eRooms (Wellschlager Decl. Ex. 6 at 75:12-76:24).

In support of their argument, Plaintiffs have identi-

fied several documents that explain, as a general matter, the

purpose and function of eRooms (Thomas Decl. ¶¶ 49-50):

> 1.  A July 11, 2002 email referred to the "COX-2 Com-
> mercial Leadership Team" eRoom (Thomas Decl. Ex. 72),
> which was described in a August 2002 document as "a
> collaborative application available for Alliance Busi-
> ness Team members to share documents, share calendars,
> archive email, conduct discussions/instant messaging,
> and to conduct informal polls.  Other suggested uses
> include sharing of operational plans, Review Committee
> Activities, market reports, meeting minutes, and agen-
> das" (Thomas Decl. Ex. 70 at 2);

> 2.  A COX-2 Alliance newsletter which reported in per-
> tinent part that "An E-Room system has just been ap-
> proved by the COX-2 Alliance that will create a direct
> line for e-communication between Pfizer and Pharmacia"
> (Thomas Decl. Ex. 102 at Sirota-E 10000230779); and

> 3.  An evaluation of a Pharmacia employee who was a
> director of Alliance Management that noted that the
> employee had "Completed roll out of and training of
> eRoom, in September 2002.  This tool is now being uti-
> lized across the alliance to facilitate resolution of
> significant issues in addition to day-to-day work pro-
> cesses" (Thomas Decl. Ex. 103 at PHARMACIA DOCUMENTS
> 00267285).

These documents are informative to the extent that they describe,

in broad strokes, the intended purposes of the eRooms.  They,

however, do not shed light on what specific documents were actu-

ally located in these eRooms or how these documents would have

54

been favorable to Plaintiffs' securities fraud claims.  With
respect to the COX-2 Commercial Leadership Team eRoom, an email
reference, even taken in conjunction with a document describing
its general purpose, does not demonstrate that specific relevant
documents were actually placed in this allegedly lost eRoom.  The
email reference does not detail what specific documents this
eRoom would have contained.  Plaintiffs' second and third exam-
ples similarly fail to establish relevance.  The general descrip-
tion of the purpose of the eRooms does not demonstrate what, if
any, relevant documents could have been found in these eRooms.
See Treppel v. Biovail Corp., supra, 249 F.R.D. at 122-23 (gener-
alized assertions that missing evidence is relevant is insuffi-
cient to establish relevancy).

          Moreover, Plaintiffs have not been prejudiced.  First,
any documents that were contained in these allegedly missing COX-
2 Alliance eRooms would have also likely been found in the custo-
dial file of the person who created the documents.  Second,
Pfizer informed Plaintiffs that to the extent that a potentially
relevant COX-2 Alliance eRoom only contained a link to another
eRoom, that linked eRoom was archived.  Though Plaintiffs com-
plain that Pfizer never specifically identified these linked
eRooms (Thomas Decl. Ex. 69 at 1), a failure to identify is not
equivalent to a failure to preserve.  Accordingly, Plaintiffs

have not satisfied the relevance prong with respect to the miss-
ing COX-2 Alliance eRooms and no sanctions are warranted with
respect to them.

        c.  SCOP and
           WW Oncology eRooms

      Plaintiffs next contend that two other eRooms, the
Strategic Clinical Operation Plan ("SCOP") eRoom and the WW
Oncology eRoom, were not produced and that they contain relevant
information (Pls.' Reply at 3). Specifically, Plaintiffs claim
that the SCOP eRoom contained information related to Pfizer's
clinical operation plan (Thomas Decl. Ex. 74) and that the WW
Oncology eRoom contained information related to Pfizer's master
clinical study monitoring report (Thomas Decl. Ex. 75). Pfizer
responds that eRooms with these specific names did not exist
(Wellschlager Decl. App. B at Line 46). Further, with respect to
the SCOP eRoom, Pfizer contends that the production of three
other eRooms -- the WW DVP SCOP eRoom, the PGP Monthly Medical
Reports eRoom, and the WWSCOPCentral eRoom -- contained any
relevant SCOP documents and subfolders (Wellschlager Decl. App. B
at Line 47). With respect to the WW Oncology eRoom, Pfizer
located a Pfizer Oncology eRoom, but due to technical difficulty,
it was unable to restore it using the eRoom software and instead
provided Plaintiffs with its data in a native file (Wellschlager

Decl. App. B at Line 50).  Pfizer also points out that it pro-
duced the Arthritis Pain Oncology Repository Information eRoom,
which would have contained documents similar to those that would
have been found in the alleged WW Oncology eRoom (Wellschlager
Decl. App. B at Line 50).

        Plaintiffs have not established the relevance of these
allegedly missing eRooms.  Though Plaintiffs have pointed to
emails which refer to these eRooms as the "SCOP eRoom" and the
"WW Oncology eRoom" (<u>see</u> Thomas Decl. Exs. 74-75), the fact that
Pfizer employees may have referred to these eRooms with those
particular names does not establish that these were the actual
names of the eRooms.  Moreover, despite being unable to locate
these precise eRooms, Pfizer has produced other eRooms that it
believes contained documents similar to those that may have been
contained in the two eRooms Plaintiffs specifically identified
(Wellschlager Decl. App. A at Line 46; App. B at Lines 47, 50).
Finally, even assuming that these two eRooms are missing, a party
cannot establish the relevancy of documents merely by pointing to
their non-production.  <u>Mitchell v. Fishbein</u>, 01 Civ. 2760
(JGK)(GWG), 2007 WL 2669581 at *5 (S.D.N.Y. Sept. 13, 2007)
(Gorenstein, M.J.).  In light of Pfizer's apparent production of
responsive documents, Plaintiffs have not established that these
eRooms and the documents contained within them are in fact miss-

ing or that they have been prejudiced.  There is no basis for
sanctions because Plaintiffs have failed to satisfy the relevancy
prong with respect to these two eRooms.

