UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE PFIZER INC. SECURITIES                    No.  04 Civ. 9866 (LTS)(HBP)
LITIGATION                                      No.  05 MD 1688 (LTS)

This document relates to: All Actions
--------------------------------------------------------x


## OPINION


APPEARANCES:


GRANT & EISENHOFER P.A.                     SIMPSON THACHER & BARTLETT LLP
By: Jay W. Eisenhofer, Esq.                 By: Lynn K. Neuner, Esq.
    Richard S. Schiffrin, Esq.                  George S. Wang, Esq.
    James J. Sabella, Esq.                      Patrick T. Shilling., Esq.
    Mary S. Thomas, Esq.                    425 Lexington Avenue
    Charles T. Caliendo, Esq.               New York, NY 10017
    Brenda F. Szydlo, Esq.
    Ned C. Weinberger, Esq.                 DLA PIPER LLP
485 Lexington Avenue, 29th Floor            By: John R. Wellschlager, Esq. (*pro hac vice*)
New York, NY 10017                          6225 Smith Avenue
                                            Baltimore, MD 21209
*Lead Counsel for Plaintiffs*                         - and-
                                                Michael D. Hynes, Esq.
                                                Rachel V. Stevens, Esq.
KESSLER TOPAZ                               1251 Avenue of the Americas
MELTZER & CHECK, LLP                        New York, NY 10020
By: David Kessler, Esq.
    Andrew L. Zivitz, Esq.                  *Counsel for Defendants*
    Benjamin J. Sweet, Esq.
    Karen E. Reilly, Esq.
    Michelle M. Newcomer, Esq.
280 King of Prussia Road
Radnor, PA 19087


*Counsel for Plaintiffs*

SEEGER WEISS LLP
By: Christopher A. Seeger, Esq.
    David R. Buchanan, Esq.
One William Street
New York, NY 10004

*Counsel for Plaintiffs*

LAURA TAYLOR SWAIN, United States District Judge

Lead Plaintiff Teachers' Retirement System of Louisiana ("TRSL") brings this action on behalf of a putative class of investors ("Plaintiffs") who purchased or acquired Pfizer stock between October 31, 2000, and October 19, 2005 (the "Class Period"), against Pfizer and corporate officers Henry McKinnell, John LaMattina, Karen Katen, Joseph Feczko, and Gail Cawkwell (together, the "Individual Defendants") (together with Pfizer, "Defendants" or "Pfizer").  Plaintiffs allege that Defendants fraudulently misrepresented the cardiovascular risks associated with two Pfizer drugs, Celebrex and Bextra.  Since the filing of the Consolidated Class Action Complaint on February 16, 2006, this case has survived a motion to dismiss, two motions for reconsideration, and a five-day Daubert proceeding.  Plaintiffs filed an Amended Consolidated Class Action Complaint ("CCAC") on March 27, 2012.  The Court granted Plaintiffs' motion for class certification on March 29, 2012, and the class was certified on July 5, 2012.

Now before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court has considered thoroughly all of the parties' arguments and, for the following reasons, the motion is granted in part and denied in part.

BACKGROUND

The following background facts are undisputed except as indicated.

Lead Plaintiff, the Teachers' Retirement System of Louisiana ("Lead Plaintiff" or "TRSL") and Named Plaintiffs Christine Fleckles, Julie Perusse and Alden Chace, represent a certified class consisting of all persons and entities who purchased or otherwise acquired securities issued by Pfizer Inc. ("Pfizer"), between and including October 31, 2000, through

October 19, 2005 (the "Class Period").  Lead Plaintiff and the Named Plaintiffs also represent a

sub-class (the "20A Subclass") consisting of all persons or entities who purchased

contemporaneously with sales of Pfizer common stock by certain Pfizer corporate officers on

specified dates.

Defendant Pfizer is a research-based, global pharmaceutical company that

develops, manufactures and markets prescription medicines, as well as consumer healthcare

products.  Pfizer acquired Pharmacia Corporation ("Pharmacia"), including all of Pharmacia's

interest in the drugs at issue -- Celebrex and Bextra -- on or about April 16, 2003.  G.D. Searle &

Co. ("Searle"), the company that began the research and development of Celebrex, had been

acquired by Pharmacia in 2000.  Prior to its acquisition of Pharmacia, Pfizer had a co-promotion

agreement regarding Celebrex, first with Searle and then with Pharmacia.[1]  (Defendants' Exs. 33

and 34.)

The Individual Defendants, Henry McKinnell, Karen Katen, John LaMattina,

Joseph Feczko, and Gail Cawkwell, were all senior Pfizer officers during the Class Period.

Henry McKinnell was Pfizer's Chief Executive Officer from January 2001 through the end of

the Class Period, and the Chairman of Pfizer's Board of Directors from May 2001 through the

end of the Class Period.  (Defendants' 56.1 Statement ¶ 1.[2])  Karen Katen, a Pfizer employee

since 1974, was president of Pfizer's pharmaceuticals operation during the bulk of the Class

Period and was Vice Chairman and President of Pfizer's human health division as of March

---

[1]     Throughout this Opinion, Searle and Pharmacia are referred to, jointly, as the
"Co-Promoter."

[2]     Citations to the parties' S.D.N.Y. Local Civil Rule 56.1 Statements and Plaintiffs'
Statement of Additional Facts ("AF") incorporate by reference the evidence cited
therein.

2005.  (Id. ¶ 2.)  Dr. John LaMattina, a Pfizer employee since 1977, was Pfizer's head of

research and development from October 2003 through the end of the Class Period.  (Id. ¶ 3.)  Dr.

Joseph Feczko was a senior vice president for medical and regulatory operations at Pfizer who

served as president of worldwide development within Pfizer's global pharmaceuticals unit from

June 2002 through the end of the Class Period.  He served as Pfizer's Chief Medical Officer

from February 24, 2005 through the end of the Class Period.  (Id. ¶ 4.)  Dr. Gail Cawkwell joined

Pfizer in December 2000.  She served as a medical director and was responsible for Celebrex

and Bextra during parts of the Class Period.  (Id. ¶ 5.)

