UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PFIZER INC. SECURITIES LITIGATION

No. 04-cv-9866 (LTS)(HBP)

ECF CASE

**DECLARATION OF CHARLES T. CALIENDO
IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND MOTION FOR
AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 1

    A.    Background ..................................................................................... 3

    B.    Twelve Years Of Hard-Fought Litigation.................................... 4

    C.    The Litigation Risks...................................................................... 7

    D.    The Settlement Is An Excellent Result Which Is
        Fully-Supported By A PSLRA-Appointed Institutional
        Investor ........................................................................................ 10

    E.    The Fee and Expense Reimbursement Requests ....................... 11

    F.    Conclusion .................................................................................. 13

II.   FACTUAL AND PROCEDURAL BACKGROUND OF THE
    LITIGATION........................................................................................... 13

    A.    The Appointment of Lead Plaintiff and Lead Counsel .............. 13

    B.    The Filing of the Consolidated Class Action Complaint and
        Dismissal And Reconsideration Motions ................................... 13

    C.    The *Daubert* Hearing On Medical Issues ................................. 15

    D.    Class Certification....................................................................... 16

    E.    Court Ordered Mediation ........................................................... 17

    F.    The Discovery Process................................................................ 18

        1.    Written Discovery And Document Analysis ...................18

        2.    Creation of Extensive Study Chronologies....................19

        3.    Taking Depositions .........................................................21

            a.    Pfizer and Third-Party Fact Witnesses ..............21

            b.    Experts ................................................................21

        4.    Defendants' Discovery of Plaintiffs................................22

    G.    Successful Motion For Leave To File An Amended Complaint
        And Denial of A Second Motion For Reconsideration............ 23

H.  Plaintiffs Largely Defeat Defendants' First Motion For Summary Judgment ........................................................... 24

I.  Trial Preparation ........................................................................ 26

    1.  Trial Exhibits and Refinement of the Extensive Drug Study Chronologies ................................................ 26

    2.  Deposition Designations ................................................. 27

    3.  Mock Trial and Creation Of Jury-Friendly Demonstratives ................................................................ 28

    4.  *Daubert* Motions And Other Motions In Limine ........... 28

    5.  Motion for Judgment on the Pleadings ......................... 29

    6.  Jury Instructions, Verdict Form, *Voir Dire* and the Pre-Trial Order ........................................................ 30

J.  The Exclusion of Plaintiffs' Loss Causation and Damages Expert ......................................................................... 31

K.  The Appeal .................................................................................. 32

L.  Continued Trial Preparation ...................................................... 33

III.  SETTLEMENT NEGOTIATIONS ......................................................... 35

IV.  TERMS OF THE SETTLEMeNT .......................................................... 36

V.  THE NOTICE PROGRAM ................................................................... 38

VI.  THE PLAN OF ALLOCATION ............................................................ 42

VII.  DAMAGES ......................................................................................... 44

VIII.  THE *GRINNELL* FACTORS SUPPORT APPROVAL OF THE SETTLEMENT ......................................................................... 47

A.  The Complexity, Likely Duration And Expense of the Litigation ........................................................................... 48

    1.  Complexity ...................................................................... 48

    2.  Likely Duration .............................................................. 54

    3.  Expense ........................................................................... 57

B.    The Reaction of the Class to the Settlement ............................................ 58

C.    The Stage of the Proceedings And The Amount of
      Discovery Completed ....................................................................... 59

D.    The Risks of Establishing Liability ....................................................... 60

      1.    Loss Causation ........................................................................ 60

      2.    Pfizer's Assertion That Certain Concealed
            Studies Were Actually Revealed to the Market
            During the Class Period .......................................................... 63

      3.    Potential Exclusion of Key Evidence on Motions
            *In Limine* ............................................................................ 63

      4.    Admission of Potentially Exculpatory Evidence If
            Plaintiffs' Key Motions *In Limine* Were Denied ......................... 64

      5.    The Difficulty of Proving Scienter .............................................. 65

            a.    Dr. McKinnell's "Interesting Problem
                  With Bextra" Email ......................................................... 65

            b.    The FDA's Public Statements ........................................... 66

E.    The Risks of Establishing Damages ...................................................... 67

F.    The Risks Of Maintaining a Class Action Through Trial ......................... 67

G.    The Ability of Defendants to Withstand a Greater Judgment .................. 68

H.    The Range of Reasonableness of the Settlement Fund
      In Light Of the Best Possible Recovery And In Light of
      All the Attendant Risks of Litigation ..................................................... 68

IX.   THE FEE PETITION ................................................................................. 69

A.    The Time and Labor Expended By Counsel ........................................... 71

B.    The Magnitude and Complexities of the Litigation ................................. 79

C.    The Risk of the Litigation ................................................................... 80

D.    The Quality of the Representation ........................................................ 81

E.    The Fee Requested In Relation to the Settlement ................................... 84

F.    Public Policy Considerations ............................................................... 85

X.      THE REQUEST FOR EXPENSE REIMBURSEMENT ..................................... 86

XI.     PLAINTIFFS' REQUEST FOR EXPENSE REIMBURSEMENT
        PURSUANT  TO 15 U.S.C. § 78u-4(a)(4) ........................................................... 88

XII.    CONCLUSION ................................................................................................. 90

## TABLE OF EXHIBITS

| EX. | DESCRIPTION |
|-----|-------------|
| A | Article: Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2015 Review and Analysis* (Cornerstone Research 2016) |
| B | Article: Svetlana Starykh and Stefan Boettrich, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review* (National Economics Research Associates Jan. 2016) |
| C | Declaration of Michael A. Keable In Support of Plan of Allocation (Plaintiffs' Damages Consultant) |
| D | Affidavit of Angela Ferrante of Garden City Group, LLC (Settlement Administrator) |
| E | Declaration of Roy A. Mongrue, Jr. of Teachers' Retirement System of Louisiana (Lead Plaintiff and Class Representative) |
| F | Declaration of Christine Fleckles (Class Representative) |
| G | Declaration of Julie Perusse (Class Representative) |
| H | Declaration of Alden B. Chace (Class Representative) |
| I | Declaration of Mary S. Thomas of Grant & Eisenhofer P.A. (Lead Counsel) |
| J | Declaration of David Kessler of Kessler Topaz Meltzer & Check, LLP (Additional Plaintiffs' Counsel) |
| K | Declaration of Christopher A. Seeger of Seeger Weiss, LLP (Additional Plaintiffs' Counsel) |
| L | Declaration of Gregory M. Utter of Keating Muething & Klekamp PLL (Additional Plaintiffs' Counsel) |
| M | Declaration of Joshua Dubin, Esq. of Joshua E. Dubin, Esq., P.A. (Additional Plaintiffs' Counsel) |
| N | Declaration of Gregory P. Joseph of Joseph Hage Aronson LLC (Additional Plaintiffs' Counsel) |
| O | Declaration of Jonathan S. Massey of Massey & Gail LLP (Additional Plaintiffs' Counsel) |

**CHARLES T. CALIENDO** declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I have been a member of the bar of this Court for 20 years and am a Director at Grant & Eisenhofer P.A. ("G&E"),[1] Lead Counsel for the Court-certified Class.  I submit this declaration in support of:  (i) final approval of the proposed settlement of this litigation consisting of $486,000,000 in cash plus interest accruing on the Settlement Fund (the "Settlement"); (ii) approval of the Plan of Allocation of the net proceeds of the Settlement, after deduction of all taxes, approved costs, fees and expenses; (iii) an award of attorneys' fees of 28% of the Settlement Fund to Plaintiffs' Counsel (the "Fee Request"); (iv) reimbursement of $20,004,879.33 in litigation expenses that were incurred by Plaintiffs' Counsel to prosecute this action ("Expense Reimbursement Request"); and (v) an award, pursuant to 15 U.S.C. § 78u-4(a)(4), to the Class Representatives in an aggregate amount of $21,515 to compensate them for their reasonable costs and expenses directly relating to their representation of the Class ("Class Representative Expense Request").

2.      I have actively participated in the prosecution of this Action and have personal knowledge of all material matters related to it and the facts set forth in this declaration.

## I.      INTRODUCTION

3.      The $486,000,000 cash settlement, which is being paid by or on behalf of defendants Pfizer Inc. ("Pfizer"), Henry A. McKinnell, Ph.D. (Pfizer's former Chief Executive Officer), Karen L. Katen (Pfizer's former President of Global Pharmaceuticals), Joseph M.

---

[1] Where an initial capitalized term is not otherwise defined herein, it shall have the meaning stated in the Stipulation and Agreement of Settlement (*see* ECF No. 700, Ex. 1) (the "Settlement Agreement").  "Plaintiffs" or "Class Representatives" refers to the Court-appointed lead plaintiff Teachers' Retirement System of Louisiana ("Lead Plaintiff" or "TRSL") and additional Court-appointed class representatives Christine Fleckles, Julie Perusse and Alden B. Chace.

Feczko, MD (Pfizer's former Chief Medical Officer) and Gail Cawkwell, MD, Ph.D. (a former Pfizer medical officer) (collectively, "Defendants"),[2] represents a significant recovery for the Class and, to the best of my knowledge, one of the largest securities fraud class action recoveries against a pharmaceutical company in history.

4.      Plaintiffs' damages consultant, Michael A. Keable, Executive Vice President of Compass Lexecon, estimates that maximum aggregate damages in this Action—assuming Plaintiffs were to prevail on every single liability issue after a trial on the merits—are $5.37 billion based on an estimated 3.67 billion damaged shares purchased during the Class Period.  *See* Declaration of Michael A. Keable In Support of Plan of Allocation dated October 27, 2016 ("Second Keable Decl.") submitted herewith as Exhibit C, ¶8; *see also* Declaration of Michael A. Keable dated September 13, 2016 submitted in connection with preliminary approval of the Settlement ("First Keable Decl."), ECF No. 702-1, ¶2.   The proposed Settlement's recovery of $486 million represents approximately 9% of these maximum aggregate damages. Notably, for years 2006-2015, median securities class action settlements as a percentage of estimated losses were only 0.8% to 1% for cases, like this one, with estimated losses of over $5 billion.[3]  As discussed further below (*see infra* § VII, however, the $486,000,000 Settlement also

---

[2] As used herein, the term "Individual Defendants" refers collectively to Dr. McKinnell, Ms. Katen, Dr. Feczko, Dr. Cawkwell and Dr. John L. LaMattina (former President of Pfizer Global Research and Development), who was dismissed with prejudice from the case on May 13, 2014, ECF No. 657, and was no longer a defendant at the time of the Settlement.

[3] *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2015 Review and Analysis*, at 9 (Cornerstone Research 2016) (hereafter, "Laarni Article"), attached hereto as Exhibit A; *see also* Svetlana Starykh and Stefan Boettrich, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review* (National Economics Research Associates Jan. 2016) (hereafter, "Starykh Article"), at 33, attached hereto as Exhibit B (finding that median securities settlements between 1996 and 2015 recovered 1% where losses were between $5 billion and $10 billion).

represents a significantly higher percentage of *likely recoverable* damages because of the enormous litigation risks that threatened to severely limit recoverable damages if the case were to proceed to trial. Consequently, it is respectfully submitted that the Settlement proposed here—reached after the Action was dismissed in its entirety at summary judgment and resurrected on appeal—is an excellent result for the Class and merits final approval.

A. **BACKGROUND**

5. As the Court is aware, the drugs at issue in this litigation—Celebrex and Bextra—are so-called "Cox-2" arthritis drugs that Plaintiffs alleged were associated with serious cardiovascular ("CV") risks, evidence of which Defendants began to hide at least as early as 1999 in order to keep Pfizer's stock price artificially inflated. ECF No. 361, ¶¶1-5. Pfizer initially "co-promoted" the drugs in partnership with G.D. Searle & Co. ("Searle") and later with Searle's successor-in-interest, Pharmacia Corporation ("Pharmacia"), which merged with a Pfizer subsidiary in 2003. *Id.*, ¶¶3, 28. The Co-Promotion partnership was known as the "Cox-2 Alliance." *Id.*, ¶236. Pfizer steadfastly denied, often in joint statements with Searle/Pharmacia, that there was any evidence of increased CV risks with the drugs. *Id.*, ¶¶348-473. Plaintiffs alleged that: (i) these statements were materially false or misleading because Pfizer was hiding evidence of increased CV risk in numerous drug studies Pfizer and its Co-Promotion partner had conducted prior to and during the Class Period (October 31, 2000 through October 19, 2005); (ii) the true heart risks with Bextra started to be revealed by Pfizer in October 2004 only because third parties threatened to expose a drug study showing increased CV risk for Bextra that Pfizer was hiding from the public; and (iii) Pfizer's stock price dropped substantially when the study was revealed (and thereafter), and Bextra was ultimately removed from the market. *See, e.g.*, *id.* ¶¶5, 255-296, 348-473.

3

6. After Bextra's true CV risks were revealed, however, Pfizer continued to deny that it had seen any evidence of increased CV risk for Celebrex. ECF No. 361, ¶288. Plaintiffs alleged, *inter alia*, that these continued denials were also designed to, and did, keep Pfizer's stock price artificially inflated. *See id.* In December 2004, Pfizer was forced to admit that Celebrex also was associated with increased CV risk and its stock price plummeted once again. *Id.*, ¶291. As with the Bextra-related price declines, Pfizer's stock price did not plummet because Pfizer voluntarily disclosed the evidence of increased CV risk with Celebrex it had, for years, been hiding. *See id.* Rather, Pfizer was forced to admit the increased CV risk with Celebrex because a third-party stopped a drug study it was conducting due to increased CV risk for study patients taking Celebrex, and was going to reveal it publically. *Id.* Only then did Pfizer tell investors that Celebrex was associated with increased CV risk. *Id.* Then, in early 2005, Pfizer quietly began to acknowledge that it had been in possession of drug studies showing "signals" of increased CV risk for Celebrex all along. *See, e.g., id.* ¶¶304-321.

## B.   TWELVE YEARS OF HARD-FOUGHT LITIGATION

7. Plaintiffs' losses caused by Defendants' alleged conduct described above occurred *twelve* years ago. Since then, Plaintiffs have been battling with Defendants and their team of as many as eleven highly-respected law firms (*see infra* § I.E) to recover losses Class Members suffered as a result of the alleged fraud. In a litigation involving esoteric medical issues not usually seen in a securities fraud case, Plaintiffs prepared an incredibly complex case for trial to put the Class in a good position to prove Defendants' alleged violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, and Sections 20(a) and 20A of the Exchange Act. Ultimately, Plaintiffs were able to achieve the Settlement only after recovering from a blow that is emblematic of the extreme risks

in litigating securities class actions—the exclusion of Plaintiffs' loss causation and damages expert on a *Daubert*[4] motion that resulted in dismissal of the Action on the eve of trial.

        8.      Prior to the exclusion of Plaintiffs' loss causation and damages expert, Plaintiffs' Counsel had, *inter alia*:

    (a) conducted an extensive investigation into the Class's claims, including review of voluminous publicly available information regarding Pfizer, Searle and Pharmacia;

    (b) conducted a deep dive into medical and CV literature and academic literature on bio-statistical and epidemiological analyses involving drugs;

    (c) drafted a consolidated class action complaint;

    (d) successfully opposed Defendants' motion to dismiss and a motion for reconsideration of the dismissal;

    (e) prepared for and largely won a *Daubert* challenge of Plaintiffs' medical and statistical experts, which was undertaken at Defendants' request in an unusually early stage of the case and involved (i) the review of millions of pages of documents produced in a products liability case involving Celebrex and Bextra filed before this Action, (ii) the preparation of numerous expert reports, (iii) depositions of all such experts, (iv) briefing of various *Daubert* motions, and finally, (v) the presentation and cross examination of nine experts in a five-day evidentiary hearing;

    (f) engaged in extensive discovery efforts, including taking and/or defending more than 100 fact and expert witness depositions, review and analysis of at least 37 opening, rebuttal and/or supplemental expert reports, review of millions of pages of documents in the 64,620,456-page production database in this Action, and preparation of numerous, highly-detailed chronologies of the many clinical drug studies at issue in this litigation;

    (g) successfully moved for class certification;

    (h) prepared a highly-detailed, 218-page amended class action complaint incorporating the fruits of Plaintiffs' extensive discovery efforts, and defeated Defendants' efforts to deny the Class the right to file such an amended complaint (as well as a second motion for reconsideration of the dismissal of the original consolidated complaint);

---

[4] *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).

(i) largely defeated Defendants' subsequent motion for summary judgment by marshaling a substantial amount of evidence indicating Defendants were aware of but hid the CV risks of the drugs, including a 255-page, 836-paragraph counter-statement of material facts as to which there were genuine issues requiring a trial supported by more than 630 exhibits containing evidence substantiating Plaintiffs' claims; and

(j) prepared for trial, including (i) conducting a mock trial, (ii) filing thirteen *Daubert* and other motions *in limine* and opposing eleven such motions by Defendants, (iii) distilling complex medical studies and other information into jury-friendly demonstratives, (iv) updating study chronologies to distill the massive amount of drug study information into useable quick reference guides for cross-examination purposes, (v) reviewing hundreds of hours of videotaped depositions and sifting through and designating the key parts of such depositions to be played at trial, (vi) analyzing the 1,687 exhibits Defendants designated for use at trial, and designating 1,567 proposed trial exhibits that would potentially be used to prove Plaintiffs' case at trial, and (vii) preparing an opening statement, jury instructions, verdict forms, *voir dire*, and the pre-trial order.

9.      Plaintiffs also successfully briefed and argued an appeal of the Court's exclusion of Plaintiffs' loss causation and damages expert on the eve of trial and the Court's earlier dismissal—based on the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)—of certain statements made by Pfizer's Co-Promotion partner, Pharmacia.

10.     Plaintiffs' efforts in preparing the case for trial, and then resurrecting it on appeal, demonstrated that Plaintiffs were ready to take the case to trial.  The Settlement is the product of protracted settlement negotiations, including formal mediation overseen by an experienced mediator and years of follow-up telephonic and in-person discussions.  The Parties ultimately reached the Settlement while Defendants' petition for rehearing and rehearing *en banc* of the Second Circuit's decision reinstating Plaintiffs' loss causation and damages expert was pending and as Plaintiffs were again preparing for trial on the assumption that the petition could be denied.

11.     While Plaintiffs and Plaintiffs' Counsel believe that the claims against Defendants are meritorious and supported by extensive evidence gathered to date, they also recognize that, in the absence of a settlement, they face significant risk that a smaller recovery—or, indeed, no recovery—might be achieved after a trial of the Action and the lengthy appeals that would surely ensue if a jury returned a verdict in Plaintiffs' favor.

### C.     THE LITIGATION RISKS

12.     The risks faced by Plaintiffs in this Action were enormous, as evidenced by, first and foremost, the eve-of-trial exclusion of Plaintiffs' loss causation and damages expert. While Plaintiffs were able to resurrect the case on appeal, the Second Circuit might still have decided to affirm the Court's exclusion of Plaintiffs' loss causation and damages expert in connection with Defendants' petition for rehearing and rehearing *en banc*.