> d.  Documents Allegedly
>     Missing from
>     Pfizer's Custodial Productions

Plaintiffs next claim that Pfizer's production from the
custodial files, the eRooms and the centralized databases is
incomplete and that specific relevant documents have not been
produced (Pls.' Mem. at 21; Thomas Decl. ¶¶ 52-61).  Pfizer
responds (1) that it was under no obligation to preserve many of
these allegedly missing documents because they pre-date Pfizer's
duty to preserve in this action and (2) that it has actually
produced some of these documents (see Wellschlager Decl. App. B
at Lines 47-53).

Plaintiffs' first example of the incomplete custodial
production relates to Mona Wahba (Thomas Decl. ¶ 19).  On May 23,
2000, Ms. Wahba wrote an email to Samuel Zwillich, a member of
Pfizer's clinical research team, to report that a medical confer-
ence had favorably viewed the result of a clinical study (Thomas
Decl. Ex. 17).  Mr. Zwillich responded, "They swallowed our
story, hook, line and sinker . . ." (Thomas Decl. Ex. 17).  This
email was produced in the New Jersey securities action, but was

not produced in this action, even though Ms. Wahba was identified
as a custodian.[11]  Pfizer responds that this email was not within
Ms. Wahba's custodial file, but rather was in the file of Mr.
Zwillich, who was not identified as a custodian in this action
(Wellschlager Decl. App. A at Line 12).  Assuming that this email
did in fact exist in Ms. Wahba's file at some point in time and
was not produced, Plaintiffs have not shown that it was improp-
erly destroyed or lost or that it existed in Ms. Wahba's files at
the time the duty to preserve attached.  There is no basis for
sanctions.

Next, Plaintiffs claim that the custodial productions
from Dr. Verne Pitman, Dr. Stephen Sainati, Dr. Elizabeth Kitsis
and Sharmila Parsotam are incomplete (Thomas Decl. ¶¶ 58-61).
Plaintiffs have not demonstrated that sanctions are warranted
based on these custodial productions.

Dr. Pitman was Pfizer's clinical liaison to the Searle
clinical team conducting the 1999 Alzheimer's trial that found
there was a statistically significant increased risk of cardio-
vascular events associated with Celebrex (Thomas Decl. ¶ 58; Ex.
86 at 30:9-12).  Plaintiffs claim that summary data he had re-
ceived from Searle has not been produced (Thomas Decl. Ex. 87

---

[11]Plaintiffs discovered this document after a filing in the
New Jersey securities action was unsealed.

(email stating that Dr. Pitman had received "45 pages of summary data" that he had requested Searle to fax)).  Plaintiffs next claim that Dr. Pitman's COX-2 files, which Dr. Pitman boxed up for a litigation and sent to archives (Thomas Decl. Ex. 86 at 58:15-59:18), have not been produced, even though "it seems logical that these documents (subject to a legal hold) could have been put into DLTS" (Thomas Decl. ¶ 58).  Finally, Plaintiffs claim that Pfizer has produced "surprisingly few e-mails and other documents" related to the 1999 Alzheimer's trial (Thomas Decl. ¶ 58).  Pfizer responds that it produced Dr. Pitman's custodial files.  Pfizer further contends that it produced the custodial files of those involved in the study in question (Wellschlager Decl. Exs. 62-64) and that the relevancy of these documents is minimal because this study was not considered a key study by Pfizer (Wellschlager Decl. App. A at Line 51).

Again, Plaintiffs have not demonstrated the relevance of the allegedly spoliated documents related to Dr. Pitman and his involvement in the 1999 Alzheimer's trial.  Even though Plaintiffs have not received the 45 pages of summary data, they have received other documents concerning this clinical trial. Moreover, Plaintiffs have not pointed to any other evidence that suggests that this missing data contained different or particu-larly relevant or critical information related to their claims.

60

Finally, to the extent that Plaintiffs' assertion that "surpris-
ingly few" documents were produced from Dr. Pitman and the 1999
Alzheimer's trial is meant to suggest that documents were
spoliated, this assertion is speculative and an insufficient
basis to justify the award of sanctions.

As to Dr. Sainati, Searle's medical monitor for the
1999 Alzheimer's trial, Plaintiffs claim that certain documents
he created relating to this clinical trial "seem to have disap-
peared" (Thomas Decl. ¶ 60), including a document entitled "Alz-
heimer's Review - Development Committee Meeting 05/13/99 - S.
Sainati" (Thomas Decl. Ex. 11 at Wahba-M 10000030582) and a
slideshow he presented at the Stockholm Symposium in 2000 that
may have included the adverse event findings from the 1999 Alz-
heimer's trial (Thomas Decl. Ex. 92 at 356:5-16).  Pfizer coun-
ters that it has produced documents related to the 1999 Alzhei-
mer's clinical trial, including some of Dr. Sainati's files
(Wellschlager Decl. App. A at Line 52).