         This action involves securities law claims based on Defendants' allegedly

fraudulent misrepresentations and omissions regarding the safety of two of Pfizer's pain-

relieving drugs, Celebrex (celexocib) and Bextra (valdecoxib).  Celebrex and Bextra are part of a

class of drugs known as Cyclooxygenase 2 ("COX-2") inhibitors, that in turn is part of a broader

class of non-steroidal anti-inflammatory drugs ("NSAIDs").  COX-2 inhibitors are primarily

used to treat pain resulting from arthritis and were designed as an alternative to older, traditional

NSAIDs such as aspirin, ibuprofen and naproxen.[3]  Merck's drug Vioxx was the biggest

competitor of Celebrex and Bextra in the COX-2 inhibitor market.

         Between 1998 and 2004, Defendants conducted various studies of the efficacy

and safety of Celebrex and Bextra.  Plaintiffs have proffered evidence that several of these

studies indicated that Celebrex and Bextra were associated with increased cardiovascular risks,

and that the results of the studies were internally recognized by Pfizer senior management,

---

[3]         Traditional NSAIDs effectively block two enzymes: Cyclooxygenase 1 ("COX-
1") and Cyclooxygenase 2 ("COX-2").  Because traditional NSAIDs suppress
both the COX-2 and COX-1 enzymes, they tend to cause harmful gastrointestinal
side effects.

including the Individual Defendants.[4]  Plaintiffs allege that, prior to the fall of 2004, Defendants

concealed material results of these tests and made false statements regarding the cardiovascular

risks associated with Celebrex and Bextra.  Defendants contend that certain risks were truthfully

disclosed and that others were not identified until 2004.

On September 30, 2004, Merck announced that it was withdrawing Vioxx from

the market, due to cardiovascular risks associated with the drug.  (Defendants' 56.1 Statement ¶

42; Defendants' Ex. 80.)  Upon receipt of this news, Defendant McKinnell, Pfizer's CEO at the

time, issued the following directive to Pfizer's senior officers:

> We need to move immediately to avoid collateral damage and to exploit what
> could be a major opportunity.  I see the priorities as the following: 1. Avoid this
> becoming a class effect.  We need a press release out the door before 9 am
> making it clear that our clinical studies in tens of thousands of patients show no
> signal of cardiovascular complications.  To the contrary we have seen strong
> signals of beneficial effects in cancer, etc.  How to handle Bextra is an
> interesting problem.  I suggest we focus on Celebrex . . .

(Plaintiffs' Ex. 387.)  Following this email, Pfizer issued a press release stating:

> The evidence distinguishing the cardiovascular safety of Celebrex has
> accumulated over years in multiple completed studies, none of which has shown
> any increased cardiovascular risk for Celebrex.

(Plaintiffs' Ex. 385.)  With regard to Bextra, the release stated only that "Bextra's cardiovascular

safety profile is also well established in long-term studies."  (Id.)

On October 15, 2004, Pfizer sent a letter to healthcare professionals, disclosing

the cardiovascular risks associated with Bextra that had become apparent in the CABG-I and

---

[4]      Plaintiffs contend that the studies that most clearly showed Celebrex's risk of
adverse cardiovascular effects were the Alzheimer's 001 Study, the CLASS
Study, the SUCCESS Study, and the APC Study.  The studies that showed
Bextra's risk of adverse cardiovascular effects were the CABG-I and CABG-II
studies.

CABG-II studies.  (Plaintiffs' Ex. 339.)  The letter stated that, in the two CABG studies, "a

higher rate of serious cardiovascular thromboembolic events (e.g., myocardial infarction,

cerebrovascular accident) was observed in the parecoxib [intravenous form of Bextra]

/valdecoxib and valdecoxib alone treatment arms compared to the group of patients receiving

placebo."  (Id.)  On November 24, 2004, the FDA approved a revised product label for Bextra

that disclosed the statistically significant cardiovascular events seen in Bextra-treated patients in

the CABG-I and CABG-II studies.  (Plaintiffs' Ex. 414 at Phelan-K 10000317140 and 7146.)

On December 16, 2004, the National Cancer Institute announced that it was

prematurely ending a long-term, placebo-controlled trial of Celebrex in cancer patients (the

"APC Study") because of an increased rate of heart attacks and strokes in patients taking

Celebrex.  (Defendants' Ex. 84.)  Pfizer disclosed the results of the APC Study to the market on

the morning of December 17, 2004.  (Defendants' Ex. 85.)  On April 7, 2005, the FDA required

Pfizer to insert a black box warning in Celebrex's label, stating that Celebrex "may cause an

increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke,

which can be fatal."  (Plaintiffs' Ex. 446.)  On this same day, the FDA issued an alert stating that

it had requested that Pfizer voluntarily withdraw Bextra from the United States market, given

Bextra's "potential increased risk fo[r] serious cardiovascular (CV) adverse events . . . , an

increased risk of serious skin reactions . . . , and the fact that Bextra [had] not been shown to

offer any unique advantages over the other available NSAIDs."  (Defendants' Ex. 449.)

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact).  A fact is considered material if "it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson, 477 U.S. at 248).  The Second Circuit has explained, however, that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation."  DeFabio v. East Hampton Union Free School Dist., 623 F.3d 71, 81 (2d Cir. 2010).  Rather, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  Duch v. Jakubek, 588 F.3d 757, 764 n.2 (2d Cir. 2009); see also Fed. R. Civ. P. 56(e).  The trial court's task at the summary judgment motion stage of the litigation is limited to discerning whether there are any genuine issues of material fact to be tried, and does not extend to deciding any such issues.  Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

In Count One of the CCAC, Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934. §§15 U.S.C. 78a et seq. (the "Exchange Act"), and Rule 10b-5(b) promulgated thereunder, by making material misrepresentations and omissions as to the cardiovascular safety of Celebrex and Bextra throughout the Class Period.  In Count Two, Plaintiffs allege that Defendants McKinnell, LaMattina and Katen violated Section 20(a) of the Exchange Act.  In Count Three, Plaintiffs allege that Defendants McKinnell, LaMattina and

Katen violated Section 20A of the Exchange Act in connection with their trading in Pfizer

common stock.