13.     Putting aside appellate risks that may have prevented the case from ever getting to a trial, the risks if the case actually went to trial were huge.  As discussed more fully below (*see infra* § VIII.D.1), this included substantial risks in proving loss causation in that the jury might find particular corrective disclosures were not in fact corrective (*i.e.*, that concealed risk did not materialize).  As just one example, Plaintiffs alleged that Pfizer's December 17, 2004 announcement about a third-party-conducted study showing increased CV risk for Celebrex (referenced briefly above) was a materialization of risk that Pfizer had concealed in earlier Pfizer-conducted studies.  Defendants and their loss causation and damages expert argued strenuously that (i) the December 17 announcement was not corrective of any concealed information because it was based on *entirely new* information (*i.e.*, the results of the third-party-conducted study) that Pfizer had received only the night before, and (ii) the type of increased CV risk seen in this study (*i.e.*, increased "thromboembolic" risk) was not the same type of CV risk

7

seen in the earlier studies Pfizer had allegedly concealed.  *See infra* § VIII.D.1.  While the Court held there was enough evidence submitted at summary judgment for the question of whether this disclosure was corrective to go to the jury, there was a risk that a jury might find the disclosure was not corrective in a battle of the experts.  The risk with this particular corrective disclosure was extreme because its elimination could have the effect of eliminating nearly all of the $5.37 billion in aggregate maximum damages that could possibly be recovered.  As explained in ¶10 of the Second Keable Decl. (Exhibit C hereto), elimination of this corrective disclosure by a jury would result in collective maximum aggregate damages being reduced to $28 million, from the estimated maximum of $5.37 billion.  In other words, one single adverse factual determination by the jury would eliminate more than 99% of the best-case scenario of $5.37 billion in estimated aggregate damages.  *See infra* § VIII.D.1.  When the Settlement is viewed in light of the possibility of this risk coming to fruition and presuming that Plaintiffs are successful in overcoming all other arguments, the $486,000,000 cash recovery in the Settlement amounts to a recovery of *more than 17 times* the remaining aggregate recoverable damages.  *See infra* § VII.

14.     There were also substantial risks for Plaintiffs in establishing other required elements of their case, most notably *scienter*.  For example, the Cox-2 Alliance partnership was incredibly complex with layers upon layers of managerial committees between the Pfizer and Pharmacia employees who were directly analyzing the CV results in a particular study and Pfizer's top executives.  Indeed, there were at least 34 such committees during the length of the relevant time period.  *See infra* §§ VIII.A.1, IX.B.  While Plaintiffs' Counsel believe they had substantial evidence of Pfizer's knowledge of CV risk in particular studies generally, information about a given study's risks did not uniformly flow up the committee structure.  Given the complexity of the committee structure, proving that some of the Individual

Defendants had such knowledge would be a challenge.  Thus, although Plaintiffs' Counsel believe there was other direct and circumstantial evidence that the Individual Defendants were aware of statistically significant and/or other evidence of increased CV risk for Celebrex and Bextra, there was a risk that a jury might find Defendants did not have the requisite level of knowledge to establish *scienter* as to key evidence.  *See infra* § VIII.D.5.b / IX.B (discussing this and other risks).

15.     There were also other substantial risks that the Court may have excluded key evidence based on Defendants' motions in *limine*.  For example, the Court may have excluded a criminal guilty plea related to Bextra that would otherwise provide valuable evidence at trial of the falsity of Defendants' statements and *scienter*.  *See infra* § VIII.D.4.  On the other hand, the Court may have allowed Defendants to introduce evidence that their own top executives either took Celebrex or gave it to their family members, thereby potentially mitigating their knowledge of increased CV risk in the eyes of the now, hypothetical juror.  *See infra* § VIII.D.4.  There were also many other risks relating to *scienter* in addition to those touched on above as well as challenges related to proving by a preponderance of evidence that particular studies were in fact fully concealed by Defendants.  *See infra* § VIII.D.2.

16.     Finally, even if Plaintiffs won a verdict after trial, the post-trial appeals that would likely ensue presented risks that the Class might ultimately receive no recovery or, at a minimum, that it may have to wait a decade or longer after a verdict to receive any recovery that remained after Defendants' exhaustion of all their appellate and other post-trial rights, with no guarantee of any award of pre-judgment interest (let alone an adequate one) to compensate them for the extreme delay.  *See infra* §§ VIII.5.b, IX.B.

### D.   THE SETTLEMENT IS AN EXCELLENT RESULT WHICH IS FULLY-SUPPORTED BY A PSLRA-APPOINTED INSTITUTIONAL INVESTOR

17.    Given these and other substantial litigation risks discussed below (*see infra* § VIII), Plaintiffs' Counsel respectfully submit that the Settlement represents an excellent result for, and is in the best interests of, the Class.  The Settlement confers a substantial, immediate and guaranteed recovery for the Class and avoids the risk of protracted litigation in the future that renders any recovery by the Class uncertain.

18.    Consistent with the intent of Congress in passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Lead Plaintiff is a sophisticated institutional investor.  Lead Plaintiff was actively involved throughout the litigation, and was aware of, participated in and approved the settlement negotiations, and fully endorses the Settlement.  The other Class Representatives were also involved in settlement negotiations and fully endorse the Settlement.[5]

19.    It is also respectfully submitted that the Court should approve the proposed Plan of Allocation (the "Plan" or "POA") of the net proceeds of the Settlement, after deduction of all taxes, approved costs, fees and expenses.  The Plan, which is set forth in the Notice of Proposed Settlement of Securities Class Action, Application for Attorneys' Fees and Expenses, and Settlement Fairness Hearing (the "Notice") that has been mailed to more than 4.1 million potential Class Members and Nominees,[6] is based on Plaintiffs' loss causation and

---

[5] Attached hereto as Exhibits E through H, respectively, are the supporting declarations of Roy A. Mongrue, Jr. (the "Mongrue Decl."), the representative of Lead Plaintiff Teachers' Retirement System of Louisiana ("TRSL"), Class Representative Christine Fleckles, Class Representative Julie Perusse and Class Representative Alden B. Chace.  Collectively, these declarations are sometimes referred to herein as the "Class Representative Declarations."

[6] *See* Affidavit of Angela Ferrante of Garden City Group, LLC ("GCG" or the "Settlement Administrator") (the "GCG Affidavit" or "GCG Aff."), attached hereto as Exhibit D, ¶12.

damages expert's post-appeal determinations of the amount of artificial inflation present in Pfizer common stock during the Class Period and the dissipation of that inflation as the corrective disclosures took place. Plaintiffs' loss causation and damages expert and Plaintiffs' damages consultant were not provided with and did not take into consideration any particular trading activity of the Lead Plaintiff or the Class Representatives in developing the Plan.

20.    The relevant law supporting approval of the Settlement and the Plan is set forth in Plaintiffs' accompanying Memorandum of Law in Support of Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Brief").

E.    THE FEE AND EXPENSE REIMBURSEMENT REQUESTS

21.    I also submit this declaration in support of the application by Lead Counsel for an award of attorneys' fees in the amount of 28% of the Settlement Amount and reimbursement of 12-years-worth of litigation expenses in the amount of $20,004,879.33 (previously defined as the "Expense Reimbursement Request"), plus interest on both amounts from the date the Settlement was funded through the date of payment at the same rate the Settlement Fund earns.

22.    As further described herein (see infra § VIII.H) and in the accompanying Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Fee Brief"), Plaintiffs' Counsel's efforts have produced an excellent result for the Class, especially in light of the extreme litigation risks and factual, legal, medical and procedural complexities they faced.

23.    Plaintiffs' Counsel prosecuted this factually dense and incredibly complex case for twelve years on a wholly contingent basis. Plaintiffs' Counsel expended vast resources and incurred a huge amount of expenses—approximately 290,705 attorney and professional

support staff hours reflecting a lodestar of $120,437,653 and $20,004,879.33 in expenses—with no guarantee that such expenses would be recovered or their legal fees would be paid. As discussed in brief above and in further detail below (a complete description of the work performed by Plaintiffs' Counsel is provided below), the quality of the representation in this case was excellent and Plaintiffs' Counsel's efforts against an array of no less than eleven of the nation's finest defense firms were extraordinary. The Class Representatives also recommend that the Fee Request and Expense Reimbursement Request be awarded in their entirety. *See* Class Representative Declarations, Exhibits E through H.

24. The reasonableness of the Fee Request is further confirmed by a comparison to other fee awards in large settlements as discussed in the Fee Brief under both the percentage of the fund method and a lodestar cross-check. When compared to fee awards in the comparable settlements discussed in the Fee Brief, the Fee Request remains fully supportable under any method of review.[7]

25. Lead Counsel also requests that the Court grant reimbursement of costs and expenses incurred by Class Representatives directly related to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4), in the aggregate amount of $21,515 (previously defined as the "Class Representative Expense Request").

---

[7] As of November 4, 2016, a total of 4,106,573 copies of the Notice were disseminated to Class Members and their nominees, and the Publication Notice was published in *The New York Times* and *The Wall Street Journal*, and transmitted over *PR Newswire*. *See* GCG Affidavit, ¶¶7-13 (Exhibit D hereto). Although the deadline for objecting has not yet passed and, thus, the reaction of the Class to the Settlement is not yet fully known, Plaintiffs' Counsel note that out of more than 4.1 million Notices mailed, as of November 10, 2016, only 10 objections in connection with the Settlement have been received by Lead Counsel. In the interests of judicial economy, Plaintiffs' reply submission following the objection deadline will respond to these and any other objections that are received prior to the deadline so all objections can be addressed at once.

### F.    CONCLUSION

26.    For the reasons discussed above and further below, and in the Settlement Brief and Fee Brief, I respectfully submit that the Settlement is outstanding and merits final approval, that the proposed POA is equitable and just, and that the Fee Request, Expense Reimbursement Request and Class Representative Expense Request should be awarded in full.

## II.    FACTUAL AND PROCEDURAL BACKGROUND OF THE LITIGATION

### A.    THE APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

27.    Beginning in December 2004, the first of a series of class action complaints was filed in this Court against Pfizer and certain of its officers and directors, asserting violations of the federal securities law in connection with Pfizer's statements regarding the CV risks of Celebrex and Bextra.  ECF No. 1.

28.    By Opinion & Order dated October 21, 2005, the Court consolidated the related actions, appointed TRSL as Lead Plaintiff pursuant to the PSLRA and designated G&E as Lead Counsel for the then-putative class.  ECF No. 43.

### B.    THE FILING OF THE CONSOLIDATED CLASS ACTION COMPLAINT AND DISMISSAL AND RECONSIDERATION MOTIONS

29.    On February 16, 2006, Lead Plaintiff and additional named plaintiff Christine Fleckles (among others)[8] filed the Consolidated Class Action Complaint (the "Complaint"), asserting claims under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Sections 20(a) and 20A of the Exchange Act against Pfizer and the Individual Defendants.  ECF No. 51.

30.    In May 2006, Pfizer and the Individual Defendants moved to dismiss the

---

[8] Class Representatives Perusse and Chace were not named plaintiffs at this time but became named plaintiffs at a later date.

Complaint and discovery was automatically stayed.  ECF Nos. 56-62.  Thereafter, in June 2006, Plaintiffs moved to strike certain exhibits attached to and portions of the memoranda in support of Defendants' motion to dismiss.  ECF Nos. 68-69.  While these motions were pending, the Action was reassigned to the Honorable Laura Taylor Swain on February 22, 2008.  ECF No. 81.

31.     On July 1, 2008, the Court denied, in large part, Defendants' motion to dismiss, holding that Plaintiffs' allegations that Defendants misrepresented and concealed the CV risk associated with Celebrex and Bextra, and engaged in insider trading while in possession of such undisclosed information, sufficiently stated claims under Sections 10(b), 20(a) and 20A of the Exchange Act (the "July 1 Order").  ECF No. 90.[9]  Defendants moved to reconsider certain portions of the July 1 Order, ECF Nos. 93-94, which motion the Court denied on September 4, 2008.  ECF No. 98.

32.     From the inception of the case in December of 2004 through the issuance of the aforementioned reconsideration motion, Plaintiffs' Counsel had expended more than 6,068 hours prosecuting the Action, reflecting a lodestar of $3,086,836.   *See infra* § IX.A (describing "Category 1" time).

33.     Pfizer and the Individual Defendants filed their answer and affirmative defenses to the Complaint in September 2008.  ECF No. 102.  In their answer, Pfizer and the Individual Defendants denied that any of them made material misstatements relating to Celebrex's or Bextra's CV safety or omitted alleged material facts about the drugs.  *See id.*  They also denied that any of them acted recklessly or with the intent to defraud Pfizer's shareholders. *See id.*  Pfizer and the Individual Defendants further denied that they caused Plaintiffs' economic

---

[9] By the same Order, the Court dismissed Plaintiffs' claims for common law fraud, violations of state securities laws, and Section 18 of the Exchange Act.

14

losses.  *See id.*  Thereafter, discovery was scheduled to commence in full.

        C.        THE *DAUBERT* HEARING ON MEDICAL ISSUES

        34.      At Defendants' request, the Court directed the Parties to conduct discovery (before allowing Plaintiffs to engage in merits or class discovery) to determine whether reliable scientific evidence existed to show that Celebrex or Bextra was associated with increased CV risk.  To this end, Defendants produced millions of pages of documents previously produced in the action *In re Bextra & Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, No. 05-cv-1699 (N.D. Cal.), and, after Plaintiffs and Defendants retained experts in a variety of scientific disciplines, both sides exchanged multiple expert reports and conducted depositions related to their experts' qualifications under *Daubert*.

        35.      In addition, both sides filed motions to preclude the other side from offering the opinion testimony of the opposing side's experts.  ECF Nos. 139-146.  Following these submissions, the Court held a 5-day *Daubert* proceeding in October 2009 (and ordered the Parties to make supplemental, post-hearing submissions for each and every expert, which they did).  Minute Entries for 10/19/09 through 10/22/09, and 10/29/09; ECF Nos. 171-189.  On March 22, 2010, the Court found that the *Daubert* standard was satisfied with respect to all experts whose preclusion was sought, and denied both side's motions.  ECF Nos. 191, 193.

        36.      Following the issuance of the Court's ruling on September 4, 2008, denying reconsideration of its prior Rule 12(b)(6) dismissal order through the March 22, 2010 *Daubert* Opinion, Plaintiffs' Counsel had expended an additional approximately 112,954 hours prosecuting the Action, reflecting a lodestar of $38,913,910.  *See infra* § IX.A (describing "Category 2" time).

### D.   CLASS CERTIFICATION

37.    On March 16, 2011, Lead Plaintiff filed its motion for Class Certification, which Defendants opposed in November 2011.  ECF Nos. 234-238, 245-248, 303.  In support of the motion for Class Certification, Lead Plaintiff submitted, among other things, the Declaration of its loss causation and damages expert, Professor Daniel Fischel, which opined with respect to, *inter alia*, the seven events that Plaintiffs had alleged were corrective disclosures.  *See id.*

38.    In connection with Class Certification, hotly-contested motion practice ensued as Defendants propounded extensive discovery requests.  Following briefing by the Parties on various motions to compel and motions for protective orders, the Hon. Henry B. Pitman, Chief Magistrate Judge for the Southern District of New York, issued multiple rulings which governed the class discovery process.  *E.g.*, ECF No. 273.  Ultimately, Lead Plaintiff and the other proposed Class Representatives produced substantial documents and prepared and sat for depositions, as further described below in § II.F.  Defendants filed their opposition brief under seal on December 14, 2011 (*see* ECF No. 311 (public redacted version)), which included the Declaration of Paul A. Gompers, a Harvard University professor, in opposition to Professor Fischel's Declaration.  ECF No. 303.  Plaintiffs filed a reply brief under seal on January 23, 2012.  *See* ECF No. 329 (unredacted public version).

39.    On March 29, 2012, the Court certified the Class, appointed Lead Plaintiff, Christine Fleckles, Julie Perusse and Alden Chace as Class Representatives and appointed G&E as Class Counsel.  ECF No. 357.  On April 6, 2012, the Court clarified its class certification order (with respect to certain individuals excluded from the Class).  ECF No. 362. In both orders, the Court directed the Parties to discuss a resolution of the Action, ECF Nos. 357, 362, which they did, as discussed below (*see infra* §§ II.E, III).

16

40.     In July 2012, in connection with its certification of the Class, the Court approved the form and manner of notifying the Class of the pendency of the Action as a class action and of the right of Class Members to request exclusion from the Class and the procedures for doing so.  ECF No. 390.  Beginning on July 26, 2012, Class Representatives caused the Notice of Pendency of Class Action (the "Class Notice") to be mailed to over 3.7 million potential members of the Class, and caused a summary of the Class Notice to be published in *The Wall Street Journal* and *The New York Times* and transmitted over *PR Newswire* on July 30, 2012.  ECF No. 393, ¶¶8-10; ECF No. 413, ¶4.

41.     In October 2012, Class Representatives reported to the Court on the number of Class Members who opted out of the Class.  ECF Nos. 412-414.  Subsequently, a group of institutional investors who had validly opted out of the Class in connection with the Class Notice requested permission to rejoin the Class once the Second Circuit had issued its opinion in *Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013), setting forth a bright line rule that the statute of repose is not tolled by the existence of a class action, thereby rendering any potential claims that these investors may have asserted in individual actions untimely.  Plaintiffs acquiesced to the former opt outs' requests, and the Court approved their reinstatement into the Class.  ECF No. 513.[10]

E.     **COURT ORDERED MEDIATION**

42.     In accordance with the Court's directives in its class certification orders, the Parties engaged David M. Brodsky of Brodsky ADR LLC, a neutral with extensive experience in mediation of complex litigation, to oversee a formal mediation.  Prior to this

_____

[10] A list of persons and entities who validly requested exclusion in response to the Class Notice, and who did *not* opt back into the Class, is attached as Ex. C to the Settlement Agreement.  ECF No. 700-1 (Ex. C).

mediation, the Parties exchanged detailed mediation statements setting forth their respective positions on liability and damages.

43.     On June 19, 2012, while the Parties were still engaged in the discovery process, the Parties participated in a full-day, in-person mediation in New York City.   The Parties, however, were too far apart in their respective positions to reach a resolution of the Action at the mediation.   The Parties also met for two days in September of 2012 with Mr. Brodsky and made presentations primarily involving damages, but once again, the Parties were too far apart to make any significant progress.   As discussed more fully below in the section on the Settlement (*see infra* § III), following the conclusion of the mediation, the Parties continued their settlement discussions informally through telephonic and in-person meetings off and on over the course of the next four years.

### F.     THE DISCOVERY PROCESS

44.     Plaintiffs aggressively pursued merits discovery, serving multiple sets of document requests, reviewing millions of pages of documents, and preparing for, taking or defending over 100 fact and expert witness depositions, including depositions of current and former employees of Pfizer, Pharmacia and Searle.[11]   On numerous occasions, disputes arose as to appropriate search terms for document requests, the breadth of discovery being sought, motions for protective orders, spoliation issues and other matters that were, to the extent that they could not be resolved by the Parties, briefed and argued before Judge Pitman.   The most significant aspects of discovery are summarized below.

### 1.     Written Discovery And Document Analysis

45.     Plaintiffs served eight separate document requests, four sets of

---

[11] These figures include written discovery and depositions that were part of the *Daubert* phase.

interrogatories and one set of requests for admission on Defendants.  Plaintiffs also served several subpoenas *duces tecum* and/or *ad testificandum* on third parties, including outside consultants to Pfizer and/or Searle/Pharmacia.

46.     A team of Plaintiffs' Counsel's attorneys made a trip to Pfizer's document storage warehouse in Kalamazoo, Michigan in early June 2011 to review and analyze documents that Defendants indicated may be responsive to Plaintiffs' discovery demands.  Ultimately, in addition to the millions of pages of documents produced in connection with the product liability action, Defendants produced almost 60 million pages of documents in response to Plaintiffs' written discovery demands.  Teams of attorneys were assigned to review and analyze the documents and distill a massive volume of information to marshal evidence for trial and for opposition to Defendants' inevitable motion for summary judgment.

47.     Since Pfizer and the Individual Defendants' knowledge of adverse CV results in Celebrex and Bextra studies was a critical part of the case, a main focus of Plaintiffs' document review process was identifying emails, slide presentations and other documents reflecting such knowledge and organizing them chronologically.

## 2.     Creation of Extensive Study Chronologies

48.     To divide labor and avoid duplication of effort, individual attorneys at Lead Counsel were initially designated to become "study experts" with respect to the numerous clinical studies at issue in the case.  For example, a more senior attorney was designated to become an expert with respect to the Alzheimer's 001 study or the CABG-1 study and learn all the material information there was to know about the particular study to which he or she had been assigned.  This entailed, *inter alia*, (i) extensive review and analysis of the lengthy clinical

study reports at issue,[12] (ii) consultation with Plaintiffs' experts for explication of medical or bio-statistical issues where necessary, (iii) working with more junior attorneys who were reviewing and analyzing massive volumes of documents in the production databases in order to isolate key documents and emails related to the studies, and (iv) preparing memos on each of the most significant studies to share with and educate the litigation team.