Plaintiffs have not established the relevancy of the
Sainati documents.  Plaintiffs have not attempted to explain in
what way the Development Committee Meeting document would have
been favorable to them.  Moreover, this document was referenced
in a list of documents (Thomas Decl. Ex. 11) that, as explained
below, were copied to either the GDMS and DLTS database; Pfizer

61

has produced documents from both of these databases.  As to the
slide show, Dr. Sainati testified that "it would have been basi-
cally the same material" as other slide shows that were presented
to management and were produced here (Thomas Decl. Ex. 82 at
357:13-18).  Plaintiffs have provided no evidentiary basis from
which to infer that this allegedly spoliated slide show contained
any non-duplicative relevant material.

        Plaintiffs also contend that Pfizer's production from
Dr. Kitsis's files has been incomplete because she testified that
her COX-2 email archives "disappeared" and then "reappeared
within a day or two" and that this incident concerned her because
it occurred when she had expressed concerns about the "risk
benefit ratio" of Celebrex and Bextra (Thomas Decl. Ex. 93 at
306:8-16; 306:21-307:7).  This testimony, however, does not
demonstrate that any of Dr. Kitsis's emails or other files are,
in fact, missing.  Although Dr. Kitsis did not confirm that her
email archives were complete once they reappeared, Plaintiffs
offer no evidence that any documents were missing and there is
nothing in the record here from which to draw that inference.
Moreover, Pfizer produced over 21,000 pages from Dr. Kitsis's
files (Wellschlager Decl. Ex. 61) and Plaintiffs have not pointed
to any other evidence that raises questions concerning the com-
pleteness of this production.

Plaintiffs claim the custodial production from Sharmila Parsotam, a former Pfizer regulatory director, was incomplete because some her emails were produced in the GDMS production, but not in her custodial production (Thomas Decl. ¶ 17; Thomas Supp. Decl. Ex. 1).  Plaintiffs, however, have not elaborated on the relevance of these particular emails.  Moreover, given that these emails were ultimately produced, it cannot be said that they were improperly lost or destroyed.  There is no basis for sanctions.

Accordingly, Plaintiffs are not entitled to sanctions arising out of the alleged spoliated material from the custodial productions.

> e.  Documents Missing from
>     the eRooms and
>     Centralized Databases Productions

Next, referring to a table of contents for the "COX-2 Portfolio Alliance Repository" (Thomas Decl. Ex. 11), Plaintiffs claim that certain documents that should have been found in Pfizer's production from the Infoshare/Insight database are missing, including (1) September 16, 1999 Development Committee Meeting Minutes and Slides; (2) Peter Isakson Phase IIIb Plan Presentation - Development Committee Meeting, January 28, 1999; (3) minutes folder containing minutes of the Celecoxib Project team in 1999; (4) folder of Celecoxib protocols from 1998-1999;

63

and (4) folder of Valdecoxib protocols from 1998-1999 (Thomas
Decl. ¶ 55).  Plaintiffs further contend that Pfizer has failed
to confirm that all relevant documents that were transferred from
older databases to the Infoshare/Insight database were preserved
and that these documents were produced (Thomas Decl. ¶ 56).

Pfizer has produced an affidavit from Edward Gramling,
its discovery counsel, in which he attested that this table of
contents did not reflect a database that contained substantive
information, but rather merely linked users to documents con-
tained in an older database (Wellschlager Decl. Ex. 19 ¶¶ 3-4).
Mr. Gramling further explained that the documents in that older
database were transferred to either the GDMS or DLTS database
(Wellschlager Decl. Ex. 19 ¶¶ 3, 11-12).  In other words, these
documents that Plaintiffs allege should have been found in
Infoshare/Insight database would now be located in the GDMS or
DLTS databases.  Pfizer produced documents from both the GDMS and
DLTS databases.  Plaintiffs do not claim that these specific
documents are not found in those productions, but only that
Pfizer has failed to confirm their production and does not have
server snapshots to verify what was preserved.  In the absence of
extrinsic evidence that otherwise demonstrates the potential loss
of evidence, a party's failure to confirm production does not
establish that the documents are missing or that the documents

are relevant for the purpose of spoliation.  There is no basis
for sanctions based on the alleged non-production of these docu-
ments.

        Plaintiffs also contend that the restored eRooms are
missing specific documents that various other emails stated were
placed in the eRooms, but which have not been found in the eRooms
production (Thomas Decl. ¶ 52, Ex. 77-80).  Pfizer claims that
"it is likely that the referenced documents were part of Pfizer's
earlier productions" (Wellschlager Decl. App. A at Line 47).
With respect to the first three emails -- a 2002 email discussing
a study involving a COX-2 drug (Thomas Decl. Ex. 77) and two 2003
emails related to Celebrex (Thomas Decl. Exs. 78-78a) -- Plain-
tiffs, again, have not provided any indication about the contents
of these documents or how they would have been favorable to their
claims.  In addition, with respect to the latter two emails, the
documents to which they refer were uploaded to the eRooms by Eve
Essing, who was a custodian in this case.  Plaintiffs do not
claim that Ms. Essing's custodial production has been incomplete.
The final two emails date from 2005 and refer to documents that
were uploaded to the COX-2 Regulatory Document Library eRoom
(Thomas Decl. Ex. 79-80); Plaintiffs claim they have not been
able any to find these documents in any of Pfizer's productions
(Thomas Decl. ¶ 52).  As with the other documents, Plaintiffs

have not attempted to explain how these documents would have been favorable to them either through reference to pertinent deposition testimony or to other documents that were found in that same eRoom.  See DeEspana v. American Bureau of Shipping, supra, 2007 WL 1686327 at *8 ("Typically, the evidence used to establish relevance of missing documents is deposition testimony."). Plaintiffs' bare assertion that these documents are missing is not sufficient to establish relevance.