Count One: Section 10(b) Violation

Section 10(b) and Rule 10b-5 make it unlawful for any person to "make any

untrue statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in the light of the circumstances under which they were made, not

misleading."  17 C.F.R. 240.10b-5.  To establish a Section 10(b) violation, Plaintiffs must prove

the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).  Defendants

argue that they are entitled to summary judgment dismissing Plaintiffs' Section 10(b) claims

because Plaintiffs cannot establish elements (1), (2), and (6) (i.e., material misrepresentation or

omission, scienter, and loss causation).  The Court addresses each of Defendants' assertions in

turn.

Material misstatement or omission

A misrepresentation is material if there is "a substantial likelihood that the

disclosure of the omitted [information] would have been viewed by the reasonable investor as

having significantly altered the 'total mix' of information made available."  Basic Inc. v.

Levinson, 485 U.S. 224, 231-32 (1998).  That is, "[a] fact is to be considered material if there is

a substantial likelihood that a reasonable person would consider it important in deciding whether

to buy or sell shares [of a company's stock]."  <u>Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC</u>, 595 F.3d 86, 92-93 (2d Cir. 2010).

Plaintiffs have proffered evidence that several studies, conducted between 1998 and 2004, revealed that Celebrex and Bextra were associated with cardiovascular side-effects, and that Defendants were aware of these results.  Nonetheless, Plaintiffs allege, Defendants made over seventy misstatements, both before and during the Class Period, touting the cardiovascular safety of both Celebrex and Bextra, and describing the drugs as free of any cardiovascular risk.  In particular, Defendants emphasized that Celebrex and Bextra had a cardiovascular safety profile superior to that of their primary competitor, Merck Inc.'s Vioxx.  (<u>See, e.g.</u>, AF ¶ 755; Plaintiffs' Ex. 523 (defendant McKinnell quoted as saying "[Pfizer has] to communicate that cardiovascular safety is a critical differentiation between Celebrex and Vioxx").)

Defendants, focusing on four of the over seventy alleged misrepresentations, argue that certain statements are not actionable because they were true when made.  Defendants' arguments turn on distinctions among types of cardiovascular risks -- their principal contention is that the statements at issue denied that Celebrex and Bextra were associated with *cardio-clotting* or thromboembolic (as opposed to cardio-renal or cardio-rhythmic) risks, and were true, as Defendants had no information indicative of cardio-clotting risks at the time the statements were made.  Defendants' parsing of the statements is unavailing in the context of this motion practice.  The cited communications spoke to the absence of increased "cardiovascular" risk, rather than cardio-renal, cardio-rhythmic or cardio-thrombotic risks.  (<u>See, e.g.</u>, AF ¶¶ 705, 727 ("Celebrex showed no increase in thromboembolic or other cardiovascular-related events" and "Celebrex showed no increase in thromboembolic events (such as myocardial infarctions and

stroke) or other cardiovascular adverse events compared with the traditional NSAID

comparators").)  Furthermore, even accepting Defendants' contention that, when they used the

word "cardiovascular," they actually meant "cardio-clotting" or "thromboembolic," Plaintiffs

have proffered evidence that Defendants were aware of evidence of cardio-clotting risks

associated with Celebrex and Bextra at the time they made their alleged misrepresentations.

(See, e.g., AF ¶¶ 164 - 171; Plaintiffs' Ex. 154 (Part 12) at Cele IND 48395 00274862 (the

SUCCESS Study, a safety study designed to compare Celebrex with two traditional arthritis

medicines, was completed in April 18, 2000, and revealed a 10 to 1 increase in heart attacks for

Celebrex versus the traditional arthritis medicines).)  To the extent Defendants contend that the

recipients of the statements would, in context, have understood that the statements referred only

to a subclass of cardiovascular risks, Defendants' arguments are misplaced at this stage of the

litigation, as the Court is obliged to draw all reasonable inferences in favor of Plaintiffs.

Defendants next argue that certain of the alleged misstatements, notably

statements by Pfizer describing the results of various clinical trials, were opinions, not false

statements of fact.  They are correct in this regard.[5]  Publicly stated interpretations of the results

of clinical studies are "essentially no different than opinions," In re Sanofi-Aventis Sec. Litig.,

774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011), and therefore must be both objectively and

subjectively false to qualify as materially misleading.  Id. (Plaintiffs "must show both that the

Defendants did not actually hold the belief or opinion stated, *and* that the opinion stated was in

fact incorrect") (emphasis in original; internal quotations omitted).  Here, Plaintiffs have

---

[5]     For example, Defendants point to a statement made by Defendant Feczko at a
February 2005 FDA Advisory Committee hearing: "We believe that this data
shows that the cardiovascular safety of Celebrex is at least on a par with
therapeutic alternatives such as the non-selective NSAIDs."  (AF ¶ 823.)

proffered evidence from which a reasonable jury could find that opinions Pfizer issued with respect to the cardiovascular safety of Celebrex and Bextra were objectively false. Plaintiffs have also proffered evidence that, at the time Pfizer issued such opinions, the makers of the statements and/or senior Pfizer management were aware that the statements mischaracterized the underlying data, such that a reasonable jury could conclude that the speakers did not believe the opinions when they were communicated. (See, e.g., Plaintiffs' Exs. 423, 424 (results of Aerna epidemiologic study provided to Defendant Cawkwell by November 22, 2004, including conclusions that "Celebrex is associated with statistically significant increased likelihood of an [acute myocardial infarction] event compared to the [placebo group]" and that "in certain sub-reviews, both Celebrex and Vioxx had statistically significant increased likelihood of an AMI event compared to Other NSAIDs").

Defendants also argue that their statements were not misleading because, at the time the statements were made, Defendants had no indication that Celebrex or Bextra could present a *statistically significant* increased risk of heart attack or stroke. In support of this contention, Defendants note that the FDA did not take action related to the drugs' cardiovascular risks until seeing the results of the APC and CABG trials. Statistical significance is not, however, a sine qua non of materiality. See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011). Additionally, Plaintiffs have pointed to evidence in the record sufficient to raise a genuine issue of fact as to whether clinical studies prior to the APC and CABG studies showed statistically significant cardiovascular risks associated with Celebrex and Bextra. Finally, as this Court has previously noted, "the FDA is not the arbiter of materiality for purposes of the securities laws." In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 637 (S.D.N.Y. 2008). While the FDA ultimately requested Pfizer to withdraw Bextra from the market and added a "black

box" warning to Celebrex's label, the FDA's determination as to whether a drug is safe enough

to be on the market is not conclusive of the question of materiality, although it is, of course, a

relevant factor in the materiality analysis.