49.     Likewise, teams were established at other firms working under Lead Counsel's direction to become experts in other areas of the case, including Bextra-related information, FDA rules and regulations and labeling requirements.  Similar to the structure established by Lead Counsel, senior attorneys at these firms would take the lead for each topic and work with more junior attorneys who were reviewing the massive document productions in order to locate key evidence and preparing memos for the broader team, both internal to the firms working on those topics and to report to Lead Counsel, and ultimately, to assist in preparing for depositions of key witnesses.

50.     After in-depth analysis of the studies was completed, extensive study chronologies, timelines on other factually-dense topics (such as the partnership between Pfizer and Searle/Pharmacia) and a master chronology of overall events relevant to the case were developed for use in connection with depositions and opposition to Defendants' inevitable motion for summary judgment.  The highly-detailed chronologies were periodically updated and refined throughout the discovery process and in preparation for trial.  Their creation required that virtually every email string containing discussion about a given study that Plaintiffs intended to use at depositions and/or trial be run to ground in an effort to ensure that all relevant commentary

---

[12] As examples of the massive length involved, the "Alzheimer's 001" original and supplemental report with associated tables and exhibits was more than 5,000 pages and the "SUCCESS" report with associated tables and exhibits was more than 60,000 pages.

on a particular study by Pfizer and/or Searle/Pharmacia employees was identified. Ultimately, more than twenty such chronologies were created to distill the enormous volume of emails and other documents into a coherent story, and related summary analyses were created to distill the information even further into useable formats for depositions and cross-examination at trial.[13]

### 3. Taking Depositions

#### a. Pfizer and Third-Party Fact Witnesses

51. In all, Plaintiffs' Counsel took or defended the videotaped depositions of 74 fact witnesses in advance of trial at which hundreds of deposition exhibits were marked. The depositions of several witnesses required two full days of deposition testimony.

52. Many Pfizer and/or Searle/Pharmacia witnesses who were deposed in this case were also deposed in the prior products liability case involving Celebrex and/or Bextra (some of those depositions lasting multiple days). Consequently, preparing for such witnesses' deposition in this case entailed the deposing attorney's review and analysis of the lengthy, often multiple-day deposition transcripts and underlying exhibits from those cases. To expedite this process and divide labor efficiently, summaries of the depositions and deposition exhibits from the product liability case were prepared by Plaintiffs' Counsel (*see infra* § IX.A) pursuant to a specific assignment by Lead Counsel. Ultimately, summaries were prepared for more than 50 fact and expert witnesses who testified in the products liability case.

#### b. Experts

53. As a case with, *inter alia*, extensive medical and bio-statistical issues, both

---

[13] Examples include chronologies for the "Alzheimer's 001" trial (the relevant events span an 8-year time frame from 1998 to 2006), the "CABG-1" and "CABG-2" trials (the relevant events span a 6-year time frame from 1999 to 2005), the "SUCCESS" trial (the relevant events span a 6-year time frame from 1999 to 2005), and the "CLASS" trial (the relevant events span a 7-year time frame from 1998 to 2005).

Plaintiffs and Defendants engaged numerous expert witnesses.

54.     Plaintiffs retained nine experts for the *Daubert* hearing and/or trial including three experts in biostatistics, two experts in cardiology and one expert in each of the fields of rheumatology, clinical drug trials, pharmaceutical development and regulatory issues, and securities litigation loss causation and damages.

55.     Plaintiffs' Counsel defended depositions of all its experts, both in connection with the earlier-described *Daubert* hearing and subsequently in connection with merits discovery.

56.     Defendants retained eight experts for pre-trial and trial purposes including one expert in each of the fields of cardiothoracic surgery, pharmacology, rheumatology, the FDA's regulatory review process, biostatistics, and securities litigation damages and two experts in cardiology.

57.     Plaintiffs' Counsel took depositions of all Defendants' experts, both in connection with the earlier-described *Daubert* hearing and/or subsequently in connection with merits discovery.

58.     In all, Plaintiffs' Counsel took or defended 32 videotaped depositions of expert witnesses in this case,[14] and reviewed and analyzed at least 37 opening, rebuttal and/or supplemental expert reports produced in this case.

**4.     Defendants' Discovery of Plaintiffs**

59.     Defendants served interrogatories on each of the Class Representatives and requests for admission on Lead Plaintiff.  Defendants also deposed each of the Class

---

[14] For the *Daubert* hearing and otherwise, some experts, including Professor Fischel, were deposed two or even three times.

Representatives, including two separate depositions of Lead Plaintiff (one of which was a two-day deposition), and Defendants deposed two third-party investment advisors to Lead Plaintiff.

60. Thus, in addition to taking and/or defending numerous depositions, Plaintiffs' Counsel defended a total of five depositions of the Plaintiffs, and participated in the depositions of two of Lead Plaintiffs' third-party investment advisors and one deposition of a TRSL representative related to Lead Plaintiff's email systems.

61. In all, there were 108 depositions of fact and expert witness depositions in this case.[15]

### G. SUCCESSFUL MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND DENIAL OF A SECOND MOTION FOR RECONSIDERATION

62. In November 2011—more than five years after the Complaint was filed—Pfizer and the Individual Defendants again filed a motion for reconsideration of its July 1, 2008 Order. ECF No. 304.

63. While the motion for reconsideration was pending, Lead Plaintiff, in March 2012, filed a motion for leave to amend the Complaint to conform the pleadings to the extensive evidence that had been gathered during the discovery process, attaching a 218-page, 585-paragraph amended complaint (the "Amended Complaint") to the motion for leave as an exhibit. ECF Nos. 343-346.

64. On March 22, 2012, the Court denied Defendants' motion for

---

[15] While many depositions were held in New York, New York, many others were taken throughout the country, including in Berkley, Los Angeles, San Diego and San Francisco, California; Groton and Westport, Connecticut; Mount Dora and Tampa, Florida; Atlanta, Georgia; Chicago and Deerfield, Illinois; Indianapolis, Indiana; Baton Rouge, Louisiana; Bethesda, Maryland; Boston and Worcester, Massachusetts; St. Louis and Kansas City, Missouri; Flemington, Florham Park, and Morristown, New Jersey; Chapel Hill and Winston Salem, North Carolina; Philadelphia and Radnor, Pennsylvania; Dallas, Texas; Seattle, Washington; and Washington, D.C. One deposition was taken in London, England.

reconsideration and granted Plaintiffs' motion to amend the Complaint.  ECF Nos. 355-356.

Thereafter, on March 27, 2012, the Amended Complaint was filed.  ECF No. 361.  In May 2012,

Pfizer and the Individual Defendants answered the Amended Complaint, denied all allegations of

wrongdoing and raised thirty-five defenses.  ECF No. 369.

65.     Following the issuance of the Court's March 22, 2010 *Daubert* Opinion,

through the conclusion of fact and expert discovery, and until July 2, 2012, when defendants

moved for summary judgment, Plaintiffs' Counsel had expended an additional approximately

132,662 hours prosecuting the Action, reflecting a lodestar of approximately $57,570,674.   *See*

*infra* § IX.A (describing "Category 3" time).

**H.     PLAINTIFFS LARGELY DEFEAT DEFENDANTS' FIRST MOTION FOR SUMMARY
JUDGMENT**

66.     Following the Parties' mediation and completion of all discovery,

Defendants moved for summary judgment on July 2, 2012.  ECF Nos. 382-387.  In their motion,

Defendants submitted a 24-page, 100-paragraph statement of undisputed facts pursuant to Local

Rule 56.1 in support of their motion for summary judgment, and a related brief asserting, *inter*

*alia*, that (i) they made no material misstatements or omissions, (ii) the evidence did not show

that they acted with intent to defraud, (iii) pursuant to the Supreme Court's *Janus* decision, they

were not liable for statements made by Pharmacia, Pfizer's Co-Promotion partner, and (iv) the

Class Representatives' alleged losses in Pfizer common stock were not caused by any supposed

fraud associated with Celebrex and Bextra.  ECF Nos. 381, 382.

67.     Plaintiffs vigorously opposed the motion for summary judgment by, *inter*

*alia*, marshaling the evidence Plaintiffs' Counsel had developed during discovery to prove

Defendants concealed the CV risks of Celebrex and Bextra and investors suffered losses as a

result.  Plaintiffs submitted, *inter alia*, a 255-page, 836-paragraph counter-statement of material

facts as to which there were genuine issues requiring a trial, as well as more than 630 exhibits containing evidence supporting their claims.  ECF Nos. 420, 421.  Plaintiffs' submission also included an "event study" prepared by Professor Fischel, their loss causation and damages expert, identifying seven corrective disclosures as evidence of loss causation.  *See id.* Defendants deposed Professor Fischel once again and submitted an opposition report by Professor Gompers in connection with their reply brief on summary judgment, which was filed on September 18 and 19, 2012.  *See* ECF Nos. 404-406.

68.     On March 28, 2013, the Court granted in part and denied in part Defendants' motion for summary judgment.  After analyzing Plaintiffs' submission, the Court found that "the record is replete with evidence that Defendants recognized that Celebrex and Bextra had associated [CV] risks, that such risks would be considered material by investors, and that Defendants nonetheless misrepresented and actively concealed these risks."  ECF No. 455 at 14.  However, the Court also found, *inter alia*, that (i) two of the seven "corrective disclosure" events which Plaintiffs had alleged were evidence of loss causation, were in fact not corrective of the alleged fraud, and (ii) certain statements made by Pharmacia were not actionable under *Janus* because there were no triable issues concerning whether Pfizer had "ultimate authority" related to such statements made by its Co-Promoter or its employees.  *See* ECF No. 455.

69.     Following the filing of Defendants' motion for summary judgment on July 2, 2012 through the issuance of the Court's summary judgment opinion on March 28, 2013, Plaintiffs' Counsel had expended an additional approximately 14,271 hours prosecuting the Action, reflecting a lodestar of approximately $7,045,383.     *See infra* § IX.A (describing "Category 4" time).

70.     In response to the Court's summary judgment opinion, on or about May

25

10, 2013, Lead Plaintiff's loss causation and damages expert, Professor Fischel, submitted an updated report which removed the two corrective disclosures eliminated by the Court from his analysis and adjusted his damage calculations.  Professor Fischel did not adjust for the ruling regarding dismissal of certain Pharmacia statements because it did not impact his analysis. (Additional details regarding Professor Fischel's adjustments to his artificial inflation calculations are discussed *infra* § VII.)  Defendants conducted an additional deposition with respect to Professor Fischel's updated report on June 28, 2013.

## I.     TRIAL PREPARATION

71.     After the Court's summary judgment ruling, Plaintiffs continued their preparation for trial.

### 1.     Trial Exhibits and Refinement of the Extensive Drug Study Chronologies

72.     A critical part of the trial preparation process was identifying the exhibits Plaintiffs would use at trial.

73.     Substantial time was spent analyzing the documents and cutting the number of exhibits down to a manageable number for trial purposes while still having all the evidence necessary to prove Plaintiffs' claims and rebut Defendants' defenses.

74.     Ultimately, in connection with preparation of the Pre-Trial Order, Plaintiffs identified 1,567 potential trial exhibits.  *See* ECF No. 656.  Considerable time was spent working with Plaintiffs' Counsel's jury consultant and organizing the exhibits so that—as just two examples—Plaintiffs' best trial exhibits were pre-marked, consecutively, as Plaintiff trial exhibits 1 through 100, and documents containing the Cox-2 Alliance's false or misleading statements were pre-marked, consecutively, as Plaintiff trial exhibits 101 through 204.  In addition, considerable time was spent evaluating the merit of Defendants' objections to the

admissibility of these 1,567 exhibits and considering appropriate responses in an effort to better ensure their eventual admission into evidence.

75.     Defendants identified 1,687 potential trial exhibits that they intended to use at trial.  *See id.*  In preparing Plaintiffs' case, Plaintiffs' Counsel spent considerable time reviewing and analyzing Defendants' proposed trial exhibits for content, particularly those that had not been used at depositions in the case.  In addition, considerable time was spent evaluating and preparing objections to the admissibility of Defendants' exhibits for the Pre-Trial Order.

76.     Another critical trial preparation task was updating and continually refining the study chronologies to add additional relevant events as they were discovered during the continuing review of the enormous document production, and to reflect the relevant information contained in the documents Defendants designated as trial exhibits.

### 2.     Deposition Designations

77.     Another vital trial preparation task was reviewing and analyzing the more than 70 fact depositions to determine what testimony was necessary for trial, particularly for the witnesses who would likely be unavailable.  This entailed, *inter alia*, reviewing and analyzing hundreds of hours of videotaped testimony to evaluate credibility issues and isolate key deposition testimony.

78.     In addition, considerable time was spent designating such testimony for the Pre-Trial Order by page and line of the transcripts.  Ultimately, Plaintiffs designated potential testimony from 46 deponents whose deposition testimony may be played at trial.  *See id.*  Further substantial time was spent preparing objections to the testimony of the 21 deponents Defendants designated as witnesses whose deposition testimony may be played at trial.  *See id.*

### 3.    Mock Trial and Creation Of Jury-Friendly Demonstratives

79.    Plaintiffs' Counsel and their jury consultant conducted a two-day mock trial on February 12 and 13, 2014.

80.    As part of their preparation for the mock trial process, Plaintiffs' Counsel and their jury consultant spent substantial time modifying the existing timelines and chronologies that had already been prepared into timelines that would be used for the mock trial and developing demonstrative exhibits for the mock trial that could also be tailored for use at the actual trial.

81.    Each mock juror completed pre- and post-mock trial questionnaires conveying their attitudes and reactions to particular evidence, witnesses and lines of argument. In addition, Plaintiffs' Counsel were able to observe the reactions of mock jurors to particular evidence and testimony during mock jury deliberation sessions.   Plaintiffs' Counsel's jury consultant also prepared an extensive written analysis of the mock trial proceedings.   The analysis was examined closely by Plaintiffs' Counsel and discussed in numerous strategy sessions that were held after the mock trial.

82.    The mock trial process provided Plaintiffs' Counsel with invaluable insight into the strengths and weaknesses of their case and how the strengths could be enhanced and the weaknesses dealt with and ameliorated.

### 4.    *Daubert* Motions And Other Motions *In Limine*

83.    Defendants filed 13 motions *in limine* to exclude evidence and/or expert testimony.[16]   ECF Nos. 514-523, 526, 533, 570.   Aside from the *Daubert* motion to exclude Plaintiffs' loss causation and damages expert, among the more significant motions *in limine*

---

[16] This does not include Defendants' motions related to the earlier *Daubert* hearing.

Defendants filed was one to exclude a guilty plea by an indirect subsidiary of Pfizer in which it was admitted that false and misleading statements regarding Bextra's CV safety were made, with intent to defraud and mislead, in connection with admitted off-label promotional activities of Bextra for unapproved uses (discussed below, *see infra* § VIII.D.4). Plaintiffs' Counsel divided up responsibility for responding to, and spent substantial time opposing, the vast majority of the motions.

84.     Based on, *inter alia*, the arguments Defendants made in connection with their summary judgment motion and the review and analysis of Defendants' proposed trial exhibits, Plaintiffs' Counsel also spent substantial time evaluating what motions *in limine* were necessary and/or advisable. Plaintiffs' Counsel divided up responsibility for preparing the motions *in limine*, prepared 16 such motions and, after a meet and confer process with Defendants' Counsel during which Defendants consented to three of the motions, ultimately filed 13 motions in *limine* with the Court.[17]  Among the more significant motions in *limine* Plaintiffs filed was one to exclude an April 6, 2005 memo prepared by two FDA representatives that Defendants intended to use in an attempt to negate *scienter* (discussed below, *see infra* § VIII.D.4).

### 5.     Motion for Judgment on the Pleadings

85.     In April 2014, as the Parties were preparing for trial, certain of the Individual Defendants moved for judgment on the pleadings seeking dismissal of Plaintiffs'

---

[17] This does not include Plaintiffs' motions related to the earlier *Daubert* hearing.

claims under Section 20A of the Exchange Act.  ECF Nos. 650-651.[18]  By Order issued on May

21, 2014, the Court denied the motion for judgment on the pleadings.  ECF No. 659.

### 6. Jury Instructions, Verdict Form, *Voir Dire* and the Pre-Trial Order

86.     After substantial negotiation, the Parties also jointly submitted a Pre-Trial

Statement to the Court on May 12, 2014 attaching, *inter alia*, Plaintiffs' witness list (identifying

40 trial witnesses it would call at trial and another 45 witnesses that it may call), Defendants'

witness list (identifying 38 trial witnesses), Plaintiffs' exhibit list (containing 1,567 potential trial

exhibits), Defendants' exhibit list (containing 1,687 potential trial exhibits), Plaintiffs' deposition

designations (identifying 46 witnesses whose deposition testimony may be played at trial),

Defendants' deposition designations (identifying 21 witnesses whose deposition testimony may

be played at trial), Plaintiffs' proposed verdict form (identifying 45 allegedly false or misleading

Class Period statements to be considered by the jury) and Defendants' proposed verdict form.

ECF No. 656.

87.     On May 12, 2014, after having negotiated a proposed juror questionnaire

containing 60 questions designed to make the jury selection process more efficient, the Parties

submitted a joint motion seeking to have the Court use the questionnaire as part of the jury

selection process.  *See* ECF Nos. 654-655.

88.     After a lengthy meet and confer and negotiation process, on May 16,

2014, the Parties jointly submitted proposed jury instructions to the Court.  ECF No. 658.

Plaintiffs' Counsel and Defendants' Counsel had reached agreement on 14 instructions, near

agreement on 4 instructions, but differed substantially as to the appropriate jury instructions on

---

[18] On May 13, 2014, Individual Defendant John L. LaMattina was dismissed with prejudice
pursuant to the Parties' stipulation of voluntary dismissal approved by the Court.  ECF No. 657.

many substantive elements of the federal securities claims at issue.  *Id.*  The Parties therefore submitted their respective proposed jury instructions on these points (Plaintiffs submitted 13 such proposed instructions and Defendants submitted 21 such proposed instructions) with justifications for their own, and objections to the other side's, instructions.  *Id.*

89.    In the Joint Pre-Trial Statement, Plaintiffs estimated it would take eight weeks to present their case and Defendants estimated four weeks for their case.  ECF No. 656.

### J.    THE EXCLUSION OF PLAINTIFFS' LOSS CAUSATION AND DAMAGES EXPERT

90.    On May 21, 2014, the Court granted Defendants' *Daubert* motion to exclude Plaintiffs' loss causation and damages expert on the grounds that, *inter alia*, proportional adjustments Professor Fischel made to the inflation calculations in his original report to account for the two corrective disclosures the Court eliminated at summary judgment were not reliable, and he did not account for the impact of the Pharmacia statements the Court had excluded at summary judgment based on *Janus*, which rendered his opinions unhelpful to the jury.[19]  *See* ECF No. 660.

91.    On June 6, 2014, Plaintiffs moved for leave to allow Professor Fischel to file an amended supplemental expert report.[20]  ECF Nos. 665-666, 668.  In light of the Court's *Daubert* ruling as to the testimony of Professor Fischel, Defendants filed a renewed motion for summary judgment.  ECF Nos. 667, 669-670.

---

[19] In the same order, the Court granted Plaintiffs' *Daubert* motion to exclude Defendants' loss causation and damages expert on the sole ground that, in the absence of the testimony of Plaintiffs' expert, the testimony of Defendants' expert is irrelevant.  ECF No. 660.  Also on May 21, 2014, the Court granted one of Plaintiffs' other motions *in limine* and denied another without prejudice to renewal at trial.  *See* ECF Nos. 661, 662.