Finally, with respect to a draft "Statistical Analysis Report" of a Celebrex study conducted in 2002, which noted that there was a statistically significant increased risk of adverse cardiovascular events associated with Celebrex (Thomas Decl. Ex. 52a at PFE SECURITIES GDMS 002131381), Plaintiffs claim the final version of this 2002 report, its patient narratives and any other documents indicating who may have reviewed the report's results have not been produced (Thomas Decl. ¶ 36; Pls.' Reply at 5). Plaintiffs argue that this report is relevant because it directly contradicts Pfizer's public statements that it had not seen a high rate of cardiovascular events related to Celebrex.  Pfizer points out that an abstract of the report was produced to Plaintiffs in 2008 (Wellschlager Decl. App. A at Line 27; Ex. 56) and that this report is not relevant because it "specifically concluded that only two of the total nine cardiovascular events were

66

considered 'related to the study drug'" (Wellschlager Decl. App.
A at Line 27, Thomas Decl. Ex. 52a at PFE SECURITIES GDMS
002131224).

Plaintiffs are not entitled to sanctions based on
Pfizer's failure to produce documents related to the 2002 report.
Even assuming that these documents would weigh in Plaintiffs'
favor, there is simply no prejudice to Plaintiffs.  Plaintiffs do
in fact have the draft report which contains a conclusion consis-
tent with their position on the cardiovascular safety of
Celebrex.  In addition, Plaintiffs' characterization of this
document as "yet another study (i.e., the Turkish study) showing
increased CV risk for Celebrex" (Pls.' Reply at 7) implicitly
concedes that the information contained in this document is
consistent with the results of other studies that were produced.

In sum, Plaintiffs have failed to demonstrate the
relevance of the spoliated evidence.  Plaintiffs' motion for
spoliation and other sanctions against Pfizer is therefore de-
nied.

C. Plaintiffs' Motion:
   Delayed Production

Finally, Plaintiffs claim that Pfizer's belated produc-
tion of documents from the eRooms and the centralized databases

67

justifies sanctions.  I conclude that Plaintiffs are not entitled to sanctions because Plaintiffs have failed to show that Pfizer acted with the requisite culpability.

"When the nature of the breach [of discovery obligations] is non-production of evidence, as opposed to actual destruction or significant alteration, a district court 'has broad discretion in fashioning an appropriate sanction.'"  Pure Power Boot Camp v. Warrior Fitness Boot Camp, 587 F. Supp. 2d 548, 567 (S.D.N.Y. 2008) (Koeltl, D.J.) (adopting Report & Recommendation of Katz, M.J.), quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 107.  The test courts apply tracks the spoilation analysis:  the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  Residential Funding Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 107.  "[T]he harm caused by delay in production is a relevant factor in determining sanctions, if a court determines that sanctions are warranted."  Pure Power Boot Camp v. Warrior Fitness Boot Camp, supra, 587 F.

68

Supp. 2d at 567, citing West v. Goodyear Tire & Rubber Co., 167
F.3d 776, 780 (2d Cir. 1999).

There is no dispute that Pfizer had an obligation to
produce documents from the eRooms and the two centralized data-
bases.  The record, however, does not demonstrate that Pfizer
acted with a culpable state of mind.  Despite the fact that
Pfizer did not begin to produce documents from these sources
until near the close of discovery, once the existence of these
repositories was called to counsel's attention, Pfizer acted in a
timely manner.  Pfizer agreed to forego an initial relevancy and
privilege review to expedite the production.  Pfizer also worked
with Plaintiffs to locate and restore all the eRooms that Plain-
tiffs had identified.  Moreover, these sources likely contained
documents that were cumulative of earlier productions.  Though
Plaintiffs may have preferred to receive categorically organized
productions earlier on in the discovery process, this does not
change the fact that Pfizer did produce these documents.  The
ultimate production of these documents militates against the
imposition of sanctions.  Convolve, Inc. v. Compaq Computer
Corp., supra, 223 F.R.D. at 169-70 (requiring the full disclosure
of relevant documents, rather than sanctions, where party had
delayed in producing documents); Phoenix Four, Inc. v. Strategic
Resources Corp., supra, 2006 WL 1409413 at *7 (no adverse-infer-

69

ence instruction warranted where the party came forward with the evidence even though it was after the close of discovery).

Plaintiffs' claims of prejudice are largely conclusory. They argue that had the eRooms been produced earlier, they would have been able to make more informed decisions about their discovery strategy. They also claim they were prejudiced because they could not use the eRoom documents during the <u>Daubert</u> hearing, to question witnesses, or in their amended complaint. For example, Plaintiffs claim that draft minute meetings that were belatedly produced could have been useful in deposing defendants McKinnell and Katen because they showed that these defendants likely reviewed clinical trial results of Celebrex and Bextra and that McKinnell knew about Pfizer's interest in an Alzheimer's indication (Thomas Decl. ¶ 15, Ex. 110). Pfizer, however, had previously produced a presentation from that same meeting, which was used at Katen's deposition (Wellschlager Decl. Ex. 45) and the final meeting minutes were produced to Plaintiffs in 2008 (Wellschlager Decl. App. A at Line 7). Therefore, any prejudice to Plaintiffs is minimal. In addition, Plaintiffs claim that they would not have had to send a document review team to a Michigan warehouse to review hard copies of files had they been aware earlier that documents were available in an electronic format (Thomas Decl. ¶ 16). There is, however, a distinction