Plaintiffs have proffered evidence that Celebrex and Bextra were significant

revenue drivers for Pfizer, that the drugs' competition for market share with Merck's Vioxx

centered on cardiovascular safety, and that Pfizer was aware that *any* information as to the

drugs' cardiovascular safety would be material to investors, regardless of whether such

information was statistically significant or whether the FDA had acted upon it. (See, e.g., AF ¶¶

58-60, Plaintiffs' Ex. 87 (email to senior Pfizer employee Dr. Ethan Weiner attaching analyst

report downgrading Merck's investment rating due to Vioxx safety concerns; report noted that

even non statistically significant indications of cardiovascular risk in Vioxx were material in

determining investment ratings). Accordingly, factual issues preclude summary judgment for

Defendants on the issue of whether there were material misstatements or omissions.

Scienter

Plaintiffs may establish scienter by a showing of either conscious misbehavior or

recklessness on part of the defendants. Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).

Recklessness is established by proof that defendants knew or should have known that they were

misrepresenting material facts related to the corporation. Id. As a general rule, "scienter is a

fact-specific issue that is generally better left to the trier of fact to determine." Lehman Bros.

Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 159,

167 (S.D.N.Y. 2001).

Plaintiffs have proffered evidence that, during the Class Period, Pfizer and the

Individual Defendants knew of, but failed to disclose, the cardiovascular risks associated with

Celebrex and Bextra.[6]  Defendants argue that Plaintiffs' proffers are insufficient to create a genuine factual dispute as to scienter, because this case concerns merely a "good-faith disagreement about the proper interpretation of scientific data."  (Defendants' Brief at p. 22.).  However, the record is replete with evidence that Defendants recognized that Celebrex and Bextra had associated cardiovascular risks, that such risks would be considered material by investors, and that Defendants nonetheless misrepresented and actively concealed these risks.  One notable example is Pfizer's behavior with respect to the Alzheimer's 001 Study.  Plaintiffs have proffered evidence that this study, which was completed in June 1999, indicated a higher rate of cardiovascular adverse events associated with Celebrex versus the placebo, and that these results were discussed internally during a November 1999 presentation to the Co-Promoter's Senior Management Board.[7]  (Plaintiffs' Ex. 135 at Coughl-O 10000078811.)  In April 2000, the

---

[6]  Defendants argue that mere knowledge of undisclosed information does not equate to scienter, citing L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc., 939 F. Supp. 294, 299 (S.D.N.Y. 1996) ("it would be folly to hold . . . that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud").  Plaintiffs' scienter argument does not, however, rely merely on knowledge and failures to disclose.  Rather, Plaintiffs have also alleged numerous instances of affirmative misrepresentations.  See In re Bank of America Corp. Securities, Derivative & ERISA Litigation, No. 09-md-2058, 2012 WL 1353523, at *11 (S.D.N.Y. Apr. 12, 2012) ("The Second Circuit has stated that securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation").

[7]  A reasonable jury could conclude that Pfizer and the Individual Defendants were aware of material information regarding Celebrex and Bextra's safety profile that was discussed during internal meetings of the Co-Promoter.  The chair of the Co-Promoter's Senior Management Board, Dr. Phillip Needleman, was also a member of the Executive Management Committee, a joint committee comprised of top-level Searle and Pfizer executives, including Defendants McKinnell and Katen, that was aware of strategic planning as to Celebrex and Bextra.  (See Plaintiffs' Ex. 12, Ex. 582.)  Additionally, the Co-Promotion Agreement provided that the Co-Promoter would provide Pfizer "with all material clinical data and the

Co-Promoter authored an abstract describing the results of the study, which stated that "the safety profile was similar in the two treatment groups" and that "Celecoxib 200 mg BID was safe and well tolerated in this elderly population." (Plaintiffs' Ex. 137.) In December 2004, after the results of the APC study had been disclosed and the FDA raised broad concerns as to the cardiovascular risks associated with COX-2 inhibitors, the Data Safety Monitoring Board ("DSMB") for the Alzheimer's 001 Study sent Pfizer a letter, stating that the Alzheimer's 001 Study had indicated "excess cardiovascular-related and other risk"; that the Alzheimer's 001 database "may be the only medically ill-elderly population [Pfizer has] in a placebo controlled trial of celecoxib, and thus might reveal information otherwise unobservable in medically healthier or younger samples; and that the Alzheimer's 001 Study "should have been fully published in 2000, and perhaps if it had been some attention might have been drawn to potential safety issues." (Plaintiffs' Ex. 436 at Cawke-G 10003250383; 0385.) Shortly thereafter, in January 2005, Pfizer submitted to the FDA a supplemental report to the original Alzheimer's 001 Study report. Unlike the original report, the new report concluded that "the safety and tolerability of celecoxib 200 mg BID, compared to placebo, in this elderly, debilitated population cannot be decisively concluded." (Plaintiffs' Ex. 437 at Cele IND 48395 00001134-1135.) The supplemental report also acknowledged for the first time that "there were statistically significant differences observed between treatment groups for certain cardiovascular-related WHOART Body Systems (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorder; Myo, Endo, Pericardial & Valve Disorders)" and that "these differences were primarily driven by the individual terms cardiac failure, fibrillation atrial, and angina pectoris." (Id.)

---

opportunity to review other clinical data, non-clinical data and regulatory communications [as well as] all final study reports" relating to the drugs. (See, e.g., Plaintiffs' Ex. 11 at Crosbi-H 10000723882.)

In addition to Pfizer's about-face as to the Alzheimer's 001 results, there are several other examples in the record of Defendants making affirmative misrepresentations about Celebrex and Bextra's cardiovascular safety while internally recognizing safety concerns about the drugs.  (See, e.g., Plaintiffs' Ex. 170 at Cawke-G 10003103764 (June 2003 slide deck presentation sent to Defendant Cawkwell, noting that publication of SUCCESS I study results "may raise questions" because of the 5x increase in myocardial infarctions in celecoxib group); Plaintiffs' Ex. 390 (October 2004 Boston Globe article including quote from Defendant Cawkwell that Pfizer "knows of no study that shows an increased [cardiovascular] risk with Celebrex").)  While a jury could ultimately determine that Defendants' statements or omissions about the drugs' safety simply indicate a good-faith disagreement as to the interpretation of study results, summary judgment is inappropriate because a reasonable jury could also find that Defendants acted with scienter.