[20] At a conference on May 23, 2014, the Court set a schedule for Plaintiffs' motion for leave to file the supplemental expert report, scheduled a final pre-trial conference for July 18, 2014 and scheduled trial to commence on September 9, 2014.  *See* 5/23/14 Minute Entry.

92.    On July 8, 2014, the Court denied Plaintiffs' motion for leave to supplement Professor Fischel's expert report and granted summary judgment to Defendants, on the basis that, without a loss causation and damages expert, Plaintiffs would be unable to prove their claims at trial.  ECF No. 679.  The Court also terminated the remaining motions in *limine* that it had not yet decided.  *See id.*

93.    Following the issuance of the Court's summary judgment opinion on March 28, 2013 through the Court's granting of summary judgment on July 8, 2014, Plaintiffs' Counsel had expended an additional approximately 20,175 hours prosecuting the Action, reflecting a lodestar of approximately $10,547,260.   *See infra* § IX.A (describing "Category 5" time).

94.    On July 9, 2014, the Court entered judgment in favor of Defendants and dismissed the Action in its entirety.  ECF No. 683.

K.    **THE APPEAL**

95.    On August 7, 2014, Plaintiffs filed a notice of appeal.  ECF No. 688. Plaintiffs noticed their appeal of the Court's (i) granting of summary judgment to Defendants based on the exclusion of Professor Fischel's testimony, and (ii) finding in its first summary judgment decision that certain statements made by Pharmacia were not actionable because Plaintiffs failed to proffer sufficient evidence of Pfizer's "ultimate authority" over those statements under *Janus*.  ECF No. 688.  Thereafter, Plaintiffs' appeal was fully briefed by the Parties, and was argued before the Second Circuit on May 26, 2015.

96.    On April 12, 2016, the Second Circuit issued a decision vacating the Court's grant of summary judgment and remanding the case for further proceedings.  ECF No. 694.  The Second Circuit concluded that the Court's "rationales for excluding the testimony [of

Professor Fischel] were inadequate to justify excluding it in its entirety" and the Court "erred in its earlier summary judgment ruling that no reasonable jury could find Pfizer liable for certain statements made by" Pharmacia.  ECF No. 694 at 2.  (Further details about Professor Fischel's adjustments to his artificial inflation calculations and the Second Circuit's rationale are discussed *infra* in § VII.)

97.     Following the Court's granting of summary judgment on July 8, 2014 through the Second Circuit's April 12, 2016 decision, Plaintiffs' Counsel had expended an additional approximately 2,953 hours prosecuting the Action, reflecting a lodestar of $2,229,485. *See infra* § IX.A (describing "Category 6" time).

98.     On May 10, 2016, following an extension request granted by Plaintiffs, Defendants filed a petition for rehearing and rehearing *en banc* (the "Rehearing Petition") in the Second Circuit.  Second Circuit ECF No. 226.  That petition remained pending at the time of the Settlement.

### L.   CONTINUED TRIAL PREPARATION

99.     After the Second Circuit's decision reinstating Professor Fischel and the dismissed Pharmacia statements pursuant to *Janus*, Plaintiffs' Counsel immediately began preparing for trial on the assumption that the Second Circuit might deny the Rehearing Petition, a mandate would issue and the case would return to this Court for trial.

100.     This entailed, *inter alia*, (i) revising Plaintiffs' proposed verdict form to include the reinstated Pharmacia statements, (ii) reviewing, analyzing and adding numerous new trial exhibits tending to show Pfizer's "ultimate authority" over Pharmacia's statements in light of the Second Circuit's *Janus* ruling, (iii) reviewing and analyzing numerous videotaped depositions of fact witnesses to add deposition testimony tending to show Pfizer's "ultimate

authority" over Pharmacia's statements and partnership with Pharmacia, (iv) revising the jury instructions to reflect the Second Circuit's *Janus* ruling, (v) assessing the effect of the Second Circuit's ruling on previously-filed motions *in limine* and evaluating how the motions, which had been terminated given the exclusion of Plaintiffs' expert (*see* ECF No. 679),[21] should be re-filed, (vi) revising the numerous study chronologies to further refine and distill the vast amount of study information for cross-examination purposes and updating them to reflect newly added exhibits and other information related to the Second Circuit's *Janus* ruling, (vii) working with Plaintiffs' loss causation and damages expert in light of his reinstatement after the Second Circuit's ruling, and (viii) strategizing about potentially conducting another mock trial.

101.    In addition, the Second Circuit's *Janus* ruling would allow (and indeed require) more of a focus on Pfizer's ultimate authority over Pharmacia's statements than Plaintiffs had been planning to present in their previous trial preparation.   Consequently, Plaintiffs' Counsel spent substantial time drafting, and were prepared to ask the Court's permission to file, a new motion for a ruling *in limine* that 21 public statements by Pharmacia are admissible against Pfizer because, *inter alia*, under the applicable Federal Rules of Evidence, (a) the statements are contained in self-authenticating news articles (or their authenticity was not otherwise in question), (b) the statements are non-hearsay admissions (i) made by Pfizer's agent,

---

[21] Twenty-one motions in *limine* that had been filed by the Parties were terminated without decision prior to the appeal.  *See* ECF No. 679.  Three had been decided by the Court prior to the appeal:  (1) the *Daubert* motion to exclude Plaintiffs' loss causation and damages expert; (2) Plaintiffs' motion in *limine* no. 9, seeking preclusion of evidence or argument relating to affirmative defenses that were not pleaded in Defendants' answer, was granted to the extent that Defendants' answer is not to be construed to assert any affirmative defense not specifically pleaded therein (*see* ECF No. 661); and (3) Plaintiffs' motion in *limine* no. 8, seeking the exclusion of "reference to claims that have been dismissed, or claims or legal theories that Plaintiffs have abandoned, changed, and/or modified, was denied without prejudice to reassertion in connection with particular arguments at trial" (*see* ECF No. 662).

(ii) made by someone (Pharmacia) whom Pfizer authorized to make statements on the subject of CV risks with the drugs, or (iii) that Pfizer manifested that it adopted or believed to be true, and (c) whether an agency relationship existed and its scope, whether statements were authorized and whether a party manifested a belief in a statement's truth are preliminary matters to be determined by the trial court.

102.    In the midst of these continuing trial preparation tasks, the Settlement was reached, as discussed more fully below.

## III.    SETTLEMENT NEGOTIATIONS

103.    As explained earlier, in accordance with the Court's orders in March and April 2012 certifying the Class and directing that the Parties engage in settlement negotiations, the Parties engaged veteran securities litigator and mediator David Brodsky to oversee a formal mediation of the Action.   Prior to this mediation, the Parties exchanged detailed mediation statements setting forth their respective positions on liability and damages.

104.    On June 19, 2012, while still engaged in the discovery process, the Parties participated in a full-day, in-person mediation in New York City.   The mediation was attended by a representative of Lead Plaintiff and representatives of Pfizer.   The Parties, however, were too far apart in their respective positions to reach a resolution of the Action at the mediation. The Parties also met for two days in September of 2012 with Mr. Brodsky, but once again, were too far apart to make any significant progress.   Following the conclusion of the mediation, the Parties continued their settlement discussions informally through telephonic and in-person meetings off and on over the course of the next four years.

105.     After the Second Circuit's reversal of the Court's dismissal of the Action and reinstatement of the dismissed Pharmacia statements pursuant to *Janus*, the Parties again resumed settlement discussions.

106.     Ultimately, with Defendants' Rehearing Petition pending, the Parties reached an agreement-in-principle to resolve the Action on July 18, 2016, and thereafter, filed a joint motion for limited remand of the case, without prejudice, pending approval of the Parties' proposed Settlement and to hold the pending Rehearing Petition in abeyance.  On July 27, 2016, the Second Circuit issued an order for a limited remand of the case to this Court for consideration of the proposed Settlement, holding Defendants' Rehearing Petition in abeyance pending final approval of the Settlement.  ECF No. 697.

107.     The Parties spent several additional weeks negotiating and documenting their agreement to resolve the Action and, on August 26, 2016, entered into the Settlement Agreement setting forth the specific terms and conditions of the Settlement.  ECF No. 700-1.

108.     Following the execution of the Settlement Agreement on August 26, 2016, Plaintiffs began working with the proposed Settlement Administrator and Escrow Agent in preparation for preliminary approval, a process which culminated in the Court's entry on September 16, 2016 of the Preliminary Approval Order.  ECF No. 703.

109.     Following the issuance of the Second Circuit's ruling on April 12, 2016 through the Court's entry of the Preliminary Approval Order on September 16, 2016, Plaintiffs' Counsel had expended an additional approximately 1,618 hours prosecuting the Action, reflecting a lodestar of $1,044,103.  *See infra* § IX.A (describing "Category 7" time).

## IV.   TERMS OF THE SETTLEMENT

110.     The Settlement of $486,000,000 (plus interest) is in full and complete

settlement of the claims that have or could have been brought against the Defendants. $3,000,000 of the Settlement Amount was, in accordance with the Preliminary Approval Order, deposited into the Escrow Account on September 30, 2016, and the remainder of the Settlement Amount will be deposited by Pfizer 30 calendar days prior to the Final Approval Hearing (*i.e.*, on or before November 21, 2016).

111. The Settlement Fund will first be used to pay taxes, Notice and Administrative Expenses and the Attorneys' Fees and Expenses Award. After payment of those amounts, the balance of the Settlement Amount—the Net Cash Settlement Amount—will be distributed on a *pro rata* basis to Class Members who are Authorized Claimants in accordance with the POA (described below).[22]

---

[22] The proposed Settlement will resolve claims of the Class certified by the Court pursuant to its Opinion and Order filed March 29, 2012, as amended April 6, 2012, and consisting of:

All persons or entities who purchased and/or otherwise acquired Pfizer common stock between and including October 31, 2000 and October 19, 2005 (the "Class Period"), with the exception of: (a) any persons or entities who both purchased and sold all of their shares of Pfizer common stock between and including October 31, 2000 and October 6, 2004; (b) Pfizer and the Individual Defendants; (c) members of the immediate family of each of the Individual Defendants; (d) subsidiaries or affiliates of Pfizer or any of the Individual Defendants; (e) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of Pfizer or any of the Individual Defendants; (f) any entity in which any of the Individual Defendants has a controlling interest; (g) the legal representatives, heirs, successors or assigns of any of the foregoing excluded persons or entities; and (h) the insurance carriers or their affiliates who insure the Defendants (the "Main Class").

A subclass was also certified by the Court and consists of all members of the Main Class who purchased Pfizer common stock contemporaneously with the sale of Pfizer common stock by Individual Defendants Henry A. McKinnell, Karen L. Katen and John L. LaMattina on any of the following dates: October 26, 2000, November 6, 2000, October 19, 2001, October 23, 2001, October 29, 2001, February 21, 2002, February 25, 2002, February 27, 2003, November 18, 2003, February 24, 2005, May 6, 2005, May 10, 2005 or August 16, 2005 (the "20A Subclass" and, together with the Main Class, the "Class").

112.     Upon the Court's final approval of the Settlement, Plaintiffs and the other Class Members will release, and shall be enjoined from prosecuting, all claims that were or could have been asserted in the Action.

## V.        THE NOTICE PROGRAM

113.     In July 2012, in connection with its certification of the Class and prior to the Settlement, the Court approved the form and manner of notifying the Class of the pendency of the Action as a class action and of the right of Class Members to request exclusion from the Class and the procedures for doing so.  ECF No. 390.  Beginning on July 26, 2012, the Class Notice was mailed to over 3.7 million potential members of the Class, and a summary of the Class Notice was published in *The Wall Street Journal* and *The New York Times* and transmitted over *PR Newswire* on July 30, 2012.  ECF No. 393, ¶¶8-10; ECF No. 413, ¶4.

114.     In October 2012, Class Representatives reported to the Court on the number of Class Members who opted out of the Class.  ECF Nos. 412-414.  Subsequently, a group of institutional investors who had validly opted out of the Class in connection with the Class Notice requested permission to rejoin the Class once the Second Circuit had issued its opinion in *IndyMac*.  The Class Representatives acquiesced to the former opt outs' requests, and the Court approved their reinstatement into the Class.  ECF No. 513.  A list of the persons and entities who validly requested exclusion in connection with the Class Notice, and who did *not* opt back into the Class, is attached as Exhibit C to the Settlement Agreement.  ECF No. 700-1 (Ex. C).  Out of the millions of Pfizer investors who were mailed the Class Notice, only 209 investors validly opted out of the Class.  *See id.*

115.     On September 16, 2016, the Court issued its Preliminary Approval Order preliminarily approving the Settlement and directing notice of the proposed Settlement to the

Class; the Court agreed that a second opt out period was not required and one was not afforded by the Court. ECF No. 703.

116.    After the Settlement was reached, a wide-ranging program was instituted to provide notice of the Settlement to the Class, to allow Class Members to submit claims in order to be potentially eligible to receive a distribution from the Settlement and to provide Class Members with an opportunity to object to any aspect of the Settlement, the Plan and/or the Fee and Expense Reimbursement Requests.   As required by the Preliminary Approval Order, Plaintiffs, working with and through the Settlement Administrator, notified potential Class Members of the Settlement by mailing the Notice and Claim Form to potential Class Members and their nominees, and publishing notice of the Settlement in accordance with the Preliminary Approval Order. *See* GCG Affidavit ¶¶2-13.

117.    The Preliminary Approval Order required that the Notice and Claim Form be mailed to all persons and entities who were previously mailed copies of the Class Notice (utilizing updated addresses where required) and other potential Class Members who otherwise could be identified through reasonable effort.  Among other things, the Settlement Administrator did the following to reasonably identify additional potential Class Members: (1) reviewed the original mailing to Class Members that was done in 2012; (2) eliminated duplicative records from the original mailing list; (3) ran the remaining address records through the United States Postal Service National Change of Address database to ensure that the Settlement database reflected the most current addresses; (4) notified the security settlement system of the Depository Trust Company ("DTC") of the issuance of the Notice, and requested that DTC post the Notice on its electronic legal notice system, which may be accessed by institutions or other nominees that participate in DTC's security settlement system; (5) caused a copy of the Claim Packet to be

mailed to the nominees in the Settlement Administrator's database; and (6) followed up with the top 70 nominees in its database that typically respond to class action notices but who did not respond in connection with the Class Notice or this Notice, to remind them to provide the names and addresses of their clients who may be Class Members.  *See* GCG Affidavit ¶¶3-10.  This process and other actions taken by the Settlement Administrator led to identification of more than 500,000 additional names and addresses of potential Class Members, and Claim Packets were mailed to these additional potential Class Members and Nominees.   *See* GCG Affidavit ¶11.

118.    The Preliminary Approval Order further required that the Publication Notice be published once in *The Wall Street Journal* and *The New York Times*, and that it be transmitted over PR Newswire within ten days of mailing of the Notice and Claim Form, and that the Notice, Claim Form and Publication Notice be posted on the website developed for the Settlement.  In sum, the Preliminary Approval Order set deadlines for, *inter alia*, the following matters related to the Final Approval Hearing:

| Event | Deadline |
|---|---|
| Mailing of Notice and Claim Form | October 1, 2016 |
| Publishing of Publication Notice in *The Wall Street Journal* and *The New York Times*, and transmitting Publication Notice over PR Newswire | October 11, 2016 |
| Filing all papers in support of the Settlement, Plan and attorneys' fees and expenses | November 11, 2016 |
| Filing Objections in connection with the Settlement | November 26, 2016[23] |
| Filing Class Member Appearances, individually or through | November 26, 2016[24] |

---

[23] November 26, 2016 is a Saturday and, therefore, under FED. R. CIV. P. 6(a)(1)(C), such objections are due on Monday, November 28, 2016.  *See, e.g.*, *Johnson v. Fordham University*, No. 11-cv-04670, 2016 WL 450424, at *2 (S.D.N.Y. Feb. 4, 2016) ("Where the last day of the period is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

| counsel | |
|---|---|
| Filing reply papers in support of the Settlement, Plan and attorneys' fees and expenses | December 6, 2016 |
| Filing proof of mailing of Notice and Claim Form and publication of the Publication Notice | December 14, 2016 |
| Final Approval Hearing | December 21, 2016 at 10 a.m. |

119. In total, as of November 4, 2016, 4,106,573 copies of the Notice and Claim Form were disseminated to potential Class Members and their Nominees. *See* GCG Affidavit ¶12. In addition, on October 6, 2016, the Publication Notice was published in *The New York Times* and *The Wall Street Journal*, and transmitted over *PR Newswire*. *See* GCG Affidavit ¶13. Information regarding the Settlement, including copies of the Notice, Claim Form and Publication Notice, as well as the Settlement Agreement and operative complaint, was posted on the website established by the Settlement Administrator, www.pfizersecuritieslitigationsettlement.com.[25] *See* GCG Affidavit ¶15. This method of providing notice, which the Court previously approved, provides appropriate and sufficient notice because it provides notice "in a reasonable manner to all class members who would be bound by the" proposed judgment. FED. R. CIV. P. 23(e)(1); *see* Settlement Brief §II.

120. The Notice explains to Class Members the essential terms of the Settlement, sets out a procedure for objecting to the Settlement, Plan and/or Fee and Expense Reimbursement Requests, and provides the specific date, time and place of the Final Approval Hearing. The Notice further contains the proposed Plan of Allocation and information regarding

---

[24] November 26, 2016 is a Saturday and, therefore, under FED. R. CIV. P. 6(a)(1)(C), such appearances are due on Monday, November 28, 2016.

[25] The Settlement Administrator also maintains a toll-free telephone hotline and interactive voice response system to accommodate inquiries from potential Class Members and to respond to frequently asked questions. The hotline is accessible 24 hours a day, seven days a week. *See* GCG Affidavit ¶14.

Plaintiffs' Counsel's Fee and Expense Reimbursement Requests.   As explained in the accompanying Settlement Brief, the Notice fairly informs Class Members of their rights with respect to the Settlement and thus is the best notice practicable under the circumstances and complies with the Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.  *See* Settlement Brief §II.  In response to the over 4.1 million Notices mailed, as of November 10, 2016, there have been only 10 objections received in connection with the Settlement.

## VI.    THE PLAN OF ALLOCATION

121.    The standard for approval of a plan of allocation is the same as the standard for approving a settlement: it must be fair, reasonable and adequate and a plan needs to only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel such as Plaintiffs' Counsel in this Action.  *See* Settlement Brief §I.D.

122.    The Settlement Amount (plus any interest accrued thereon), after reduction for taxes and tax expenses (as provided for in the Settlement Agreement), Notice and Administrative Expenses and Court-approved attorneys' fees and expenses, will be allocated to eligible members of the Class based on a plan of allocation.   The POA being proposed by Plaintiffs, as set forth in the Notice, was developed by Plaintiffs' loss causation and damages expert and Plaintiffs' damages consultant in consultation with Lead Counsel and other Plaintiffs' Counsel and provides a fair and reasonable method to allocate the proceeds of the Settlement among Class Members who submit valid Claim Forms.

123.    Under the POA, a "Recognized Loss or Gain Amount" will be calculated for the purchases and/or acquisitions of Pfizer common stock listed in each Claim Form and for which adequate documentation is provided.  This calculation will be based on several factors,

including when the shares of Pfizer common stock were purchased/acquired and sold, the purchase/acquisition and sale prices, and the estimated artificial inflation in the price of Pfizer common stock at the time of purchase/acquisition and at the time of sale, as determined by Plaintiffs' damages consultant.  Additionally, the POA takes into account the Court's ruling on Defendants' first summary judgment motion in which the Court found that the full extent of the truth was in the public domain as of the end of the day on December 19, 2004 and there was no loss-causing risk information disclosure after that time.  *See* ECF No. 455 at 19-22.[26]

124.   The Settlement will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claim (*i.e.*, the sum of an Authorized Claimant's Recognized Loss Amounts and Recognized Gain Amounts) in comparison to the total Recognized Claims of all Authorized Claimants.