70

between lost usefulness and inconvenience, on the one hand, and prejudice, on the other hand.  The examples Plaintiffs have cited do not demonstrate the sort of serious harm to the effective litigation of their case that sanctions are intended to remedy. Finally, whatever prejudice Plaintiffs may have suffered is mitigated by the fact that these productions came well before the trial date.  Cf. Residential Funding Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 112 (instructing district court on remand that moving party "could establish prejudice by pointing to specific e-mails that it would have used at trial; if so, the District Court could consider the likelihood that the newly produced e-mails would have affected the jury's verdict, in light of all the other evidence adduced at trial"); L-3 Commc'ns Corp. v. OSI Sys., Inc., 02 Civ. 9144 (PAC), 2006 WL 988143 at *15 (S.D.N.Y. Apr. 13, 2006) (Crotty, D.J.) (moving party had not shown prejudice from untimely production of documents where rescheduling of trial date had afforded parties additional time to prepare with the belatedly produced documents).  Plaintiffs' motion for sanctions against Pfizer based on the delayed produc-tion of documents is denied.

      D.  Pfizer's Motion
         for Sanctions

Pfizer moves for sanctions on three different grounds: (1) against TRSL for its failure to preserve electronic documents; (2) against Plaintiffs for their failure to preserve material generated by two of their experts, Dr. Lawrence Baruch and Dr. Curt Furberg; and (3) against Plaintiffs for their use of statements by the Quoted Former Employees in the CCAC.

### 1.   TRSL's Document Preservation

Pfizer first seeks sanctions against TRSL because it failed to institute a litigation hold and did not suspend its routine document destruction.  Pfizer contends that these failures resulted in the loss of relevant emails concerning TRSL's investment in Pfizer.  Pfizer also claims that TRSL did not comply with a Louisiana state statute that requires the permanent retention of all documents related to its investment transactions.  TRSL counters that its preservation polices were adequate to preserve whatever relevant documents existed.

Pfizer's motion for sanctions against TRSL is denied because it has failed to demonstrate the relevance of the spoliated evidence.

### a.   TRSL's Duty to Preserve Electronic Documents

TRSL's duty to preserve relevant evidence attached when it made the decision to bring this action against Pfizer.  At that time, it did not institute a litigation hold and did not suspend its routine document destruction policies, including its one-year retention policy for emails.  Because these failures led to the destruction of emails and other electronic information, TRSL breached its duty to preserve.

b.  TRSL's Culpability

Pfizer argues that TRSL's failure to place a litigation hold amounts to gross negligence.  However, based on the record here, I conclude that TRSL acted only negligently because its compliance with its existing preservation policies and Louisiana state law was adequate to preserve relevant evidence notwith-standing the absence of a formal litigation hold.  Though other courts have found that a party has acted with gross negligence when it fails to institute a litigation hold, TRSL's situation presents several mitigating factors.  See Chin v. Port Auth. of N.Y. & N.J., supra, 685 F.3d at 162 (rejecting notion that fail-ure to institute a litigation hold constitutes gross negligence per se and endorsing a case-by-case approach).  Pursuant to Louisiana state law, TRSL is obligated to retain permanently all

records of its stock transactions, and it has produced these
records to Pfizer.  Mr. Reeves, TRSL's Rule 30(b)(6) witness,
testified that he could not say for certain that TRSL never had
any email communications about Pfizer with it outside advisors,
but he also testified that he would not have expected any such
communications because TRSL's investment decisions were in the
sole discretion of these advisors (Wang Decl. Ex 20 at 124:9-13).
Mr. Griffith testified that TRSL's employees knew to preserve any
documents related to Pfizer (Wang Decl. Ex. 33 at 49:7-22).  This
testimony, in conjunction with TRSL's statutory preservation
obligations, indicates that TRSL's preservation policies reached
the very sort of evidence relevant to a securities fraud action
that a litigation hold would have covered.  Importantly, TRSL's
representatives testified that TRSL did not exercise any inde-
pendent discretion over its investment decisions, but rather that
these transactions were entirely in the discretion of its outside
advisors.  This suggests that TRSL never had any internal docu-
ments concerning the decision to invest in Pfizer.  Thus, under
these particular circumstances, TRSL's failure to institute a
litigation hold does not rise to the level of gross negligence,
but rather only negligence.

          c.  Relevancy of
              TRSL's Documents

Finally, sanctions are not warranted because Pfizer has not established that any of the lost documents would have been relevant.  Pfizer claims that the missing documents were relevant to TRSL's decision to invest in Pfizer and the issue of reliance.  However, the evidence Pfizer has identified does not suggest that TRSL had any electronic documents that specifically referred to or discussed its decision to invest in Pfizer.  First, Pfizer overstates the significance of deposition testimony from a TRSL employee that TRSL would occasionally discuss a specific invest-ment with its outside investment advisors.  This testimony was elicited in an unrelated case -- the Tyco securities litigation -- and there is no indication that TRSL's testimony in that case has any bearing on what communication it may have had with its investment advisors concerning Pfizer.  Second, Pfizer argues that an email between TRSL and one of its investment advisors attaching information about a particular investment demonstrates that TRSL did communicate via email about specific investments and, therefore, there are missing emails related to Pfizer (Wang Decl. Ex. 35).  The mere fact that TRSL had received information about other unrelated investments is insufficient, without more, to demonstrate that it must have also necessarily received infor-mation about its investment in Pfizer.  Moreover, TRSL's Rule 30(b)(6) witness testified that TRSL likely sought this informa-