Causation

To establish causation in a securities action, plaintiffs must provide evidence of both transaction causation and loss causation.  In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000)

*Transaction Causation*

The term transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.  In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 509-10 (2d Cir. 2010).  Here, Plaintiffs are proceeding under the "fraud on the market" presumption of reliance, which can be rebutted by "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic Inc. v. Levinson, 485 U.S. 224, 248 (1988).

Defendants argue that Plaintiffs cannot establish reliance based on any of the forty-three alleged misstatements and/or omissions made during the portion of the Class Period prior to August 26, 2004, because Pfizer's share price remained constant during that time and so could not have been artificially inflated by any alleged misrepresentation.  Plaintiffs' expert, Professor Daniel Fischel, acknowledges that none of the pre-August 2004 statements artificially inflated Pfizer's share price.  In his report,  Professor Fischel assumes that Pfizer's stock was artificially inflated, based on pre-Class Period misrepresentations, by $1.46 at the beginning of the Class Period, and remained artificially inflated until August 26, 2004.

Transaction causation does not require a company's stock price to increase with each alleged misstatement.  In fact, "a misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made." In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 561-62 (S.D.N.Y. 2011); see also FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1315, 1317 (11th Cir. 2011) ("[I]t is irrelevant to securities fraud liability that the stock price was already inflated before a defendant's first actionable misrepresentation; fraudulent misstatements that prolong inflation can be just as harmful to subsequent investors as statements that create inflation in the first instance . . . Defendants whose fraud prevents preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance.").  Defendants argue that Professor Fischel has not explained when and how the $1.46 inflation that was allegedly built into the stock price at the beginning of the Class Period came about.  While Professor Fischel's expert report and deposition testimony do not include analysis specific to the $1.46 in alleged inflation, his event study does tie later drops in Pfizer's stock price to disclosures of adverse information

about Celebrex and Bextra's cardiovascular risks.  Additionally, the record includes several

alleged misrepresentations by Pfizer (and consequent favorable reports by financial analysts),

pre-dating the Class Period, as to Celebrex and the prospects for COX-2 drugs as a whole.  (See

AF ¶¶ 700 – 723.)  Drawing all reasonable inferences in favor of Plaintiffs, the Court finds that,

in light of these pre-Class Period alleged misstatements and later drops in Pfizer's stock price, a

jury could conclude that Pfizer's stock price was artificially inflated at the beginning of the Class

Period.  Accordingly, the Court finds that Plaintiffs have sufficiently framed genuine disputes of

fact with respect to transaction causation during the portion of the Class Period predating August

2004.[8]


### *Loss Causation*

The term loss causation refers to "the requirement that the wrong for which the

action was brought is a but-for cause or cause-in-fact of the losses suffered."  In re Omnicom

Group, Inc. Sec. Litig., 597 F.3d 501, 510 (2d Cir. 2010).  Loss causation may be demonstrated

through the market's reaction to either a "corrective disclosure" or the "materialization of [a

---

[8]    In arguing that Plaintiffs have not established transaction causation, Defendants
rely principally on In re Northern Telecom, 116 F. Supp. 2d 446, 458 (S.D.N.Y.
2000), a securities fraud class action in which  the court granted defendants'
motion for summary judgment in part because plaintiffs failed to establish
causation.  The facts of Nortel, however, are clearly distinguishable from those of
the instant case.  In Nortel, the plaintiffs' expert's opinion as to causation was
based on the theory that defendant was obligated to disclose negative information
to the market in order to prevent the relevant statements from being misleading.
The court held that plaintiffs had not demonstrated causation, because there was
no such duty of disclosure.  Additionally, in Nortel, plaintiffs' expert did not
conduct an event study and refused to opine that the relevant statements inflated
or artificially maintained the level of the stock price, while defendants' expert *did*
conduct an event study and concluded that none of the statements at issue had any
effect on the stock price.

previously concealed] risk." Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 594 (S.D.N.Y. 2008).  Here, Plaintiffs rely on the "materialization of the risk" theory, under which a plaintiff must show that "the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss."  Id. at 594; see also In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) ("In each of the cases in which the Second Circuit has employed a materialization of the risk analysis, it has considered a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss.").

The potential cardiovascular side effects of Celebrex and Bextra were the relevant undisclosed risk here.  Plaintiffs allege that Pfizer, through its misstatements and omissions, kept this risk concealed and assured the public that Celebrex and Bextra were not associated with adverse cardiovascular effects.  Plaintiffs' expert, Professor Fischel, conducted an "event study," through which he (1) identified seven disclosure events in 2004 and 2005 that revealed adverse cardiovascular risks associated with Celebrex and Bextra; (2) tied those events to statistically significant declines in Pfizer's stock price; and (3) cited market commentary confirming that it was those events -- not market forces or non-fraudulent Pfizer-specific news -- that caused the price declines.  (See Fischel Report, Plaintiffs' Ex. 490.)  The seven identified disclosures are as follows:

> (1) On October 7, 2004, *Reuters News* reported that "an editorial published in The New England Journal of Medicine late on Wednesday [October 6, 2004] . . . questioned the safety of [COX-2] arthritis drugs, including Pfizer Inc.'s (PFE.N) Celebrex and Bextra, which are members of the same class of treatments as Vioxx."  The same day, *Dow Jones News Service* reported that "Pfizer shares drop 6% as a report in New England Journal of Medicine raises concerns about Celebrex . . ." (Id. at p. 9)

> (2) Before the market opened on October 15, 2004, *Reuters News* reported that

Pfizer "said two clinical trials [i.e. the CABG-1 Study and the CABG-2 Study] showed patients taking its anti-inflammatory drug Bextra had a higher risk of cardiovascular events during high-risk coronary bypass surgery." On the same day, analysts at CIBC World Markets reported that this disclosure knocked 4% off of Pfizer's shares. (Id.)