125.   Similar plans of allocation repeatedly have been approved by this Court. *See* Settlement Brief §I.D.

126.   The Notice sets forth the proposed POA and notifies Class Members of their right to object to it.   The POA was prepared only after extensive consultation with

---

[26] While the Plan compensates all Class Members who file valid Claim Forms with Recognized Losses based upon their transactions, the Plan does not "separately" compensate Class Members who traded contemporaneously with the Individual Defendants under Section 20A of the Exchange Act.  A large portion of the damages associated with such 20A Claims accrued from trades of the Individual Defendants that occurred after December 16, 2004, which are no longer compensable under the rulings of the Court referred to above.  The remaining damages for trades that occurred during the Class Period, but prior to December 16, 2004, amount to a relatively insignificant amount of damages, when compared to the overall Section 10(b) damages. Apportioning the $486 million Settlement Amount between Section 10(b) damages and Section 20A damages leaves the Section 20A portion at well below $100,000 in total.  *See* ECF 702-2 at p. 10.  Consequently, the costs of separately administering and apportioning out such funds among all of the potential Class Members who may have traded contemporaneously is not justified under the circumstances, as it would add little to nothing to each individual Class Member's recovery who so qualifies under Section 20A.  *See id.*

Plaintiffs' loss causation and damages expert and Plaintiffs' damages consultant, does not take into account the specific trading patterns of Lead Plaintiff or the other Class Representatives, and is fair, reasonable and adequate to the Class as a whole.

## VII.    DAMAGES

127.    To calculate damages, Plaintiffs retained Professor Daniel Fischel, a renowned expert who has served as Dean of the University of Chicago Law School, Director of its Law and Economics Program, Professor at both the Chicago and Northwestern Business Schools, and consultant to the SEC and the Federal Trade Commission.

128.    Professor Fischel used a standard "event study" methodology to calculate artificial inflation of Pfizer's stock price during the Class Period.  Originally, he identified seven "corrective disclosures" that revealed CV risks associated with Celebrex and Bextra and led to statistically significant declines in Pfizer's stock price.  He also developed an offsetting financial calculation that measured inflation that came into Pfizer's stock price during the Class Period (*i.e.*, a conservative offsetting calculation that had the effect of *reducing* the artificial inflation in the stock price and, thus, *reducing* overall recoverable damages).  Professor Fischel's analysis included calculations of the amount of artificial inflation in Pfizer's stock attributable to the alleged fraud on each day of the Class Period.

129.    After the Court's ruling on Defendants' first summary judgment motion, which eliminated two of the corrective disclosures (as discussed earlier), Professor Fischel revised his analysis to remove from his calculations the artificial inflation associated with the two "dismissed" corrective disclosures.  Thus, Professor Fischel's revised analysis used the five remaining corrective disclosure events to calculate the artificial inflation that came out of the stock and found that the elimination of the two corrective disclosures reduced overall inflation in

the stock by 9.7%.   In his revised analysis, Professor Fischel took the additional step of calculating a proportionate decrease (the "Proportional Reduction") in the offsetting calculation that measured inflation coming into the stock during the Class Period.  Professor Fischel did not believe it was necessary to make any changes to his calculations based on the dismissal of the Pharmacia statements and, therefore, he made no adjustments related to that ruling.

130.    In vacating the Court's decision excluding Professor Fischel from testifying, the Second Circuit noted that the Court did *not* abuse its discretion in concluding that the Proportional Reduction was unreliable, ECF No. 694 at 54-58, but held that rather than excluding Professor Fischel's testimony in its entirety, the Court "should have simply prevented him from making the Proportional Reduction."  *Id.* at 62.

131.    Based on Professor Fischel's proposed Amended Supplemental Report,[27] which eliminated the two corrective disclosures and the Proportional Reduction, and as further analyzed post-appeal by Plaintiffs' damages consultant, Michael A. Keable, the artificial inflation existing in Pfizer's stock price during the Class Period for purposes of the Settlement is as reflected in the table below:

---

[27] This report was included with Plaintiffs' June 6, 2014 motion for leave to file an amended supplemental expert report, ECF Nos. 665-666, 668.

| Date | Artificial Inflation |
|---|---|
| October 30, 2000 – April 15, 2003 | $0.96 |
| April 16, 2003 – August 25, 2004 | $1.92[28] |
| August 26, 2004 – September 29, 2004 | $2.23 |
| September 30, 2004 – October 6, 2004 | $3.28 |
| October 7, 2004 – October 14, 2004 | $2.76 |
| October 15, 2004 – November 9, 2004 | $1.96 |
| November 10, 2004 – December 16, 2004 | $1.44 |

132.    Plaintiffs' damages consultant utilized the foregoing estimate of artificial inflation to compute an estimate of the maximum aggregate damages that could be recovered by Class Members after a trial at $5.37 billion.  *See* Second Keable Decl. ¶8; First Keable Decl., 702-1, ¶2.  This estimate assumed that Plaintiffs would prevail on all elements of liability, including overcoming every loss causation and damages argument that Defendants would raise at trial (discussed below).  *See* ECF Nos. 702-1, 702-2.

133.    To compute maximum aggregate damages, Plaintiffs' damages consultant applied the estimated artificial inflation in Pfizer's stock to the commonly utilized "80/20 multi-trader" trading model to estimate the number of shares bought and held through at least one corrective disclosure.  *Id.*  Plaintiffs' damages consultant estimates that maximum aggregate damages under this model are $5.37 billion based on an estimated 3.67 billion damaged shares purchased during the Class Period, which equates to average per-share damages of $1.46. Dividing the amount of the Settlement ($486 million) by 3.67 billion damaged shares yields an average per-share settlement value of approximately $0.13 cents.  *Id.*[29]

---

[28] Professor Fischel's analysis stated that the artificial inflation for this period was $1.93 based on arithmetical rounding resulting from the merger of Pharmacia with a Pfizer subsidiary, but for purposes of the POA, Plaintiffs' damages consultant determined that $1.92 was the appropriate figure.

[29] It is important to note that the average recovery per share would differ for every Class Member as each Class Member's recovery depends on when they transacted in Pfizer common stock and,

134.    The proposed recovery of $486 million in the Settlement represents approximately 9% of these maximum aggregate damages, which is about nine times greater than similar securities class action settlements where alleged losses are greater than $5 billion. *See* Laarni Article (attached hereto as Exhibit A) (for years 2006-2015, median securities class action settlements as a percentage of estimated damages were only 0.8% to 1% for cases, like this one, with estimated losses of over $5 billion); Starykh Article (attached hereto as Exhibit B) (median securities settlements between 1996 and 2015 recovered 1% where losses were between $5 billion and $10 billion). As discussed briefly above (*see supra* § I.C), and further below (*see infra* § VIII.G), the $486,000,000 Settlement also represents a significantly higher percentage of *likely* recoverable damages because of the enormous litigation risks that threatened to severely limit recoverable damages if the case were to proceed to trial.

135.    Consequently, it is respectfully submitted that the Settlement proposed here—particularly after the Action was dismissed in its entirety at summary judgment prior to its resurrection on appeal—is an excellent result for the Class and merits final approval.

## VIII.    THE *GRINNELL* FACTORS SUPPORT APPROVAL OF THE SETTLEMENT

136.    As explained in the Settlement Brief, courts in the Second Circuit examine the following factors in assessing the adequacy of a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

---

if challenged in a trial setting, possibly whether they could actually show reliance on the integrity of the market price when purchasing/acquiring Pfizer stock. *See* ECF No. 702 at 3.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted); *see* Settlement Brief §I.C.  As explained below, the Settlement satisfies the *Grinnell* criteria.

### A.   THE COMPLEXITY, LIKELY DURATION AND EXPENSE OF THE LITIGATION

#### 1.   Complexity

137.   The complexity of this case cannot be overstated.  Aside from complicated issues of medical science (such as esoteric nuances between CV risk generally and "thromboembolic" CV risk) and difficult-to-grasp concepts of bio-statistics, discussed further below, the case involved not one Cox-2 drug, but three—Celebrex, Bextra and parecoxib (a/k/a Dynastat, the injectable form of Bextra).  Each drug had separate (yet sometimes intertwined) clinical and/or epidemiological studies and/or associated meta-analyses that were integral to understanding their CV risks.  There were at least twenty Celebrex, Bextra and/or parecoxib clinical studies, epidemiological studies, pooled-analyses and meta-analyses that were central to Plaintiffs' task of showing increased CV risks for Celebrex and Bextra.  Digesting and understanding the results of each study and the associated bio-statistical analyses was a complicated, time-consuming and laborious endeavor.  And, at trial, Defendants would bring more studies and meta-analyses that they claimed did not show increased CV risk into the fray as part of their defense.  These studies also needed to be digested and understood.

138.   In addition, the time span of the events in question was at least seven years.  While the Class Period was itself lengthy (approximately five years), the events in question began as early as 1997 and 1998 when Pfizer and Searle first began their partnership to jointly develop and market the products.  The facts related to the Pfizer/Searle (later Pfizer/Pharmacia) partnership and the sharing of information about the CV risks of the drugs that occurred during this time frame are essential to understanding the case.  Thus, even pre-Class

Period events were critical to understanding Plaintiffs' case about the alleged fraud that occurred during the Class Period and added significantly to the complexity of the case.

139. Furthermore, the partnership structure between Pfizer and Searle/Pharmacia not only added complexity in terms of time but it also more than doubled the number of people who were involved and whose identities and roles would need to be explained to and understood by jurors. For example, each Pfizer employee who headed a joint committee related to Celebrex and/or Bextra had a "counterpart" or committee "co-head" at Pharmacia or, before that, Searle. Decisions to publish or, more pertinently, not to publish, a clinical study that showed increased CV risk were made *jointly* by both companies. *See, e.g.*, ECF No. 420 ¶¶7-24. Thus, it would be necessary to review with the jury the composition and managerial structure of the joint committee that made such decisions. With respect to other studies, the composition and managerial structure of different joint committees (staffed with different personnel from the respective companies) would have to be explained to the jury, and so on.

140. The sheer number of committees (over the life of the partnership, there were at least 34 joint committees devoted to jointly running the Cox-2 Alliance), changes to the committee structure over time, periodic renaming of committees and reshuffling of committee functions and responsibilities, and the reorganization of committee membership made understanding how decisions regarding the drugs were made, and who made them, dizzyingly complex. There were many Pfizer employees and equally as many (if not more) Searle/Pharmacia employees whose identities and roles within their respective organizations— and, in addition, their roles within the Pfizer and Searle/Pharmacia partnership—were critical to Plaintiffs' case and to the jury's understanding of the alleged scheme to defraud.

141.     Jurors would need to gain familiarity with most if not all of these committees and with the Pfizer and Pharmacia personnel who were on such committees before even proceeding to hearing evidence about the CV risks in particular studies.  This is primarily because the committee structure was often key to the manner in which information flowed up the chain of command in the Pfizer/Pharmacia partnership structure.  The committee structure was designed like the layers of a wedding cake with numerous committees of lower level managers reporting to fewer committees filled with mid-level managers which in turn reported to the top level committee of the combined partnership—the so-called "Executive Management Committee," which was comprised of Pfizer's top level executives (including Dr. McKinnell and Ms. Katen) and Pharmacia's top executives.  *See* ECF No. 420, ¶¶7-24.

142.     In addition to the complexity of the partnership committee structure, the volume of information shared between the companies during the more than five years the partnership lasted was immense and added significantly to the challenges in the case.  For example, the task of wading through the morass of email traffic between and among Pfizer and Searle/Pharmacia discussing the CV results of particular studies and then distilling that knowledge down to a chronology of simple events to illustrate to the jury who knew what about the CV results of a particular study, and when they knew it, required a truly Herculean effort and the investment of substantial attorney and paralegal time.  Thus, the lengthy time period in question added to the complexity of the case based merely on the volume of information that needed to be digested.

143.     Further complexity was added because Defendants also sought to lengthen the period of time in question to well after December 2004 (the month in which, as determined by the Court in its first summary judgment decision, the last corrective disclosure occurred).

Defendants' trial exhibit list included at least 248 exhibits that were dated *after* December 2004, and included potential exhibits from 2009 to 2014 relating to such things as Celebrex label changes, Physician's Desk Reference excerpts relating to Celebrex, and Celebrex clinical studies conducted well after the Class Period.  At trial, Plaintiffs' Counsel would object that such belated evidence is irrelevant to Pfizer's mental state and the relevant events that took place from 1997 to December 2004.   If Defendants were successful in introducing such evidence, however, numerous additional studies and other evidence would become part of the case and add to its complexity; indeed, the time frame of relevant events would then extend from 1997 to 2014, a period of *seventeen* years.

144.     In addition to contending with a lengthy time period during which relevant facts occurred, jurors would also need to grasp complicated medical hypotheses and fine distinctions between types of CV risk.  This is primarily because just as Celebrex was first being introduced to the market in early 1999, a professor at the University of Pennsylvania (Dr. Garrett Fitzgerald) and others released a study that hypothesized increased CV risk for Cox-2 inhibitors. This became known as the "Fitzgerald Hypothesis."  *See* ECF No. 420, ¶¶87-104.  Differences between types of CV risk would be extremely important during a trial because Defendants insisted throughout the litigation that:   (a) both the Fitzgerald Hypothesis and the public's concern about increased CV risk with Cox-2 inhibitors involved only a particular type of CV risk—so-called "thromboembolic" risk, which can loosely be described as heart problems created by clotting in the blood vessels (examples being a heart attack or stroke)—and (b) when Pfizer (and/or Searle/Pharmacia) made statements that they had seen no evidence of increased CV risk for Celebrex (and later Bextra) in particular studies, they were referring to only CV "thromboembolic" risk, but not to other types of CV risks such as angina pectoris, arrhythmias,

palpitations, tachycardia, atrial fibrillation, cardiac failure, hypertension or edema.  *See, e.g.*,
ECF No. 382 at 1-2, 5-10, 19.

145.  Although Plaintiffs' Counsel firmly believe that these distinctions were
irrelevant to the alleged falsity of many of Pfizer's statements (*see, e.g.*, ECF No. 418 at 4-7), in
order to understand why Defendants' supposed defense was not valid, jurors would need to gain
a basic (and, with respect to certain studies, an in-depth) understanding of the Fitzgerald
Hypothesis and the distinctions between types of CV risks.  While Plaintiffs' Counsel had no
intention of belaboring an explanation of the Fitzgerald Hypothesis in front of the jury, the
hypothesis was a basic factual "building block" in the case that was constantly referred to in the
evidence and testimony, even if the relevant evidence was dated much later in 2002, 2003 or
2004.  Thus, a basic understanding of the hypothesis would be necessary to understanding
references to it made by witnesses (both factual and expert) throughout the trial, and the
hypothesis's intricacies is just one illustration of the medical complexities in the case.[30]

146.  Jurors would also need to understand complicated methods of bio-
statistical analysis.  In particular, the concepts of statistical significance in a clinical study,
"meta-analysis," study "end points," "p-values," "two-sided p-values," and "confidence
intervals," among other statistical concepts, would need to be explained to and understood by
jurors, not to mention mastered (as they were after great effort) by Plaintiffs' Counsel so that fact
and expert witnesses could be effectively cross-examined in this case.  Plaintiffs' Counsel's need
to master the intricacies of bio-statistics greatly added to the complexity and importance of
explaining the intricacies to jurors in a straightforward, easy-to-understand manner.

---

[30]  The article describing the Fitzgerald Hypothesis entitled "Systemic biosynthesis of
prostacyclin by cyclooxygenase (COX)-2: The human pharmacology of selective inhibitor of
Cox-2," and evidencing its complexity, is attached as Exhibit 15 to ECF No. 383.

147.     Another factor adding to the complexity of this case was that, indirectly, there was also a fourth Cox-2 drug involved—Vioxx.  A Cox-2 inhibitor developed and owned by Merck, Inc., Vioxx competed with Celebrex and Bextra from Vioxx's introduction to the market in mid-1999, shortly after Celebrex was first introduced.  Because they were all Cox-2 inhibitors, Vioxx was in the same "class" of drugs as Celebrex (and Bextra and parecoxib).  Thus, in order for a jury to understand the statements Pfizer made relating to the relative risks of Celebrex and Bextra versus Vioxx, certain information would need to be conveyed.  Specifically, jurors would need to understand and have explained to them in detail, *inter alia*, the basics behind the Vioxx drug, the reasons it was found to have heightened CV risks, the Vioxx studies that showed increased CV risk (primarily the so-called "VIGOR" study), and what Pfizer knew about Vioxx's risks (both from information in the public domain and from internal Pfizer discussions about Vioxx's risks).  *See, e.g.*, ECF No. 420, ¶¶54-60; ¶¶699-826.  Thus, the need to keep track of facts related to not only the three Cox-2 drugs directly at issue in the case, but also a competitor's Cox-2 drug and the drug studies showing it had increased CV risk added to the complexity of the case.

148.     In addition, Pfizer's statements also included statements that certain studies showed that Celebrex or Bextra had less (or no increased) CV risk versus traditional, non-Cox-2 arthritis drugs such as naproxen, diclofenac or ibuprofen.  *See* ECF No. 420, ¶¶699-826.  These traditional arthritis drugs were used by consumers before introduction of Cox-2s in 1999 and are referred to as NSAIDs.  As with Vioxx, in order to understand how Pfizer's statements were allegedly false or misleading, it would be necessary to explain to the jury, and for the jury to keep track of, even more drugs and associated drug studies, drug labels and other information related to them.  This too added to the complexities of the case.

53

149.     Another factor adding to the complexity of the case was the need to understand and succinctly explain to the jury the FDA drug-approval and drug labeling processes.  In addition, the drugs were marketed in numerous countries other than the United States.  Thus, there were numerous regulatory authorities aside from the FDA whose assessments and opinions of the CV risks of the drugs as seen in clinical and pre-clinical (*i.e.*, animal) studies were relevant to Defendants' knowledge of those risks.  *See, e.g.*, ECF No. 420, ¶¶199-206.  The nuances of the particular foreign regulator's drug review and approval process and ongoing, post-approval drug safety review processes would have to be explained to jurors.

150.     Given (i) the extended time frame over which the events in question occurred, (ii) the number of drugs and drug studies involved, (iii) the maze of the Pfizer and Searle/Pharmacia partnership committees structure, (iv) the sheer number of Pfizer and Searle/Pharmacia personnel involved, (v) the need to understand nuanced differences in types of CV risk and esoteric medical hypotheses, (vi) the need to understand complex bio-statistical concepts, and (vii) the need to have a basic understanding of the different regulatory schemes between the FDA and non-U.S. regulators, keeping track of the basic facts in this matter would be a complex task and a challenge for any juror, as it was for Plaintiffs' Counsel.

151.     Finally, all of the foregoing complexities do not even include challenges that were presented by Plaintiffs' Counsel having to understand, and having to develop a method to explain to jurors in an easy-to-understand manner, the "event study" methodology employed by Professor Fischel, which is discussed at length elsewhere herein.

### 2.     Likely Duration

152.     The likely duration of this case also supports the fairness and reasonableness of the Settlement.  This case has already lasted 12 years since it was first filed.

But that is really only the tip of the iceberg. Assuming for illustration purposes that instead of reaching a settlement, the Second Circuit denied Defendants' Rehearing Petition in late August, 2016 (*i.e.*, shortly after the Settlement was reached) and remanded the case to this Court for trial, given the varying schedules of the more than ten (Plaintiff and Defendant) law firms that would be involved in a trial and this Court's own schedule, at best, a trial likely would have commenced in early 2017.[31] The Parties estimated in the Joint Pre-Trial Statement that a trial would take at least three months. Thus, the absolute earliest a verdict in this case was likely would have been mid-2017.