tion in the email cited by Pfizer only after TRSL had already
invested in that particular stock.   Therefore, its receipt of the
information after the investment was actually made sheds no light
on TRSL's decision-making process leading to that investment.
Third, the emails between TRSL and its outside advisors that
related to the execution of certain trades of securities, includ-
ing Pfizer, do not demonstrate that TRSL participated in the
decision to invest in Pfizer.   Rather, as explained by TRSL's
Rule 30(b)(6) witness, these emails illustrate TRSL's role as a
sort of middleman between its outside advisors and Louisiana
brokers in an effort to comply with a then in-effect Louisiana
law that required a certain percentage of trades be executed in
Louisiana (La. Rev. Stat. Ann. § 266.1).   The decision, however,
whether to make these trades remained in the sole discretion of
TRSL's outside advisors (Wang Decl. Ex. 20 at 64:4-5; Thomas Opp.
Decl. Ex. G at 82:4-5, 11-15; Thomas Decl. Ex. 33 at 7:24-8:5).
Finally, Pfizer argues that TRSL's potential receipt of a Goldman
Sachs document that contained an analysis of Pfizer's stock
indicates that there are other similar, relevant items that have
been destroyed.   However, Goldman Sachs is unable to confirm or
deny that it sent this document to TRSL (Thomas Opp. Decl. Ex. T
at 29 n.9).   Even assuming that it did, a document containing a
general analysis of certain stocks, including Pfizer, does estab-

lish that TRSL actually actively participated in investment
decisions.  At most, it demonstrates that Plaintiffs received
general information about stocks in its portfolio, but not that
it was actively engaged in the decision to buy or sell specific
securities.

            Even considering these documents in the aggregate, they
do not suggest that TRSL discussed its investment strategy con-
cerning Pfizer (or any other stock) with its advisors through
email and, therefore, these documents have no bearing on TRSL's
reliance.  Accordingly, the absence of documents has not created
"an unfair evidentiary imbalance."  Richard Green (Fine Paint-
ings) v. McClendon, supra, 262 F.R.D. at 291 (adverse inference
not appropriate "without some proof that the defendant's actions
created an unfair evidentiary imbalance"); see also Centrifugal
Force, Inc. v. Softnet Commc'n, Inc., supra, 783 F. Supp. 2d at
750 (in a copyright infringement action, plaintiff was not enti-
tled to sanctions where it did not demonstrate that missing
evidence "would have allowed it to show infringement in a way
that is at all materially different from the proof already avail-
able to it").  Moreover, TRSL has consistently represented
throughout the course of discovery that it did not have any
discretion over its investment decisions because these decisions
were made independently by its outside advisors (Wang Decl. Ex.

20 at 64:4-5; Thomas Opp. Decl. Ex. G at 82:4-5, 11-15; Thomas
Decl. Ex. 33 at 7:24-8:5).  Accordingly, there simply are no
relevant electronic documents to preserve or produce.  There is
no basis to sanction a party for non-production or spoliation
when those documents never existed in the first instance.  See
Zervos v. S.S. Sam Houston, 79 F.R.D. 593, 595 (S.D.N.Y. 1978)
(Werker, D.J.) ("Under ordinary circumstances, a party's good
faith averment that the items sought simply do not exist, or are
not in his possession, custody or control, should resolve the
issue of failure of production."); see also Nycomed U.S. Inc. v.
Glenmark Generics Ltd., 08 Civ. 5023 (CBA), 2009 WL 3463912 at *2
(E.D.N.Y. Oct. 21, 2009); Atwell v. City of New York, 07 Civ.
2365 (WHP), 2008 WL 5336690 at *1 (S.D.N.Y. Dec. 15, 2008)
(Pauley, D.J.).  Pfizer's motion for sanctions against TRSL for
failure to preserve electronic documents is denied.

    2.  Expert Material

        Pfizer next contends that I should impose sanctions
against Plaintiffs because they failed to preserve the documents
created and used by their experts Dr. Lawrence Baruch and Dr.
Curt Furberg in classifying deaths from Pfizer's clinical trials.
With respect to Dr. Baruch, Pfizer claims that the adverse event
files Dr. Baruch requested in connection with his classifications

78

and any files he created have been lost or destroyed.  With
respect to Dr. Furberg, Pfizer claims that his handwritten revi-
sions to Dr. Baruch's classification spreadsheet have been lost.
Pfizer argues that because Dr. Madigan's statistical analysis
relied on the classification work performed by Dr. Baruch and Dr.
Furberg, Plaintiffs should have produced these documents.  Plain-
tiffs respond that Dr. Madigan ended up relying on Pfizer's own
classifications and his reliance on Dr. Furberg's and Dr.
Baruch's classifications was ultimately limited to one category
and four additional deaths.

        The critical issue here is whether Plaintiffs had a
duty to preserve this material under the parties' protective
order regarding expert discovery.  This protective order pro-
vided, in pertinent part, that the parties were required to
produce only those documents "on which the expert has relied as a
basis for his or her opinion" (Wang Decl. Ex. 53 at ¶ 4(c)).
Here, Dr. Madigan's testimony demonstrates that he relied only on
the final product of Dr. Baruch's and Dr. Furberg's classifica-
tions, i.e., the final version of the classification spreadsheet
(Shilling Decl. Ex. 58 at 148:14-21).  Dr. Madigan did testify
that the classification work performed by Dr. Baruch and Dr.
Furberg was important to his analysis, but that testimony ad-
dressed their final conclusions -- not the process by which they

reached those conclusions.  In other words, it was the final
product of Dr. Baruch's and Dr. Furberg's work that mattered to
Dr. Madigan, not all the steps leading up it.  The fact that
Pfizer questions whether the classification process was sound is
a separate matter from whether Dr. Madigan relied on that process
in reaching his opinion.