(3) On November 4, 2004, *The National Post* of Canada reported that Celebrex "is itself suspected of contributing to at least 14 deaths and numerous heart and brain-related side effects." *Reuters News* reported that "Pfizer Inc.'s (PFE.N) shares fell as much as 6.2 percent on Thursday after a report in a Canadian newspaper said the company's arthritis drug Celebrex was linked to 14 deaths." (Id. at p. 10)

(4) Before the stock market opened on November 10, 2004, *The New York Times* disclosed that, according to a preliminary study presented at an American Heart Association meeting, "[t]he incidence of heart attacks and strokes among patients given Pfizer's painkiller Bextra was more than double that of those given placebos." *Reuters News* reported that "[s]hares of Pfizer Inc. (PFE.N) fell 2.1 percent before the bell on Wednesday after the New York Times reported that a study had found a higher incidence of heart attack and stroke among patients taking Pfizer's arthritis drug Bextra." (Id.)

(5) Before the market opened on December 17, 2004, Pfizer disclosed that "it received new information last night about the cardiovascular safety of its COX-2 inhibitor Celebrex (celecoxib) based on an analysis of two long-term cancer trials" and that "[b]ased on these statistically significant findings, the sponsor of the trial, the [National Cancer Institute], has suspended the dosing of Celebrex in the study." *Reuters News* reported that "[s]hares of Pfizer Inc. (PFE.N), the world's largest drugmaker, on Friday fell 12 percent in composite trading after trial data for its popular arthritis drug Celebrex showed increased risk of heart attack." (Id.)

(6) On Sunday, December 19, 2004, *Reuters News* reported that the FDA had asked Pfizer "to suspend advertisements for arthritis drug Celebrex" while regulators reviewed data from the clinical trials. The Wall Street Journal reported: "Pfizer continued to fall [on December 20, 2004], shedding 1.46, or 5.7%, to 24.29 after the Food and Drug Administration told it to stop advertising Celebrex, its pain treatment, to consumers. This came after a study linked high doses of Celebrex to a greater risk of heart attack, which led to an 11% drop in Pfizer's stock Friday." (Id. at pp. 10-11.)

(7) Before the market opened on October 20, 2005, *Dow Jones News Service* reported that "Pfizer Inc.'s (PFE) third-quarter earnings fell by more than half, hurt by a loss of patent protection on key drugs and a loss of sales from its blockbuster Cox-2 family of drugs. Discussing Pfizer's announcement the next day, The *New York Times* stated, among other things, that: "Facing increasing

generic competition and concerns about the heart risks of Celebrex, its once-popular painkiller, Pfizer said yesterday that sales in the third quarter fell 5 percent compared with the period in 2004.  The *New York Times* further stated that the Company's "report led Pfizer's battered shares to plunge $2.07 to $21.90."  (Id. at p. 11.)

Defendants argue that these seven events did not disclose "new" information, and so do not qualify as materializations of a previously undisclosed risk.  As to events (1), (4), (5), and (6), the Court finds that Plaintiffs have proffered evidence from which a reasonable jury could find that the events notified the public of previously undisclosed cardiovascular risks, and that Pfizer's stock price fell accordingly.

Events (2), (3) and (7) however, warrant a closer analysis.  Event (2) is connected with Pfizer's October 15, 2004, letter to healthcare professionals.  (See Plaintiffs' Ex. 339.)  In the letter, Pfizer discussed two topics -- Pfizer's proposal to modify Bextra's label due to the associated risk of adverse skin reactions, and Bextra's cardiovascular safety.  (Id.)  Defendants argue that, in the case of such a compound disclosure, Plaintiffs bear the burden of disaggregating the losses caused by each aspect of the disclosure.  Defendants rely on In re Williams Sec. Litig., 558 F.3d 1130, 1142 (10th Cir. 2009), a case where the court affirmed the district court's exclusion of a loss causation expert's testimony and affirmed a grant of summary judgment for defendants.  In Williams, the court found the expert's testimony unreliable in part because, when reviewing a corrective press release containing two announcements, the expert attributed all of the day's market losses to the revelation of fraud, despite the fact that the release "included [another] significant piece of [negative] information that was unrelated to the fraud." Id.  Here, as in Williams, Plaintiffs' expert fails to ascribe any portion of the October 15, 2004, market loss to the negative skin-related news, as compared to the CABG data disclosure.  Plaintiffs have, however, proffered evidence that Bextra's adverse skin effects had been publicly

disclosed as early as 2002, and thus a reasonable jury could conclude that the skin-related aspect of the disclosure had no effect on the October 15, 2004, stock decline.  (AF ¶ 832; see also Plaintiffs' Ex. 599 at pp. 2-3.)

Event (3) concerns a November 4, 2004 article in Canada's *National Post*, which stated that Celebrex was suspected of contributing to several deaths and heart and brain-related side effects.  (Defendants' Ex. 136.)  Shortly after the publication of the article, however, both Canada's health department and Pfizer refuted the assertion that any causal link could be drawn from this data.  (Defendants' Ex. 137.)  Thus, the Court finds that the November 4, 2004, article cannot qualify as materialization of a concealed risk, because the data discussed in the article did not evidence any true risk of Celebrex and Bextra's cardiovascular side effects.

Event (7) involves two news articles reporting the market's reaction to Pfizer's announcement that its third quarter earnings had fallen, in part because of reduced COX-2 inhibitor sales.  Rather than revealing any new information as to Celebrex and Bextra's cardiovascular risks, this event appears to be a simple reporting of business information.  In fact, Pfizer's announcement of reduced sales indicates that, at this point in time, information as to the drugs' risks was sufficiently disseminated that even buyers were aware of the risks. Accordingly, partial summary judgment is granted dismissing Plaintiffs' claims insofar as they are tied to disclosure events (3) and (7).