153. A verdict in favor of Plaintiffs would have resulted in Defendants' initiation of a lengthy appeal process that would in all probability take years to resolve. Indeed, the appeal involving discrete issues related to the exclusion of Plaintiffs' loss causation and damages expert and whether Pfizer could be held liable for Pharmacia's statements under *Janus* itself took more than 21 months from the time the notice of appeal was filed until a decision was rendered by the Second Circuit (and even then the matter was not resolved because Defendants filed the Rehearing Petition). Any post-verdict appeal would involve many more issues and likely take at least as long, if not longer, for the Second Circuit to resolve.

154. In the event of an unfavorable decision by the Second Circuit on such a post-verdict appeal, Defendants would likely file a petition for *certiorari* in the U.S. Supreme Court challenging the "price maintenance theory" on which Plaintiffs' damages analysis was premised. As the Court is aware, the price maintenance theory has been described as the proposition that when a company makes statements pre-class period and repeats them during the

---

[31] This hypothetical time frame also presupposes that Defendants would not have attempted to seek Supreme Court review following the denial of their petition by the Second Circuit.

class period, "it is reasonable to conclude that each misstatement played a role in causing the inflation in the stock price (whether by adding to the inflation or helping to maintain it)." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("There is no reason to draw any legal distinction between fraudulent statements that wrongfully *prolong* the presence of inflation in a stock price and fraudulent statements that initially *introduce* that inflation.") (emphases added).   In their opposition brief submitted in the Second Circuit on the summary judgment appeal, Defendants argued, *inter alia*, that the price maintenance theory is not the law because neither the Supreme Court nor the Second Circuit (at that time) had addressed it,[32] and it is inconsistent with the Supreme Court's ruling that experts must disaggregate the full "tangle of factors affecting price" under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).   *See* Second Circuit ECF No. 148 at 41.   Defendants also raised this argument in the Rehearing Petition.   Second Circuit ECF No. 226 at 14.   If a petition for *certiorari* was granted, further litigation before the U.S. Supreme Court would add significant delay and, if Defendants were successful, could result in a reversal, the need for a new trial and possibly no recovery at all for the Class.   In any event, years would be added to the duration of the case regardless of whether there was a successful outcome for the Class.

155.   In addition, even putting aside post-trial appellate issues, there is no question that Defendants would, as other Defendants in securities fraud class actions have done (*see In re Vivendi Universal, S.A. Securities Litigation*), initiate a second step to the trial process,

---

[32] After the Settlement, the Second Circuit generally endorsed the price maintenance theory.  *See In re Vivendi Universal, S.A. Securities Litigation*, Nos. 15-180-cv(L), 15-208-cv(XAP), slip op. at 76 (2d Cir. Sept. 27, 2016) ("[W]e agree…that securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation.").

post-verdict, by attempting to rebut the presumption of reliance based on the fraud-on-the-market

doctrine as to individual reliance by certain categories of Class Members.  In *Vivendi*, Judge

Scheindlin set established standards and procedures by which Defendants in that case could seek

to meet the burden of rebutting the presumption of individual reliance as to certain categories of

class member claimants.  The process in that case lasted *more than six years* from the date of the

verdict,[33] and it would be likely to last at least that long in this case.

156.    In sum, it is likely that if the Settlement had not been reached, this case

would have lasted at least another decade beyond the 12 years it has already lasted before any

recovery would be paid to Class Members.  That would amount to a total likely delay of more

than *22 years* from the filing of the first complaint in this Action before any recovery would be

paid to Class Members.[34]  The length of the probable delay in receiving any recovery weighs

heavily in favor of the reasonableness of the Settlement.

### 3.    Expense

157.    Given the complexity of this case and the need for multiple experts,

including experts in cardiology, rheumatology, biostatistics, clinical drug trials, epidemiology,

pharmaceutical development and regulatory issues, and securities litigation damages, mammoth

---

[33] *See In re Vivendi Universal, S.A. Secs. Litig.*, No. 02 Civ. 5571 (SAS), Final Judgment, ECF
No. 1301 (S.D.N.Y. July 14, 2016) (final judgment explains that jury verdict was returned on
January 29, 2010, the Court set procedures for challenging individual reliance on July 5, 2012,
the Court granted summary judgment motions related to Defendant's rebuttal of the presumption
of reliance in April 2015 and August 2015, and a final judgment was entered on July 14, 2016).

[34] While an award of pre-judgment interest to compensate the Class for the delay would be a
possibility, *see In re Vivendi Universal, S.A. Secs. Litig.*, 284 F.R.D. 144, 161-64 (S.D.N.Y.
2012) (awarding pre-judgment interest to a class in a securities fraud case), such an award is
entirely within the discretion of the Court, *see id.*, and there is a risk that no pre-judgment
interest would be awarded or that the amount awarded would not be sufficient to compensate the
Class for the extreme delay in awaiting a recovery.

litigation expenses have been incurred.  To date, over the 12-year duration of this litigation, without any guarantee of recovery, Plaintiffs' Counsel have incurred $20,004,879.33 in expenses to prosecute the Action.

158.    The expenses have run the gamut of costs that are necessary to prosecute a massive securities class action case, including more than $1.6 million on document duplicating costs, more than $5.8 million in expert witness expenses, more than $2.9 million in expenses related to providing Class Notice to Class Members and over $4.8 million in consulting fees in connection with Plaintiffs' jury consulting firm that has been actively assisting Plaintiffs' Counsel for over 7 years.

159.    Absent the Settlement, millions of dollars more would have to be advanced by Plaintiffs' Counsel in order to try the case, fight the numerous appeals that would surely be filed if the trial were to result in a Plaintiffs' verdict and see the case through to a final judgment on behalf of the Class.  For example, if, as discussed above, it would take another decade from a jury verdict to a final judgment on behalf of the Class (as it did for class members in another securities class action in this Court), the cost of simply hosting the documents Defendants produced in this litigation on a server for use at trial and in connection with appeals would cost an estimated $15,000 per month.  Over the course of a decade, these document hosting expenses by themselves would amount to over $1.8 million.

**B.    THE REACTION OF THE CLASS TO THE SETTLEMENT**

160.    Per the Preliminary Approval Order, the Settlement Administrator began mailing copies of the Notice and Claim Form to Class Members and nominees on September 30, 2016.  *See* GCG Affidavit ¶¶7-11.  As of November 4, 2016, over 4.1 million copies of the Notice and Claim Form have been sent, the Publication Notice was published in *The Wall Street*

58

*Journal* and *The New York Times* and transmitted over PR Newswire, and these documents, and others related to the Settlement, were posted on the website developed for the Settlement. *See* GCG Affidavit ¶¶12-13, 15.

161.   While the deadline set by the Court for Class Members to object has not yet passed, as of November 10, 2016, Lead Counsel has received only 10 objections to the Settlement, Plan of Allocation, Fee Request and/or Expense Reimbursement Requests.[35]

### C.   THE STAGE OF THE PROCEEDINGS AND THE AMOUNT OF DISCOVERY COMPLETED

162.   Having prosecuted this case:   (i) through discovery, including the review/analysis of tens of millions of pages of documents, the completion of more than 100 fact and expert depositions, and the marshaling of an enormous amount of evidence for purposes of Plaintiffs' largely-successful opposition to Defendants' summary judgment motion on the merits; (ii) to the brink of trial, including identification of 1,567 potential Plaintiffs' trial exhibits, intensive analysis of Defendants' 1,687 proposed trial exhibits and receipt of the benefits of the reactions of a mock jury; and (iii) to a successful conclusion on appeal after the eve-of-trial exclusion of Plaintiffs' loss causation and damages expert, Plaintiffs and Plaintiffs' Counsel are acutely aware of the strengths and weaknesses of Plaintiffs' claims and Defendants' defenses.

163.   The late stage of the proceedings and the enormous amount of discovery that has been completed, thus, substantiates that Plaintiffs and Plaintiffs' Counsel have an excellent understanding of each side's case as to both liability and damages.

---

[35] Lead Counsel will address these objections along with any others that are hereafter received in Plaintiffs' reply submission to be filed with the Court on or before December 6, 2016.

### D.     THE RISKS OF ESTABLISHING LIABILITY

164.    The risks of establishing liability in this case are substantial.  The most immediate risk Plaintiffs faced was that absent the Settlement, the Second Circuit might have granted Defendants' Rehearing Petition and possibly have reversed the Second Circuit panel's decision reinstating Plaintiffs' loss causation and damages expert.  While the likelihood of this was small given that such petitions are infrequently granted in this Circuit, the possibility that the Second Circuit sitting *en banc* might have agreed with this Court's exclusion of Plaintiffs' loss causation and damages expert existed nonetheless.  If that were to happen, Plaintiffs would obviously be unable to prove their case as loss causation and damages are required elements of a Section 10(b) violation[36] and, therefore, the Action would subsequently be dismissed on summary judgment, as had been the situation prior to Plaintiffs' resurrection of the case on appeal.

165.    Plaintiffs faced much more significant risks in proving loss causation and *scienter* at trial, as well as other substantial risks relating, *inter alia*, to Pfizer's defense that the "truth was on the market" (*i.e.*, allegedly concealed study information was adequately disclosed) and possible exclusion of key evidence on motions *in limine*.

### 1.     Loss Causation

166.    Defendants continuously raised loss causation issues throughout this litigation.  As briefly touched upon earlier, in their summary judgment motion on the merits, Defendants were successful in eliminating two corrective disclosures Plaintiffs had alleged in their Amended Complaint (a November 4, 2004 article in Canada's *National Post* and two news

---

[36] *See* 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").

articles appearing on October 20, 2005).  The Court found that the disclosures in these articles

did not qualify as "materialization of a concealed risk" because they did not reveal any "true risk

of Celebrex and Bextra's [CV] side effects."   ECF No. 455 at 22.   The Court rejected

Defendants' arguments that the other disclosures Plaintiffs alleged were not corrective, finding

that resolution of such issues were factual questions for the jury.  *Id.* at 19-22.

167.    A trial of this Action promised to bring these issues front and center

before the jury.  While Plaintiffs' Counsel believe that Plaintiffs have persuasive arguments as to

loss causation, there nevertheless existed a risk that a jury could agree with Defendants that

particular disclosures were not corrective of the CV risks Pfizer allegedly concealed.  Adverse

factual determinations on narrow loss causation issues could eliminate large amounts of

recoverable damages.

168.    For example, as discussed (in brief) earlier, the corrective disclosure

associated with the largest stock price decline, and therefore causing the largest percentage of

class damages, was Pfizer's December 17, 2004 announcement that "it received new information

last night about the [CV] safety of…Celebrex…based on an analysis of two long-term cancer

trials" and that "[b]ased on these statistically significant findings, the sponsor of the trial, the

[National Cancer Institute], has suspended the dosing of Celebrex in the study…."  *See* ECF No.

455 at 20.  The study in question was known as the "APC" trial.[37]  *See id.* at 7.  Securities

analysts reacted to this announcement and the halt of the APC study by exclaiming such things

as:  "CV Risk for Celebrex a shocker."  ECF No. 420, at 427 ¶819.  Plaintiffs maintained that

concealed risk materialized with this announcement and resulted in at least a 12% drop in

---

[37] "APC" stands for the Adenoma Prevention with Celebrex study, which was run to examine, *inter alia*, whether Celebrex was efficacious in stemming the development of cancer.

Pfizer's stock price.

169.     Defendants and their loss causation expert maintained that the December 17, 2004 APC announcement was not corrective of any concealed information because it was based on entirely new information (*i.e.*, the news that the APC study would need to be halted due to increased CV risk with Celebrex) that Pfizer had received only the night before.  *See, e.g.*, ECF No. 382 at 10, 19, 29.  Pfizer would argue strenuously that it did not know, and could not have known, about the increased CV risk for Celebrex in the study until the night before December 17, 2004 and that Pfizer disclosed it promptly upon receiving the news.  Pfizer would also argue that the type of increased CV risk seen in the APC study (*i.e.*, increased "thromboembolic" risk) was not the same type of CV risk seen in the studies that Pfizer allegedly concealed during the Class Period.  To bolster that argument, Pfizer would cite to a December 17, 2004 FDA press release stating that the FDA did not see the same "sort of" risk in prior Celebrex studies that was seen in the APC study.  Thus, Pfizer had a basis to argue to the jury that the risk that materialized from disclosure of the APC study was not the same as the information Pfizer had allegedly been concealing and, therefore, the APC announcement did not correct any alleged prior misrepresentations Pfizer had made about the CV risk of the drug.

170.     While Plaintiffs had substantial evidence to counter these arguments, the possibility that these arguments could be successful in front of a jury was one of the more important considerations in assessing the risks of trial.  The APC corrective disclosure was, by far, the most important corrective disclosure in the case from the standpoint of the magnitude of damages associated with it.  If the jury were to find the December 17, 2004 disclosure relating to the APC study was not corrective, the elimination of this corrective disclosure from Plaintiffs' damages model would have the effect of eliminating at least 99% of the aggregate maximum

estimated potential damages of $5.37 billion.  This would leave the Class with a liability verdict, but a Pyrrhic victory because recoverable damages would be reduced to only $28 million.  *See* Second Keable Decl. ¶10.

171.    Defendants and their loss causation expert also challenged each of the remaining corrective disclosures and a substantial risk remained that a jury would make a factual determination or side with Defendants' expert in connection with these corrective disclosures.  In sum, the risk of adverse jury determinations on relatively narrow factual issues involving whether particular disclosures were corrective increased the risk that large amounts of damages could be eliminated from Plaintiffs' case at trial.

### 2.    Pfizer's Assertion That Certain Concealed Studies Were Actually Revealed to the Market During the Class Period

172.    Another risk Plaintiffs faced was whether a jury would credit Defendants' argument that some of the study information that Plaintiffs alleged was concealed was, in fact, revealed to the market.  This is sometimes referred to as a "truth on the market" defense.  In some instances, the validity of this argument turned exclusively on issues of credibility and, in evaluating whether to enter into the Settlement, Plaintiffs' Counsel considered that there is always inherent litigation risk when an issue goes to a jury based solely on credibility.

### 3.    Potential Exclusion of Key Evidence on Motions *In Limine*

173.    Another litigation risk Plaintiffs faced was uncertainty over whether key pieces of evidence that would bolster Plaintiffs' case would be excluded from the trial by the Court on a motion in *limine* or later on a ruling at trial.

174.    Although these motions were fully briefed, they were not yet ruled upon given the exclusion of Plaintiffs' loss causation and damages expert on the eve of trial.  While Plaintiffs' Counsel believe that Plaintiffs had valid arguments that Defendants' various motions

in *limine* should be denied, there was a risk that Plaintiffs would not be able to use valuable and persuasive evidence that was the subject of Defendants' motions.

> **4.** **Admission of Potentially Exculpatory Evidence If Plaintiffs' Key Motions *In Limine* Were Denied**

175.   Conversely, there was also a risk that allegedly exculpatory evidence would be admitted if Plaintiffs' motions *in limine* to keep out such evidence were denied.

176.   One such instance involves a memorandum written by FDA employees in 2005.  After hearings were held in early 2005 concerning whether Celebrex and Bextra should be withdrawn from the market (as Vioxx was), the FDA released an April 6, 2005 memorandum summarizing the conclusions of these employees (the "April 2005 FDA Memo").   During pre-trial proceedings, Defendants sought to use, *inter alia*, the following statement in the April 2005 FDA Memo about the Alzheimer's 001 study to negate their *scienter* in allegedly concealing the study prior to and during the Class Period:   "[T]here was a small one-year trial comparing celecoxib 200 mg twice daily to placebo in patients with Alzheimer's disease that did not demonstrate a significantly increased risk of serious adverse CV events, but did show a trend toward more CV events in the celecoxib treatment arm."   *Id.*

177.   In responding to Plaintiffs' motion *in limine* to exclude the April 2005 FDA Memo from the trial, Defendants argued strenuously that "[t]he fact that the FDA [in the April 2005 FDA Memo] reached the same conclusion as Pfizer…confirms the reasonableness of Defendants' views.  This alone precludes a finding of scienter."  ECF No. 405 at 2.  Although the motion in *limine* was fully briefed, it was not yet ruled upon given the exclusion of Plaintiffs' loss causation and damages expert on the eve of trial.  While Plaintiffs' Counsel believe that there were valid arguments that Plaintiffs' motion in *limine* seeking to exclude the April 2005 FDA Memo should be granted to prevent Defendants' attempt to confuse the jury, there was a

risk that the memo would be admitted and Defendants would be able to use it in an after-the-fact attempt to negate *scienter* by making the potentially powerful argument that the FDA agreed with Pfizer's interpretation of the data and retroactively endorsed the statements Pfizer made from 1999 through December 2004.

178.     Similarly, a risk existed that Plaintiffs' motion to exclude testimony that the Individual Defendants and senior Pfizer executives took Celebrex themselves or gave it to their family members would be denied.  While Plaintiffs believe that they had ample grounds for keeping such testimony out of the trial, Plaintiffs' Counsel recognize the surface appeal of such an argument that could mitigate the Individual Defendants' knowledge of the increased CV risk associated with Celebrex.

### 5.     The Difficulty of Proving Scienter

179.     In addition to the April 2005 FDA Memo, Defendants would point to other evidence in an effort to negate *scienter*.  This evidence would also create substantial challenges in proving *scienter* before the jury.

### a.     Dr. McKinnell's "Interesting Problem With Bextra" Email

180.     As the Court is aware, a key piece of *scienter* evidence was the following email written by Dr. McKinnell to many senior Pfizer officers (including Drs. Feczko and LaMattina) immediately after the withdrawal of Vioxx on September 30, 2004 and at a time when the "CABG-2" study—which showed a statistically significant increased CV risk that was known to Pfizer since January 2004—was not public:

> We need to move immediately to avoid collateral damage and to exploit what could be a major opportunity.  I see the priorities as the following: 1. Avoid this becoming a class effect. We need a press release out the door before 9 am making it clear that our clinical studies in tens of thousands of patients show no signal of CV complications. To the contrary we have seen strong signals of beneficial

effects in cancer, etc. ***How to handle Bextra is an interesting problem***.  I suggest we focus on Celebrex….

ECF No. 420 at 146, ¶531; ECF No. 455 at 6.

181.    Pfizer deponents who were recipients of this email testified, in substance, that they understood Dr. McKinnell to be referring to "skin issues,"[38] not CV issues, when he referred to the "interesting problem with Bextra," and Dr. McKinnell also testified that he was referring to skin issues.  *See, e.g.*, ECF 405 at Appendix C.  While Plaintiffs' Counsel believe that Plaintiffs have the better argument on the credibility of this explanation, there nevertheless existed the possibility that a jury might believe Pfizer's explanation that Dr. McKinnell was referring to skin issues resulting in a substantial weakening of a central piece of *scienter* evidence.

### b.    The FDA's Public Statements

182.    Defendants would also seek to rely heavily on public statements made by the FDA after Vioxx's withdrawal that the FDA had not seen a CV safety signal with Celebrex.  *See* ECF No. 404-14 (senior FDA official stated in October 28, 2004 article:  "As far as Celebrex, we have not seen any signal, either in the controlled clinical trial data or the population based data that would make us think that it has excess cardiovascular toxicity over other drugs in the class.  That doesn't mean that we're certain.  That means that's what we know so far.").

183.    While Plaintiffs' Counsel believe documentary evidence establishes that key information was misrepresented to, or not timely shared with, the FDA and other regulators (*see, e.g.*, ECF No. 420 at ¶¶617-629, 660-663; ECF No. 548 at 2-6; ECF No. 617 at 1-5), there

---

[38] The reference to skin issues was to Stevens Johnson Syndrome, which is a form of rare but serious skin reactions that had been seen due to use of Bextra.  *See* ECF No. 405 at 17.  A warning had been placed on Bextra's label regarding these issues in 2002.  *See* ECF No. 419 at 64-66.

was nevertheless a risk that jurors would credit Defendants' position that if the FDA stated

publically that there was no CV safety signal with Celebrex, it agreed with Pfizer's interpretation

of the clinical data and, thus, a jury should not conclude Defendants acted with *scienter*.