       Moreover, an entire portion of Dr. Madigan's analysis
was updated to reflect classifications that had been performed by
Pfizer itself.  As a result, Dr. Madigan testified that his
analysis relied on Dr. Furberg's and Dr. Baruch's classifications
only with respect to one category and four additional deaths.
With respect to these deaths, Dr. Madigan similarly did not
testify that his opinion turned on the process by which either
Dr. Furberg or Dr. Baruch reached their classifications.

       Pfizer has also failed to demonstrate prejudice.
Pfizer claims that the spoliation of these materials has pre-
vented it from replicating the classification work of Dr. Baruch
and Dr. Furberg and adequately testing the reliability of Dr.
Madigan's analysis.  However, Pfizer does have the raw clinical
trial data underlying the work of all three experts, as well as
Dr. Baruch's and Dr. Furberg's final classification conclusions.
Indeed, Pfizer completed its own meta-analysis of the adverse
events that were reported in its clinical trial data.  In addi-

tion, Pfizer also has the classification work initially performed by Dr. Baruch in 2008 (Wang Decl. Ex. 7 at 391:20-392:14; Thomas Opp. Decl. ¶ 2).  Pfizer cannot claim prejudice when it has all the materials available to it to recreate the work performed by Plaintiffs' experts.

Finally, the fact that Dr. Madigan relied on Dr. Baruch's and Dr. Furberg's classifications does not alter my conclusion.  Again, he relied only on their final classifications and the documents reflecting those classifications were produced.

Accordingly, having failed to show that Dr. Madigan relied on any of the spoliated material from either Dr. Furberg or Dr. Baruch, Pfizer's motion to exclude the testimony of Dr. Madigan, Dr. Furberg and Dr. Baruch and its motion for sanctions against Plaintiffs arising out of the spoliation of this expert material are, therefore, denied.[12]

     3.  Statements of Quoted Former
         Employees Included in the CCAC

---

[12]Pfizer also claims that portions of the expert reports and testimony of Dr. Blume, Dr. Helfgott, Dr. Jewell and Dr. Zipes relied on Dr. Madigan's work, and therefore should also be excluded (see Docket Item 423, Memorandum of Law in Support of Defendants' Motion for Sanctions ("Pfizer Mem.") at 6, 16-17). For the reasons explained in the text above, this motion is also denied.

Pfizer next argues that I should award sanctions pursu-
ant to my inherent powers because Plaintiffs used the statements
of the Quoted Former Employees in a misleading manner in the
CCAC.  Plaintiffs respond that (1) sanctions pursuant to the
court's inherent power are inappropriate because Rule 11 of the
Federal Rules of Civil Procedure applies and (2) in any event,
sanctions are not warranted because Plaintiffs' use of the Quoted
Former Employees was proper.

>           a.  <u>Applicable Law</u>

Pursuant to its inherent power, a court may impose
sanctions "when a party has 'acted in bad faith, vexatiously,
wantonly, or for oppressive reasons.'"  <u>Chambers v. NASCO, Inc.</u>,
501 U.S. 32, 45-46 (1991), <u>quoting</u> <u>Aleyska Pipeline Serv. Co. v.</u>
<u>Wildnerness Soc'y</u>, 421 U.S. 240, 258-59 (1975).  The Supreme
Court, however, has counseled that "when there is a bad-faith
conduct in the course of litigation that could be adequately
sanctioned under the [Federal Rules of Civil Procedure], the
court ordinarily should rely on the Rules rather than the inher-
ent power."  <u>Chambers v. NASCO, Inc.</u>, <u>supra</u>, 501 U.S. at 50.
Nonetheless, if a court determines in its discretion that the
applicable Rule is not adequate to sanction the conduct, it may

rely on its inherent powers.  Chambers v. NASCO, Inc., supra, 501
U.S. at 50.

Rule 11 of the Federal Rules of Civil Procedure permits
a court to impose sanctions for violations of Rule 11(b).
Fed.R.Civ.P. 11(c)(1); Perez v. Posse Comitatus, 373 F.3d 321,
325 (2d Cir. 2004).  Rule 11(b) provides, in pertinent part, that
"[b]y presenting to the court a pleading . . . whether by sign-
ing, filing, submitting, or later advocating it . . . an attorney
. . . certifies that to the best of the person's knowledge,
information, and belief, formed after an inquiry reasonable under
the circumstances the factual contentions have evidentiary sup-
port or, if specifically so identified, will likely have eviden-
tiary support after a reasonable opportunity for further investi-
gation or discovery."  Fed.R.Civ.P. 11(b)(3).  In securities
fraud actions, "[u]pon final adjudication . . ., the [Private
Securities Litigation Reform Act] requires the court to make
findings regarding each attorney's compliance with Rule 11(b)."
Weinraub v. Glen Rauch Sec. Inc., 419 F. Supp. 2d 507, 512
(S.D.N.Y. 2005) (Scheindlin, D.J.); see 15 U.S.C. § 78u-4(c)(1)
("In any private action arising under this chapter, upon final
adjudication of the action, the court shall include in the record
specific findings regarding compliance by each party and each
attorney representing any party with each requirement of Rule