Claims against the Individual Defendants

Defendants argue that Plaintiffs cannot sustain their Section 10(b) claims against Individual Defendants Henry McKinnell, John LaMattina, Karen Katen, Joseph Feczko, and Gail Cawkwell, insofar as those claims relate to Pfizer press releases and SEC filings, because the

Individual Defendants may not be held liable for alleged misrepresentations made by others, and there is no evidence that the Individual Defendants acted with the requisite scienter.[9]

The issue of whether the Individual Defendants can be liable for allegedly misleading statements not expressly attributed to them must be analyzed in light of the Supreme Court's holding in Janus Capital Group v. First Derivative Traders, 131 S. Ct. 2296 (2011). In Janus, plaintiffs brought suit against an investment adviser for "making" false statements in its client mutual fund's prospectuses. Id. at 2299. The Supreme Court held that "[t]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 2302. Because nothing "on the face of the prospectuses indicate[d] that any statements" came from the investment advisor, and "none of the statements in the prospectuses were attributed, explicitly or implicitly, to [the investment advisor]," the Court concluded that the advisor had not "made" any actionable misrepresentations or omissions and could not be held liable under Rule 10b-5. Id. at 2305, 2305 n11. Janus did not, however, alter "the well-established rule that 'a corporation can act only through its employees and agents.'" In re Merck & Co., Sec., Derivative & "ERISA" Litig., MDL No. 1658, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001)); see also Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 2011 U.S. Dist. LEXIS 93873, at *15 (N.D. Ala. Aug. 23, 2011) ("nothing in Janus stands for the proposition that CEOs and CFOs can not be liable for false and misleading statements in their own company's financial statements"). In Merck, the court found that a senior Merck executive was liable for statements

---

[9]      Defendants do not contest that each Individual Defendant may be liable for the statements that he or she specifically communicated.

in the company's public filings that contained actionable misrepresentations.  The <u>Merck</u> Court

distinguished <u>Janus</u>, noting that the defendant "was at the time of each attributed statement an

officer of Merck" who "made the statements pursuant to his responsibility and authority to act as

an agent of Merck, not as in <u>Janus</u>, on behalf of some separate and independent entity."  2011

WL 3444199, at *25.  Similarly, in <u>City of Pontiac v. Lockheed Martin Corp.</u>, 875 F. Supp. 2d

359 (S.D.N.Y. 2012), the court noted that <u>Janus</u>:

> addressed only whether third parties can be held liable for statements made by
> their clients.  Its logic rested on the distinction between secondary liability and
> primary liability . . . and has no bearing on how corporate officers who work
> together in the same entity can be held jointly responsible on a theory of primary
> liability.  It is not inconsistent with <u>Janus Capital</u> to presume that multiple people
> in a single corporation have the joint authority to 'make' an SEC filing, such that
> a misstatement has more than one 'maker.'

<u>Id.</u>, at 373.  Such reasoning is equally applicable here.  The record contains evidence that the

Individual Defendants had "ultimate authority" over the alleged misstatements released by Pfizer

as a corporation.  In particular, Plaintiffs point to testimony from Andrew McCormick, Pfizer's

vice president of media relations during the Class Period, stating that top management, including

the Individual Defendants, reviewed all Pfizer press releases as to COX-2 drugs. (<u>See</u>

McCormick Deposition, Plaintiffs' Ex. 602 at 44:14 - 51:7.)  McCormick's testimony is broadly

corroborated by testimony from the Individual Defendants that they had authority over the

issuance of any press releases.  (<u>See</u> AF ¶¶ 25, 32, 37, 40, 42.); <u>see also</u> <u>City of Roseville</u>

<u>Employees' Retirement System v. EnergySolutions, Inc.</u>, No. 09 Civ. 8633, 2011 WL 4527328,

at *18 (S.D.N.Y. Sept. 30, 2011) ("<u>Janus</u> recognized that attribution [can] be 'implicit from

surrounding circumstances'") (quoting <u>Janus</u>, 131 S. Ct. at 2302).  Thus, there is record evidence

from which a jury could conclude that the Individual Defendants made statements issued by

Pfizer, and Defendants are not entitled to judgment dismissing the claims against them that are based on such statements.[10]

As to scienter, Plaintiffs have pointed to evidence in the record that each of the Individual Defendants was in possession of material, non-public information as to Celebrex and Bextra's cardiovascular side-effects when they made their public statements that the drugs were associated with no cardiovascular risk.  (See, e.g., Plaintiffs' Exs. 376, 405 (Pfizer senior management became aware of CABG II results no later than March 2004, but only disclosed results to public in October 2004).)  Defendants' summary judgment motion is therefore denied as to this issue.

Count Two: Exchange Act Section 20(a) Claim Against McKinnell, LaMattina and Katen

Plaintiffs assert control person liability claims under Section 20(a) of the Exchange Act against Individual Defendants McKinnell, LaMattina and Katen.  The law in this Circuit is not entirely clear as to the elements required to establish control person liability,

---

[10]    In addition to numerous press releases, the following Pfizer SEC filings also included alleged misstatements and omissions:  1) Second Quarter 2002 Form 10-Q (Plaintiffs' Ex. 525); 2) Third Quarter 2002 Form 10-Q (Plaintiffs' Ex. 527); 3) First Quarter 2004 Form 10-Q (Plaintiffs' Ex. 541); 4) Second Quarter 2004 Form 10-Q (Plaintiffs' Ex. 544); and 5) Third Quarter 2004 Form 10-Q (Plaintiffs' Ex. 557).  All the filings, with the exception of the Second Quarter 2002 Form 10-Q, were signed by Defendant McKinnell, who consequently may be liable for any misstatements contained within these filings.  Given the evidence of Defendant McKinnell's position as Pfizer CEO and his testimony that corporate statements were not issued without his approval, the Court finds that he may also be held liable for any misstatements within the Second Quarter 2002 Form 10-Q. Plaintiffs have identified no evidence to indicate that the other Individual Defendants had authority over the content of Pfizer's SEC filings, and so Defendants LaMattina, Katen, Feczko and Cawkwell may be not be held be liable for any misstatements contained in the filings listed above.

notably whether a plaintiff must establish "culpable participation" on the part of a defendant.[11]

This Court has previously held that in order to establish control person liability, a plaintiff must

establish: (1) a primary violation by a controlled person; (2) control of the primary violator by

the defendant; and (3) that the controlling person was a "culpable participant" in the primary

violation.  In re American Intern. Group, Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 534-35

(S.D.N.Y. 2010).  As shown above, Plaintiffs have proffered evidence sufficient to establish a

primary violation by Pfizer.  Plaintiffs have also proffered evidence that Defendants McKinnell,

LaMattina and Katen held top management positions at Pfizer such that they controlled the

corporation, and have also identified evidence in the record from which a jury could find that

McKinnell, LaMattina and Katen were culpable participants in Pfizer's fraud.  See, e.g., id. at

535 ("the pleading requirements for 'culpable participation' are satisfied by the same allegations

that satisfy the scienter pleading requirements").  The motion is therefore denied insofar as it

seeks dismissal of the Section 20(a) claim against Defendants McKinnell, LaMattina and Katen.