184.    Other examples exist where unfairly prejudicial or misleading evidence

was the subject of Plaintiffs' *in limine* motions, which were still pending at the time the

Settlement was reached.  If such motions were not granted, the risk of establishing liability in

this case would be heightened.

**E.    THE RISKS OF ESTABLISHING DAMAGES**

185.    Even if Plaintiffs succeeded in overcoming the liability issues discussed

above at trial, and numerous others, they still faced significant risks in proving damages.

186.    Presenting the complexities of Professor Fischel's testimony to a jury

would be challenging and entailed risks since Defendants' expert, Professor Gompers,

challenged Professor Fischel's damage calculations.  As discussed in the Fee Brief, there are

ample litigation risks when an issue goes to a jury based on a battle of experts.  *See* Fee Brief §

I.3.C (citing *In re Bear Stearns Cos., Inc. Secs., Deriv. and ERISA Litig.*, 909 F. Supp. 2d 259,

267 (S.D.N.Y. 2012) ("When the success of a party's case turns on winning a so-called 'battle of

experts,' victory is by no means assured."); and *In re Cendant Corp. Litig.*, 264 F.3d 201, 239

(3d Cir. 2001) ("[E]stablishing damages at trial would lead to a 'battle of experts,' with each side

presenting its figures to the jury and with no guarantee whom the jury would believe.")).

**F.    THE RISKS OF MAINTAINING A CLASS ACTION THROUGH TRIAL**

187.    The Class was certified early on in the case and there was little risk that a

Class could not be maintained through a verdict.  However, in the "second step" of the litigation

(discussed above) in which Defendants would attempt to rebut the presumption of reliance based

on the fraud-on-the-market doctrine and challenge individual Class Members' reliance on particular misrepresentations, there was real risk to the claims of certain Class Members.

188.    If individual reliance challenges were successful, Defendants would effectively be "chipping away" at the size of the Class and reducing (or eliminating) the damages that particular Class Members would be eligible to recover.[39]   This risk is eliminated by the guaranteed recovery provided by the Settlement as Defendants do not have an opportunity to raise individualized issues of reliance as part of the Claims process.

### G.    THE ABILITY OF DEFENDANTS TO WITHSTAND A GREATER JUDGMENT

189.    Pfizer is one of the larger companies in the world judged by market capitalization and revenues.   While the Settlement is substantial and more than nine times the median class action settlement percentage (*see supra* § I), and a significantly higher percentage of the likely recoverable damages (*see supra* § VII), Plaintiffs recognize that Pfizer had the ability to pay more than $486 million.   The Second Circuit has held, however, that this factor is not dispositive and need not affect the conclusion that the settlement is within the range of reasonableness.   *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001); Settlement Brief §I.C.5.

### H.    THE RANGE OF REASONABLENESS OF THE SETTLEMENT FUND IN LIGHT OF THE BEST POSSIBLE RECOVERY AND IN LIGHT OF ALL THE ATTENDANT RISKS OF LITIGATION

190.    As discussed at length earlier, the proposed recovery of $486 million represents approximately 9% of maximum aggregate damages, which is 9 times the amount of

---

[39] Such a tactic was successfully utilized by defendants in *Vivendi* to lengthen the proceedings and to ultimately reduce the jury award in a substantial fashion.  *See In re Vivendi Universal, S.A. Secs. Litig.*, No. 02 Civ. 5571 (SAS), Final Judgment, ECF No. 1301 (S.D.N.Y. July 14, 2016).

recent similar settlements. *See supra* § I. Consequently, it is respectfully submitted that the Settlement proposed here—reached after the Action was dismissed in its entirety at summary judgment and resurrected on appeal—is an excellent result for the Class and merits final approval.

191.    In addition, the Settlement represents one of the largest reported securities class action recoveries against a pharmaceutical company. As demonstrated by the foregoing, the litigation involved significant risk. *See supra* § I. Jury questions could be decided either way, and there would be many other challenges if the case were tried.

192.    Plaintiffs' Counsel respectfully submit that although the evidence (documentary and testimonial) supported the allegations against Defendants, significant risks existed with respect to Plaintiffs' ability to prove liability, especially with respect to loss causation and *scienter*, as discussed at length earlier herein. *See supra* § VIII.D.1 (explaining the risks in proving *scienter* and the extreme risk that a single adverse factual determination with respect to a key corrective disclosure could reduce maximum recoverable damages from $5.37 billion to $28 million).

193.    In view of all the foregoing circumstances, and in light of all the risks, the Settlement represents an excellent recovery for the Class.

## IX.   THE FEE PETITION

194.    The Fee Request in the amount of 28% of the Settlement Fund is merited given the excellent result obtained for the Class.[40] Similar percentage awards and significantly

---

[40] The Notice states that Lead Counsel, on behalf of Plaintiffs' Counsel, will ask the Court for an award of attorneys' fees not to exceed 30% of the Settlement Fund. *See* Ex A. to the GCG Affidavit at 2. The actual fee percentage being sought (28%) is below the maximum amount set forth in the Notice.

larger multipliers have been awarded in some of the largest securities class action settlements since the enactment of the PSLRA. As set forth below, and in the Class Representatives' Declarations, the Fee Request is also fully supported by the Class Representatives, which include a large institutional investor with a significant financial stake in the outcome of the litigation and the model fiduciary for the Class that Congress envisioned in enacting the PSLRA, *see* Exhibit E ¶¶14-17 (Mongrue Decl.), as well as individual investors with smaller, but from an individual Class Members' perspective, no less significant stake in this case, *see* Exhibit F ¶¶12-16 (Fleckles Decl.); Exhibit G ¶¶12-16 (Perusse Decl.); and Exhibit H, ¶¶12-16 (Chace Decl.).

195. As set forth in the Fee Brief, courts in the Second Circuit "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *McDaniel v. Cnty. Of Schenectady*, 595 F. 3d 411, 417 (2d Cir. 2010) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)). Courts in the Second Circuit also consider the "Goldberger" factors in assessing the reasonableness of a request for attorneys' fees in a common fund case, which are:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (quotation marks and citation omitted).

196. Here, as discussed below and more fully in the Fee Brief, Plaintiffs' Counsel have presented an analysis of their Fee Request under both the percentage of the fund method and the lodestar cross-check, as well as the *Goldberger* factors, all of which — it is respectfully submitted — confirm that the Fee Request is reasonable.

197. An analysis of each of the *Goldberger* factors supports Plaintiffs' Counsel's Fee Request.

70

A.      THE TIME AND LABOR EXPENDED BY COUNSEL

198.    The work Plaintiffs' Counsel undertook in prosecuting this complex securities fraud class action for the past twelve years and arriving at the Settlement has been time-consuming, challenging and labor-intensive.

199.    During the past twelve years, Plaintiffs' Counsel dedicated an enormous amount of labor, time, money and resources toward prosecuting and resolving this case successfully.   As explained earlier, prior to the exclusion of Plaintiffs' loss causation and damages expert, Plaintiffs' Counsel had, *inter alia*:  (i) conducted an extensive investigation into the Class's claims, including review of voluminous publicly available information regarding Pfizer; (ii) conducted an intensive review of medical and CV literature and academic literature on bio-statistical and epidemiological analyses involving drugs; (iii) drafted a consolidated class action complaint; (iv) successfully opposed Defendants' motion to dismiss and a motion for reconsideration of the dismissal; (v) prepared for and largely won a *Daubert* challenge of Plaintiffs' medical and statistical experts, which involved the review of millions of pages of documents, the preparation of numerous expert reports, depositions of all such experts, briefing of various *Daubert* motions, and finally, the presentation and cross examination of numerous experts in a five-day evidentiary hearing; (vi) engaged in extensive discovery efforts, including taking or defending more than 100 fact and expert witness depositions and the review of tens of millions of pages documents and preparation of detailed chronologies of the numerous clinical drug studies at issue in this litigation; (vii) successfully moved for class certification; (viii) prepared an extensive amended class action complaint incorporating the fruits of Plaintiffs' extensive discovery efforts and defeated Defendants' efforts to deny the Class the right to file such an amended complaint (as well as a second motion for reconsideration of the dismissal of

the original consolidated complaint); (ix) largely defeated Defendants' subsequent motion for summary judgment based on a culling out and marshaling of a substantial amount of evidence indicating Defendants were aware of but hid the CV risks of the drugs; and (x) prepared for trial, including conducting a mock trial, filing thirteen *Daubert* motions and other motions *in limine* and opposing eleven such motions by Defendants, distilling complex medical studies and other information into jury-friendly demonstratives, updating the study chronologies to encapsulate the massive amount of drug study information into useable quick reference guides for cross-examination purposes, reviewing hundreds of hours from videotaped depositions and sifting through and designating the key parts of such depositions to be played at trial, and preparing an opening statement, jury instructions, verdict forms, *voir dire* and the pre-trial order.

200.    The foregoing efforts were themselves incredibly time- and resource-consuming but do not even include Plaintiffs' Counsel's efforts in resurrecting the case on appeal, and then continuing to prepare for trial.   Plaintiffs' Counsel spent an additional approximately two years briefing and arguing the appeal and not only successfully fought for the reinstatement of Plaintiffs' loss causation and damages expert, but improved their case for trial by successfully reinstating certain dismissed Pharmacia statements.

201.    The successful reinstatement of the dismissed Pharmacia statements pursuant to *Janus* also necessitated further trial preparation efforts by Plaintiffs' Counsel.  Thus, among other things, Plaintiffs' Counsel:  (i) revised the verdict form to include the now-reinstated Pharmacia statements; (ii) reviewed, analyzed and added numerous new trial exhibits to their trial exhibit list tending to show Pfizer's "ultimate authority" over Pharmacia's statements in light of the Second Circuit's *Janus* ruling; (iii) reviewed and analyzed numerous videotaped depositions of fact witnesses to add deposition testimony tending to show Pfizer's

"ultimate authority" over Pharmacia's statements and partnership with Pharmacia in light of the Second Circuit's *Janus* ruling; (iv) revised the jury instructions to reflect the Second Circuit's *Janus* ruling; (v) assessed the effect of the Second Circuit's ruling on previously-filed motions *in limine* and evaluated how the motions, which had been terminated given the exclusion of Plaintiffs' loss causation and damages expert (*see* ECF No. 679), should be re-filed; and (vi) revised numerous study chronologies to further refine and distill the vast amount of study information for cross-examination purposes and update them to reflect newly-added exhibits and other information related to the Second Circuit's *Janus* ruling.

202.    Attached hereto as Exhibits I through O are the respective declarations submitted on behalf of each Plaintiffs' Counsel firm, which set forth the hours and the hourly rates for each attorney, paralegal and support staff member that worked on the case.

203.    The overall total lodestar for all Plaintiffs' Counsel[41] in this Action is set forth in the chart below:

| FIRM | HOURS | TOTAL LODESTAR |
|------|-------|----------------|
| G&E | 192,772.57 | $73,907,401.50 |
| KTMC | 82,480.11 | $36,072,973.60 |
| SW | 5,504.30 | $3,929,061.50 |
| Dubin Law | 4,268.90 | $3,820,665.50 |
| KM&K | 4,171.60 | $1,501,168.40 |
| JHA | 1,248.60 | $1,050,364.00 |
| M&G | 259.30 | $156,019.00 |
| **GRAND TOTAL** | 290,705.38 | $120,437,653.50 |

204.    To compensate for the lengthy delay Plaintiffs' Counsel have experienced in receiving any compensation for their efforts in this case (twelve years), it is appropriate to use

---

[41] In addition to Lead Counsel G&E, the other Plaintiffs' Counsel firms in this Action are: Kessler Topaz Meltzer & Check, LLP ("KTMC"), Seeger Weiss LLP ("SW"), Keating Muething & Klekamp, PLL ("KM&K"), Joshua E. Dubin, Esq., P.A. ("Dubin Law"), Joseph Hage Aaronson LLC ("JHA"), and Massey & Gail LLP ("M&G").

Plaintiffs' Counsel's current billing rates in calculating the lodestar, as they have done.  *See*, *e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) ("an appropriate adjustment for delay in payment" by applying "current" rate is appropriate); *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (rates "should be 'current rather than historic'"); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (current rates "should be applied in order to compensate for the delay in payment").  In determining whether the rates are reasonable, the Court should take into account the attorney's legal reputation, experience, and status (*e.g.*, partner, counsel, associate).  In this case, Plaintiffs' Counsel are among the preeminent firms in the field of securities class action litigation, the trial team of lawyers working on the case are all highly experienced and respected securities lawyers and the team of appellate lawyers are also highly regarded and among the top in the appellate field.  *See* Exhibits I to O hereto (attaching declarations with biographies of Lead Counsel's firm and each of the other Plaintiffs' Counsel firms).  In short, the experience and reputations of Plaintiffs' Counsel support the hourly rates charged.

205.   In order to provide for a more thorough understanding of the massive amount of work performed by Plaintiffs' Counsel in this matter and the true risk that was undertaken, each Plaintiffs' Counsel firm has presented their time broken down into the following specific time periods:

| Category | Start Time | End Time | Brief Description |
|---|---|---|---|
| Category 1 | 12/1/2004 | 9/4/2008 | Case inception through denial of Defendants' motion for reconsideration of the Court's decision on Defendants' motion to dismiss |
| Category 2 | 9/5/2008 | 3/22/2010 | Denial of reconsideration of motion to dismiss through *Daubert* hearing ruling |
| Category 3 | 3/23/2010 | 7/2/2012 | *Daubert* hearing ruling through filing of Defendants' first summary judgment motion |
| Category 4 | 7/3/2012 | 3/28/2013 | Defendants' first summary judgment motion through Plaintiffs' opposition and the Court's ruling largely denying the motion |
| Category 5 | 3/29/2013 | 7/8/2014 | Summary judgment opinion through trial preparation |

| | | | and the Court's *Daubert* ruling excluding Professor Fischel and grant of Defendants' second summary judgment motion dismissing case on eve of trial |
|---|---|---|---|
| Category 6 | 7/9/2014 | 4/12/2016 | Case dismissal through Plaintiffs' appeal and the Second Circuit's opinion reinstating Professor Fischel and certain dismissed Pharmacia statements |
| Category 7 | 04/13/2016 | 9/16/2016 | Second Circuit opinion through Plaintiffs' continued trial preparation and Court's granting of preliminary settlement approval |

206. ***Category 1***. This category commences with the inception of the case and continues through and including September 4, 2008, the date on which the Court denied Defendants' motion to reconsider its motion to dismiss opinion. Included within this time frame is work performed in connection with the initial investigations, the lead plaintiff stage, preparation of the consolidated amended complaint and its related investigation, and briefing on Defendants' Motion to Dismiss, Plaintiffs' Motion to Strike and Defendants' Motion for Reconsideration. Collectively, Plaintiffs' Counsel spent approximately 6,068 hours on this phase of the case, with an accompanying lodestar of $3,086,836.

207. ***Category 2***. This category commences the day following the Court's September 4, 2008 denial of Defendants' Motion for Reconsideration and continues through and including its March 22, 2010 *Daubert* ruling. The overwhelming majority of the approximately 112,954 hours spent during this phase of the case resulting in a lodestar of approximately $38,913,910, were incurred in connection with the *Daubert* hearings involving numerous experts in complex, scientific areas such as bio-statistics and cardiology.

208. ***Category 3***. This category commences the day following the Court's *Daubert* opinion and continues through the conclusion of fact and expert discovery, culminating with Defendants' filing of their initial motion for summary judgment on July 2, 2012. During this time frame, Plaintiffs' Counsel reviewed and analyzed tens of millions of pages of

documents for use in connection with nearly 100 fact and expert depositions.[42]   In addition, during this time the Parties engaged in extensive motion practice in connection with Lead Plaintiff's Class Certification motion, and litigated numerous discovery disputes that were resolved either by the Parties or with the assistance of Judge Pitman.   During this same period of time, Plaintiffs prepared the 218-page Amended Complaint and successfully defeated Defendants' opposition to Plaintiffs' motion for leave to amend, as well as a brand new reconsideration motion.   Plaintiffs' Counsel expended an additional approximately 132,662 hours on this phase of the case, representing a lodestar of approximately $57,570,674.

209.   ***Category 4***.   This category commences the day following the filing of Defendants' motion for summary judgment on July 2, 2012 and continues through the Court's issuance of its first summary judgment opinion in this matter on March 28, 2013.   During this time frame, Plaintiffs' Counsel engaged in a massive effort to oppose the motion which included the research and preparation of a comprehensive counter-statement of facts, which identified 630 separate exhibits and included an event study prepared by Professor Fischel.   Additional depositions and responses ensued, culminating in the Court's first summary judgment opinion largely denying the motion.   During this phase, Plaintiffs' Counsel invested an additional approximately 14,271 hours, reflecting a lodestar of approximately $7,045,383.

210.   ***Category 5***.   This category commences the day following the Court's ruling largely denying Defendants' summary judgment motion and dismissal of the case on July 8, 2014.   Extensive trial preparation followed the Court's summary judgment opinion, including the revision of Professor Fischel's report, identification of over 1,500 trial exhibits by each side,

---

[42] While there were 108 total fact and expert witness depositions, a number of depositions were taken in connection with the earlier *Daubert* hearing and not during this time frame.

designations of potential trial testimony from more than 70 fact depositions, a mock trial by Plaintiffs' Counsel with the assistance of their jury consultant, the preparation of a highly-detailed timeline for use at the mock trial (and actual trial), numerous *Daubert* and *in limine* motions, opposition to Defendants' motion for judgment on the pleadings, and preparation, exchange and submission of jury instructions, verdict forms, *voir dire* and the final pre-trial order.  In addition, the Parties also engaged in extensive motion practice related to Defendants' renewed efforts to exclude Professor Fischel from testifying in the Action.  Between the Court's issuance of the initial summary judgment opinion on March 28, 2013 and the dismissal of the case on July 8, 2014, Plaintiffs' Counsel incurred approximately 20,175 hours prosecuting the case, reflecting an additional lodestar for this category of approximately $10,547,260.  At this juncture, Plaintiffs' Counsel had invested approximately 286,133 hours to the Action since its inception and approximately $117,164,065 in lodestar.

211.  ***Category 6***.  This category commences on the day following the Court's granting of its second summary judgment opinion and continues until the issuance of the Second Circuit's decision on April 12, 2016 reinstating Professor Fischel and reinstating certain Pharmacia statements under *Janus*.  During this phase, Plaintiffs' Counsel revived the case and expended an additional approximately 2,953 hours, representing new lodestar of approximately $2,229,485.

212.  ***Category 7***.  The final category commences the following day when trial preparation commenced once again and continues through the Court's granting of preliminary approval to the Settlement on September 16, 2016.  During this final phase, Plaintiffs' Counsel invested an additional approximately 1,618 hours to the Action, reflecting approximately $1,044,103 in lodestar.

213.   Set forth in the table below is a summary of the total lodestar for the Action broken down by each of the seven categories:

| Category | Brief Description | Total Hours | Total Lodestar |
|---|---|---|---|
| Category 1 | Case inception through denial of Defendants' motion for reconsideration of the Court's decision on Defendants' motion to dismiss | 6,068.52 | $3,086,836.00 |
| Category 2 | Denial of reconsideration of motion to dismiss through *Daubert* hearing ruling | 112,954.65 | $38,913,910.55 |
| Category 3 | *Daubert* hearing ruling through filing of Defendants' first summary judgment motion | 132,662.58 | $57,570,674.60 |
| Category 4 | Defendants' first summary judgment motion through Plaintiffs' opposition and the Court's ruling largely denying the motion | 14,271.75 | $7,045,383.75 |
| Category 5 | Summary judgment opinion through trial preparation and the Court's *Daubert* ruling excluding Professor Fischel and grant of Defendants' second summary judgment motion dismissing case on eve of trial | 20,175.80 | $10,547,260.25 |
| Category 6 | Case dismissal through Plaintiffs' appeal and the  Second Circuit's opinion reinstating Professor Fischel and certain dismissed Pharmacia statements | 2,953.30 | $2,229,485.25 |
| Category 7 | Second Circuit opinion through Plaintiffs' continued trial preparation and Court's granting of preliminary settlement approval | 1,618.78 | $1,044,103.10 |

214.   As set forth in the declarations submitted on behalf of each firm and summarized herein, Plaintiffs' Counsel devoted a total of 290,705.38 hours to prosecuting this Action for a total lodestar of $120,437,653.50.[43]   As discussed more fully above and further

---

[43] It should be noted that the lodestar figures do not include any time which Plaintiffs' Counsel have expended since the Court's granting of preliminary approval to the Settlement on September 16, 2016, or any time they will spend in obtaining final approval of the Settlement, in

below, this case was enormously risky and complex and, as evidenced by the excellent result obtained, the representation of the Class on an entirely contingency basis over a period of twelve years was outstanding.  It is respectfully submitted that a multiplier of approximately 1.13 under the lodestar/multiplier method is eminently fair and reasonable and fully supports the Fee Request.