83

11(b) of the Federal Rules of Civil Procedure as to any com-
plaint, responsive pleading, or dispositive motion."). The PSLRA
does not alter the standards applicable to assessing whether Rule
11(b) has been violated, but instead makes review for Rule 11
violations mandatory rather than discretionary and creates pre-
sumptions regarding sanctions. ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd., 579 F.3d 143, 152 (2d Cir. 2009); de La Fuente v. DCI
Telecommc'ns, Inc., 259 F. Supp. 2d 250, 256 (S.D.N.Y. 2003)
(McMahon, D.J.).

       b.  Analysis

       Here, Pfizer's motion for sanctions based on the inclu-
sion of the Quoted Former Employees' statements in the CCAC is
more properly addressed through a Rule 11 motion after the final
adjudication of this action.  The crux of Pfizer's claim is that
the inferences Plaintiffs drew from these statements in support
of their scienter allegations "lacked any factual basis" (Pfizer
Mem. at 24-25) because each of the Quoted Former Employees all
maintained that he or she never believed that anyone at Pfizer or
Pharmacia engaged in any wrongdoing with respect to the safety of
Celebrex and Bextra and was never aware of any evidence of such
wrongdoing (Pfizer Mem. at 25; Wang Decl. Exs. 49-50).  In other
words, Pfizer has alleged that Plaintiffs' factual contentions in

the CCAC did not have evidentiary support.  This is the very sort
of claim that Rule 11 is intended to address.  See Fed.R.Civ.P.
11(b)(3); Richton Design Grp., L.L.C. v. Classical Pilates, Inc.,
06 Civ. 0547 (NRB), 2007 WL 1098706 at *3 n.1 (S.D.N.Y. Apr. 10,
2007) (Buchwald, D.J.) ("[T]he invocation of this Court's inher-
ent powers in situation such as this, where the moving party
might have availed itself of Rule 11, would have the unwanted and
undesirable 'effect of rendering Rule 11's separate motion and
safe harbor provisions meaningless,'" quoting Coley v. Rosewood
Care Ctr., Inc., 142 F.3d 1041, 1059 (7th Cir. 1998)).  Moreover,
Pfizer is assured of a Rule 11 review because the PSLRA makes
such a review mandatory in securities fraud actions.  See 15
U.S.C. § 78u-4(c)(1).  Thus, any prejudice from my decision not
to exercise my inherent power at this point in time to consider
whether Plaintiffs should be sanctioned is minimized.  To the
extent that Pfizer moves for sanctions because Plaintiffs' inves-
tigator did not disclose that it was working for a party suing
Pfizer when eliciting statements from the Quoted Former Employe-
ees, this conduct can also be addressed by Rule 11.  The context
in which the statements were given can color the analysis of
whether Plaintiffs were objectively unreasonable in drawing the
inferences that they did.

Moreover, the fact that the Quoted Former Employees disagree with the inferences Plaintiffs' counsel draws from their statements does not necessarily imply that Rule 11 has been violated.  Part of the job of an advocate is to argue to the fact finder that all the evidence, taken together, leads to the infer-ence most favorable to the advocate's client.  The fact that some percipient witnesses disagree with the ultimate conclusion drawn by the advocate does not ineluctably demonstrate that the conclu-sion is baseless or even incorrect.  As the preceding sections of this opinion demonstrate, millions of documents have been pro-duced in this action and numerous depositions conducted.  There can be no question that the Quoted Former Employees have not had access to this discovery and have not seen the same array of information to which Plaintiffs' counsel has had access.  The fact that the Quoted Former Employees draw different inferences, based on a less complete array of information, than Plaintiffs' counsel does provides no reliable basis for concluding whose inferences are correct.  Thus, even if I were to consider the merits of this aspect of Pfizer's application, there would be no basis for concluding at this point in time that Rule 11 has been violated.

Finally, a pre-trial motion for sanctions is not the appropriate vehicle to test the truth or falsity of allegations

in a complaint.  Pfizer's claim is that Plaintiffs misrepresented the Quoted Former Employees in such manner that their allegations lacked any factual basis.  If I were to accept this claim and sanction Plaintiffs, it would be tantamount to discrediting the truth of these allegations.  Such a finding, if warranted, is and should remain in the discretion of the fact finder.  A motion for sanctions cannot serve as an end-run around the fact finder's exclusive role to resolve factual disputes.

Accordingly, Pfizer's motion for sanctions based on the statements of the Quoted Former Employees included in the CCAC is denied without prejudice to renewal pursuant to Rule 11 after the final adjudication of this action.

IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion for sanctions is denied in its entirety (Docket Item 425), and Pfizer's motion for sanctions (Docket Item 422) is denied in its entirety.

Dated:  New York, New York
        January 8, 2013

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

87

Copies transmitted to:

Jay W. Eisenhofer, Esq.
Richard S. Schiffrin, Esq.
James J. Sabella, Esq.
Mary S. Thomas, Esq.
Charles T. Caliendo, Esq.
Brenda F. Szydlo, Esq.
Ned C. Weinberger, Esq.
Grant & Eisenhofer P.A.
485 Lexington Avenue
29th Floor
New York, New York  10017

David Kessler, Esq.
Andrew L. Zivitz, Esq.
Benjamin J. Sweet, Esq.
Michelle M. Newcomer, Esq.
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania  19087

Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
Seeger Weiss LLP
One William Street
New York, New York  10004

John R. Wellschlager, Esq.
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209-3600

Michael D. Hynes, Esq.
Rachel V. Stevens, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104

Lynn K. Neuner, Esq.
George S. Wang, Esq.
Patrick T. Shilling, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York  10017