Count Three: Insider trading allegations as to McKinnell, LaMattina and Katen

---

[11]     Compare ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d
Cir. 2007) ("To establish a prima facie case of control person liability, a plaintiff
must show (1) a primary violation by the controlled person, (2) control of the
primary violator by the defendant, and (3) that the defendant was, in some
meaningful sense, a culpable participant in the controlled person's fraud") with In
re Parmalat Securities Litig., 497 F. Supp. 2d 526, 532 n. 42 (S.D.N.Y. 2007)
("This Court repeatedly has held that culpable participation need not be alleged to
state a claim under and is not an element of Section 20(a) liability. . . The Court
notes that [in ATSI Communications, Inc.] the Second Circuit recently listed
culpable participation as an element of liability under Section 20(a) . . . The
statement in ATSI, however, was dictum, as indeed was the statement in [SEC v.
First Jersey Securities, Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)] to which it
referred.  While the Court gives careful attention even to dicta of the Court of
Appeals, it respectfully declines to follow these, which appear to be at odds with
the language of Section 20(a) of the Exchange Act").

Section 20A of the Exchange Act, codified at 15 U.S.C. § 78t-1(a), imposes liability on any person who purchases or sells a security while in possession of material, nonpublic information.  Plaintiffs have indicated that the relevant defendants traded Pfizer stock on a variety of dates during the Class Period and have identified evidence in the record that, at the time defendants made these trades, they possessed material, non-public information concerning the cardiovascular safety of Celebrex and Bextra.  Because, however, Plaintiffs have identified no loss-causing cardiovascular risk information disclosure after December 19, 2004, Defendants may not be held liable for trades of Pfizer stock after that date.  (See discussion supra, granting partial summary judgment as to October 20, 2005 disclosure event.)

Liability for Pharmacia's Pre-Acquisition Conduct

Defendants' final argument is that they cannot be liable for the following ten pre-acquisition statements issued solely by Pharmacia and its employees:

> (1) On February 1, 1999, Dr. Needleman gave an interview to the Philadelphia Inquirer in which he stated "There has been no evidence of extra heart problems in the approximately 9,000 people who have taken Celebrex in trials . . ."  Dr. Peter Isakson followed up by stating that "In fact we'll keep track of all safety around the patients taking the drug," and assured the investing public that "We'll monitor cardiovascular just like we monitor all the safety around Celebrex." (CCAC ¶ 348.)

> (2) On April 28, 2000, Pharmacia issued a press release discussing the results of a Celebrex safety study.  (CCAC ¶ 356.)

> (3) On November 1, 2000, Pharmacia filed a Form 8-K with the SEC, stating in part that Celebrex showed "no increase in thromboembolic or other cardiovascular-related events."  (CCAC ¶ 363.)

> (4) - (10) Between August 22, 2001 and June 8, 2002, Pharmacia employees, notably Dr. Steven Geis, issued various media statements as to Celebrex's cardiovascular safety.  (CCAC ¶¶ 372(b), (c), (d), (f), 386, 389, 390.)

Prior to their April 2003 transaction, Pfizer and Pharmacia had a co-promote agreement, pursuant to which Pharmacia would not issue a press release without Pfizer's prior approval. (See ¶¶ AF 61-63.)  Accordingly, there is evidence from which a jury could find Pfizer liable in connection with statement (2), Pharmacia's April 28, 2000 press release.  Janus precludes liability for Plaintiffs' claims relating to the other statements, over which Pharmacia -- which at the relevant times was a separate and independent entity -- had control.  Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011).  Plaintiffs have proffered no evidence that Pfizer had "ultimate authority" over Pharmacia's pre-acquisition SEC filings, or that the Pharmacia employees who issued media statements (1) and (4) - (10) were controlled by Pfizer.  In fact, Plaintiffs assertion that Dr. Geis was Pfizer and Pharmacia's joint designee for media inquiries is contradicted by the record.  (See Geis Deposition, Plaintiffs' Ex. 93 at 63:13 - 63:24 (testimony that he was designated a media spokesperson for only Searle and/or Pharmacia).)  Thus, Plaintiffs have failed to meet their burden of proffering evidence from which a reasonable factfinder could conclude that Pfizer had "ultimate authority" over certain of the pre-acquisition Pharmacia statements and, therefore, Defendants are entitled to partial summary judgment dismissing Plaintiffs' claims that are premised on Pharmacia statements (1) and (3) through (10).

CONCLUSION

        For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiffs' claims that are based on the November 4, 2004, *National Post* of Canada disclosure and the October 20, 2005, *Dow Jones* and *New York Times* disclosures; as to Plaintiffs' claims against Individual Defendants LaMattina, Katen, Feczko and Cawkwell insofar

as they are based on alleged misstatements in the following Pfizer SEC filings -- Second Quarter

2002 Form 10-Q, Third Quarter 2002 Form 10-Q, First Quarter 2004 Form 10-Q, Second Quarter

2004 Form 10-Q, and Third Quarter 2004 Form 10-Q; and as to Plaintiffs' claims based on nine of

the statements issued by Pharmacia Corporation.  (See CCAC ¶¶ 348, 363, 372(b), (c), (d), and

(f), 386, 389, and 390.)  Defendants' motion is denied in all other respects.  This Opinion and

Order resolves docket entry no. 380.  A Final Pre-trial Conference will be held on July 12, 2013,

at 11:00 a.m. in Courtroom 17C.  The parties must meet with Magistrate Judge Pitman or an

outside mediator to work on settlement prior to that date, and must consult and file submissions

in advance of the conference in accordance with the Pre-Trial Scheduling Order issued

simultaneously herewith.


Dated: New York, New York
      March 28, 2012

                                               _____/S_____
                                               LAURA TAYLOR SWAIN
                                               United States District Judge