### B.   THE MAGNITUDE AND COMPLEXITIES OF THE LITIGATION

215.   As stated earlier, the magnitude and complexities in this litigation presented substantial challenges.  Plaintiffs' Counsel's consultation with numerous experts in preparation for trial was necessarily extensive given the complex nature of the CV, medical, regulatory and bio-statistical issues underlying the claims in this case.  *See supra* § IX.A.  In addition, the expert issues related to loss causation and damages were particularly complex and presented cutting edge issues of securities law and corporate finance that Defendants pursued, and Plaintiffs' Counsel contested, vigorously through appeal.  *See supra* § II.J.  By themselves, these issues were enough to elevate this case into the sphere of what would reasonably be considered complex litigation.  But the complexities surrounding such issues were only the beginning.

216.   Numerous other factors added to the enormous complexity of the case including, *inter alia*:  (i) the fact that the intricacies of not just one, but three Cox-2 drugs (and numerous other arthritis drugs) were involved; (ii) the alleged fraud involved three companies, Pfizer and its Co-Promotion partner, Pharmacia, and its predecessor, Searle; (iii) a complex web of 34 partnership committees needed to be investigated and understood, and a plan needed to be

---

connection with the application for an award of attorneys' fees and expenses or in assisting in the administration of the Settlement.

(and was) developed to concisely explain to a jury how decisions relating to the drugs were made to convincingly prove, among other things, *scienter*; (iv) the sheer number of clinical, epidemiologic and other studies and analyses involved; (v) the lengthy, 7-year time span over which relevant events occurred and the fact that Defendants may have been successful in introducing evidence that extended the relevant time frame to as many as seventeen years; and (vi) the regulatory schemes of multiple countries, in addition to the United States, were involved. *See supra* § VIII.A.1.

217.   Plaintiffs' Counsel created a compelling record addressing these and other complicated issues and otherwise prepared a factual and legal record that took Defendants to the brink of trial.  In a complex appeal involving myriad issues of procedural rules regarding experts and expert reports, corporate finance and the federal securities laws, Plaintiffs' Counsel then convinced a panel of Second Circuit judges that the case should be returned to this Court for trial.  *See supra* § II.K.  The magnitude and complexity of the Action at both the trial and appellate court levels support the reasonableness of the Fee Request.

### C.   THE RISK OF THE LITIGATION

218.   Plaintiffs' Counsel undertook to prosecute this Action entirely on a contingency basis and took a huge risk that the litigation would yield no recovery and leave not only the Class, but Plaintiffs' Counsel, uncompensated.  In fact, that very risk of zero recovery had materialized until the case was (through Plaintiffs' Counsel's efforts) resurrected on appeal.

219.   As stated in the Fee Brief §I.C.3, courts in this Circuit and across the country have consistently recognized that the risk of receiving no (or little) recovery is a substantial factor in considering an award of attorneys' fees.

220.    Unlike counsel for Defendants, who (Plaintiffs' Counsel believe) are paid substantial hourly rates and reimbursed for their out-of-pocket expenses on a monthly or periodic basis, Plaintiffs' Counsel have not been compensated for any of their time (collectively over 290,000 hours) or reimbursed for any of the expenses (approximately $20 million) incurred over the twelve years that have passed since this litigation was first commenced.

221.    In addition, Plaintiffs' Counsel are asking to be compensated for their time only because they have been successful in obtaining a $486,000,000 cash benefit for the Class in this Action.  Had they been unsuccessful, which appeared to be the case as of the Court's granting of Defendants' second summary judgment motion, Plaintiffs' Counsel would not have received any compensation at all.  The enormous contingency risk in this case heavily weighs in favor of the Fee Request.  As discussed elsewhere herein (and further in the Settlement Brief), Plaintiffs' Counsel faced substantial legal and factual hurdles in establishing Defendants' liability under the Exchange Act, and in proving damages.  The challenges were heightened by the complexity of the case and the zealous advocacy of Defendants' array of highly competent defense counsel.

222.    Therefore, Plaintiffs' Counsel respectfully submit that considering the enormous contingency risks Plaintiffs' Counsel took in taking this case, the Court should find that this factor weighs in favor of the reasonableness of the Fee Request.

D.    THE QUALITY OF THE REPRESENTATION

223.    Plaintiffs' Counsel's efforts in bringing this case to a successful conclusion—a Settlement that exceeds the aforementioned median recovery in similar cases by 9 times—is perhaps the best indication of the ability and effectiveness of the attorneys involved.

224.   The experience of the law firms that represent Plaintiffs in the Action are set forth in the accompanying declarations of Plaintiffs' Counsel.  *See* Exhibits I through O. Each of the Plaintiffs' Counsels' firms practice extensively in the highly complex field of federal securities litigation and/or appellate litigation and each brought the necessary experience and skill to understand the sophisticated factual and legal issues in this case and litigate them to a successful conclusion in the face of vehement opposition by Defendants.

225.   Courts also frequently view the quality of opposing counsel as an important consideration in assessing the quality of the legal services rendered by plaintiffs' class counsel.  Here, Defendants were represented by no less than 11 law firms, each of which has a national reputation as leading defense counsel in class action securities litigation, trial advocacy in complex cases and/or appellate litigation.  Defendant Pfizer was represented by 6 law firms as follows (in alphabetical order):

| Pfizer's Counsel |
|---|
| Cadwalader, Wickersham & Taft LLP |
| DLA Piper LLP (US) |
| Gibson, Dunn & Crutcher LLP |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Simpson Thacher & Bartlett LLP |
| Wilkinson Walsh & Eskovitz PLLC |

226.   After the first summary judgment motion was denied, the Individual Defendants were each separately represented by the following firms (listed by Defendant):[44]

| Defendant | Law Firm |
|---|---|
| Dr. Henry A. McKinnell | Skadden, Arps, Slate, Meagher & Flom LLP |
| Ms. Karen L. Katen | Baker Botts LLP |
| Dr. Joseph M. Feczko | Allen & Overy LLP |

---

[44] The firms representing the Individual Defendants did not enter appearances in the case until after the first summary judgment motion was denied, but it is Plaintiffs' Counsel's understanding that these firms acted as "shadow counsel" for the Individual Defendants prior to such decision.

| Dr. John L. LaMattina[45] | O'Melveny & Myers LLP |
|---|---|
| Dr. Gail Cawkwell | Baker & Hostetler LLP |

227.   Senior litigation partners headed teams of attorneys at these firms in vigorously litigating the defense of the Action.  The caliber of the legal work performed by these defense attorneys was of the highest quality and sophistication.

228.   In the face of this formidable team of defense attorneys, Plaintiffs' Counsel were able to effectively and efficiently marshal the enormous amount of evidence in this case and distill it down so that a compelling presentation could be made to a jury at trial, resurrect the case on appeal after an entirely unexpected, eleventh-hour exclusion of their loss causation and damages expert on the eve of trial, and then negotiate a settlement the size of which clearly reflects Defendants' awareness of Plaintiffs' Counsel's ability and readiness to proceed to trial if a fair settlement could not be achieved.  This further confirms the high quality of Plaintiffs' Counsel's work.

229.   Plaintiffs' Counsel also rendered skilled legal services to achieve the Settlement in as cost-effective a manner as was practicable under the circumstances, notwithstanding Defendants' legal tactics.  Defendants' strategy to press the Court to hold a *Daubert* hearing on medical issues at the outset of the case rather than after merits discovery was not only unsuccessful but also wasteful.  That strategy created an unnecessary duplication of work (through no fault of Plaintiffs) in that, *inter alia*, some of the issues that were litigated in the early *Daubert* hearing were necessarily re-litigated after subsequent merits discovery during which some of the operative facts changed or theories were viewed differently in light of massive amounts of additional facts.

---

[45] As stated earlier, Defendant LaMattina was not a defendant at the time of the Settlement.

230.   Despite the unnecessary duplication created by Defendants' insistence on an early *Daubert* phase of the case, Plaintiffs' Counsel prosecuted the case effectively and efficiently.  Plaintiffs' Counsel used the partial discovery it gleaned from the *Daubert* hearing to develop a plan for merits discovery going forward.  Lead Counsel held weekly or periodic strategy calls in an effort to ensure that work was performed without duplication.  In addition, to the extent practicable under the circumstances, work was divided so that particular attorneys or teams of attorneys had responsibilities for marshaling facts related to particular issues.  As one example (discussed to a certain extent earlier, *see supra* § II.F.2), Lead Counsel divided responsibilities for discovering and mastering the facts related to particular clinical studies showing increased CV risk for Celebrex and/or Bextra to individual attorneys who would then inform the larger group of the relevant facts related to that study and Defendants' knowledge of such facts.

231.   Prosecuting the case in an efficient and effective manner was not an easy task given the highly dense factual complexity and the lengthy time period over which relevant events occurred, as discussed earlier herein, as well as the fact that there were as many as 11 of the nation's top defense firms arrayed in opposition but only a few Plaintiffs' Counsel firms that were primarily responsible for preparing the case for trial.  Therefore, it is respectfully submitted that the skill, resolve, trial preparation and established reputations of Plaintiffs' Counsel in the field of securities litigation and trial and appellate work were substantial factors in creating the excellent recovery under all the circumstances in this case.

## E.   THE FEE REQUESTED IN RELATION TO THE SETTLEMENT

232.   Plaintiffs' Counsel are aware that there is no set formula for determining what percentage of a common fund should be awarded as attorneys' fees and that the Court has

wide discretion in the manner in which fee requests are evaluated and ultimately awarded. Plaintiffs' Counsel believe that their Fee Request is supportable under either the percentage of the fund method, the lodestar/multiplier method or even utilizing the lodestar as a cross-check on the percentage of the fund method.

233.   Plaintiffs' Counsel have cited several cases in the accompanying Fee Brief, in which percentage-based awards greater or equal to 28% of the recovery were awarded by courts in this Circuit and elsewhere.  *See* Fee Brief §I.B.1.

**F.   PUBLIC POLICY CONSIDERATIONS**

234.   Important public policy considerations also support the Fee Request. Without class actions like this one, small individual claimants such as many of the Pfizer stock purchasers in this case would lack the resources to litigate a case of this magnitude.  In addition, private securities lawsuits like this case are essential to enforce one of the federal securities laws' important purposes of protecting investors and the integrity of the financial markets.  Moreover, Lead Plaintiff, an institutional investor with substantial losses, has doggedly led the charge in vindicating the rights of investors in this case, just as Congress intended, and approving the Settlement will encourage similarly situated institutional investors to do so in the future.

235.   Courts have consistently recognized that the public interest is served by having experienced counsel enforce the securities laws as private attorneys general, particularly when they are presenting institutional investors who are significant players in the securities markets.   Indeed, the Supreme Court has characterized securities class actions as an "indispensable" part of the securities law enforcement framework.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 32 & n.4 (2007).

236.   Private attorneys such as Plaintiffs' Counsel here should be encouraged to

take the risks required to represent those who would not otherwise be protected from securities fraud.  That is exactly what happened in connection with this Action.  Accordingly, an award of the requested fee would be fully consistent with important public policy considerations and encourage firms to advance funding for contingent litigation to protect the integrity of the securities markets in the future.

**X.        THE REQUEST FOR EXPENSE REIMBURSEMENT**

237.    Plaintiffs' Counsel took this case on a contingency basis and have been responsible for all costs in the Action since inception.  The un-reimbursed expenses incurred by Plaintiffs' Counsel to date total $20,004,879.33.

238.    As set forth in their respective declarations, each Plaintiffs' Counsel firm has prepared a chart reflecting their expenses.[46]

239.    The overwhelming majority of the expenses were incurred for experts and consultants, jury consultants, document reproduction, document storage and retrieval costs, class notice, travel to depositions and accommodations, on-line research, court reporting services, a mediator and expenses incurred in managing the more than 64 million pages of documents produced in this Action and loading them onto a database and related use of software to review the documents.  These expenditures were each critical to Plaintiffs' success in achieving the proposed Settlement and, for the Court's convenience are also summarized below:

---

[46] As reflected in the declarations of the individual firms, some of the firms seeking reimbursement have made contributions to a litigation fund which was maintained by Lead Counsel, which, in turn, was utilized to pay common expenses of the Action.  As a result, line items appearing on each of the respective individual firm declarations indicating "Contributions to Litigation Fund" match in total the deposits made into the overall litigation fund.

| EXPENSES: | TOTALS |
|---|---|
| Experts and (Non-Jury) Consultants | $5,834,158.01 |
| Mock Trial, Jury Selection, Visual Presentation & Jury Consulting | $4,862,534.02 |
| Class Notice of Pendency | $2,940,570.59 |
| eDiscovery & Data Hosting | $2,971,539.45 |
| Reproduction Costs (Internal and External) | $1,625,301.19 |
| Travel | $563,982.81 |
| Legal and Factual Research | $554,294.39 |
| Court Reporters and Transcripts | $428,740.02 |
| Postage & Express Mail | $36,518.41 |
| Telephone, Faxes and Conference Services | $35,666.73 |
| Mediation | $35,000.00 |
| Court/Filing Fees | $16,743.42 |
| Outside Counsel Expense Reimbursement | $15,693.40 |
| Working Meals and Meeting Expenses | $54,535.30 |
| Deposition Expense Reimbursement and Deposition Meeting/Hosting Costs | $12,044.71 |
| Miscellaneous, Publications and Supplies | $8,177.28 |
| Process Server and Notary Fees | $6,319.20 |
| Tax Preparation Services | $2,679.48 |
| Bank Service Charges | $360.00 |
| Witness Fees | $236.00 |
| Interest on Litigation Fund | ($215.09) |
| **TOTALS:** | **$20,004,879.33** |

240.    The Notice stated that Plaintiffs' Counsel intended to apply for reimbursement of their litigation expenses up to a maximum amount of $25 million, plus interest (at the same rate as earned by the Settlement Fund).   The actual expense figure of $20,004,879.33 for which reimbursement is being sought is below the maximum amount of expenses set forth in the Notice.

241.    It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in

creating the fund so long as the submitted expenses were all reasonable, necessary, and directly related to the prosecution of the action. *See* Fee Brief at §II.

242.     The Expense Reimbursement Request is, as Class Representatives' approval of it demonstrates, reasonable in all respects. The Court therefore should approve the Expense Reimbursement Request.

## XI.     PLAINTIFFS' REQUEST FOR EXPENSE REIMBURSEMENT PURSUANT TO 15 U.S.C. § 78u-4(a)(4)

243.     Plaintiffs' Counsel also seek approval for $21,515 in costs and expenses incurred by the Class Representatives directly relating to their representation of the Class in this matter.

244.     The PSLRA specifically states that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). As stated in the Fee Brief, numerous courts have awarded costs to representative plaintiffs to compensate them for their effort and time spent on behalf of a class. *See* Fee Brief §III. Here, the Class Representatives devoted substantial time and energy over the course of this litigation producing an excellent result for the Class.

245.     As set forth in the Mongrue Decl. (Exhibit E hereto), Lead Plaintiff TRSL played an active role in prosecuting this case from the outset, including extensive communication with Lead Counsel regarding developments in the case, strategy and the appeal, sitting for two separate depositions in Louisiana (one of which was a two-day deposition), attending the mediation in New York and otherwise coordinating and consulting with Lead Counsel regarding the Settlement. Pursuant to the PSLRA, Lead Plaintiff TRSL requests $4,015 based on the time TRSL employees spent participating in and supervising this case on behalf of the Class. *See*

88

Mongrue Decl. ¶¶18-23.

246.   As set forth in the Fleckles Declaration (Exhibit F hereto), Class Representative Fleckles actively participated in the prosecution of this case, including extensive communication with Plaintiffs' Counsel regarding developments in the case, strategy and the appeal, responding to document requests and interrogatories, sitting for a deposition in Washington D.C., and otherwise coordinating and consulting with Plaintiffs' Counsel regarding the Settlement.  Pursuant to the PSLRA, Class Representative Fleckles requests $7,500 based on the time she spent participating in and supervising this case on behalf of the Class.  *See* Fleckles Decl. ¶¶17-18.

247.   As set forth in the Perusse Declaration (Exhibit G hereto), Class Representative Perusse actively participated in the prosecution of this case, including extensive communication with Plaintiffs' Counsel regarding developments in the case, strategy and the appeal, responding to document requests and interrogatories, sitting for a deposition in Washington D.C., and otherwise coordinating and consulting with Plaintiffs' Counsel regarding the Settlement.  Pursuant to the PSLRA, Class Representative Perusse requests $5,000 based on the time she spent participating in and supervising this case on behalf of the Class.  *See* Perusse Decl. ¶18.

248.   As set forth in the Chace Declaration (Exhibit H hereto), Class Representative Chace actively participated in the prosecution of this case, including extensive communication with Plaintiffs' Counsel regarding developments in the case, strategy and the appeal, responding to document requests and interrogatories, sitting for a deposition in Seattle, Washington, and otherwise coordinating and consulting with Plaintiffs' Counsel regarding the Settlement.  Pursuant to the PSLRA, Class Representative Chace requests $5,000 based on the

time he spent participating in and supervising this case on behalf of the Class. *See* Chace Decl. ¶¶17-19.

249.    In total, therefore, Class Representatives seek approval for an aggregate $21,515 in costs and expenses relating to their representation of the Class in this matter. This amount is less than the maximum $100,000 in costs and expenses that the Notice stated Plaintiffs would be seeking from the Settlement Fund.

## XII.    CONCLUSION

250.    Given the excellent recovery achieved in this complex case in the face of hefty litigation risks that threatened to—even if Plaintiffs were otherwise successful in proving liability at trial—substantially curtail (if not eliminate) recoverable damages, it is respectfully submitted that the Settlement of $486,000,000, plus interest, should be approved as fair, reasonable and adequate, and further that the Plan of Allocation has a reasonable and rational basis and fairly allocates the recovery among Class Members and should be approved.

251.    Lead Counsel also respectfully submits that in view of the substantial recovery achieved, quality of the legal work performed, the contingent nature of the fee, the complexity of the case, the standing of Lead Counsel and other Plaintiffs' Counsel among their peers, and the quality of the defense by Defendants' eleven law firms that collectively presented a vigorous defense of the corporate and Individual Defendants' legal and equitable rights, the Fee Request in the amount of 28% of the Settlement Fund, should be awarded to Plaintiffs' Counsel, together with reimbursement of litigation expenses in the amount of $20,004,879.33, with interest on both the fee award and the expense award, from the date the Settlement was funded through the date of payment at the same net rate as earned by the Settlement Fund, in accordance with the terms of the Settlement Agreement and with the award of attorneys' fees to

be allocated among Plaintiffs' Counsel in a fashion which, in the opinion of Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of the Action.

252.    Finally, Lead Counsel also respectfully submits that a total of $21,515 in costs and expenses should be awarded to the Class Representatives relating to their representation of the Class in this matter.

Done at New York, New York this 11th day of November, 2016.


s/ Charles T. Caliendo
Charles T. Caliendo